## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO.  1:12-cv-333

| | | |
|---|---|---|
| KENNETH  L. HUNTER, RICK A. DONATHAN, and JERRY D. MEDLIN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his official capacity as Administrative Chief of Police of the Mocksville Police Department and in his individual capacity; CHRISTINE W. BRALLEY, in her official capacity as Town Manager of the Town of Mocksville and in her individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs, Kenneth L. Hunter, Rick A. Donathan, and Jerry D. Medlin, complaining of defendants, do hereby state and allege the following:

### ACTION

1.      Plaintiffs, certified and long-term law enforcement officers employed by the Mocksville Police Department until their recent terminations on December 29, 2011, institute this action to address retaliation against them as a result of their reports of and opposition to unlawful, improper and discriminatory practices within the Department by the administrative chief of police and other officers and

officials of the Town of Mocksville. Because plaintiffs spoke out against such practices, they have lost their jobs and have been subjected to severe damages to their reputations and careers. Plaintiffs have been deprived of their rights to free speech and other rights guaranteed by the United States and North Carolina Constitutions, and the law of North Carolina.

## JURISDICTION AND VENUE

2. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, and the Constitution and common law of North Carolina. Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

3. The unlawful practices alleged below were committed within the Middle District of North Carolina, and venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

4. Plaintiff, Kenneth L. Hunter, is and was at all times pertinent to this action, a citizen of the United States and a resident of Davie County, North Carolina.

5. Plaintiff, Rick A. Donathan, is and was at all times pertinent to this action, a citizen of the United States and a resident of Davie County, North Carolina.

6. Plaintiff, Jerry D. Medlin, is and was at all times pertinent to this action,

2

a citizen of the United States and a resident of Davie County, North Carolina.

7. Defendant, Town of Mocksville ("Town"), is a municipal corporation, established and existing pursuant to Chapter 160A of the North Carolina General Statutes, as defined and described in N.C. Gen. Stat. § 160A-11. In the exercise of its statutory powers, defendant Town has established and operates the Mocksville Police Department ("MPD") as a department of the Town. At all times relevant to this action, defendant Town acted through its managers and policymakers, including its administrative chief of police, town manager and members of its town board; and the acts, edicts, and practices of these persons represent the official policies of defendant Town. At all times relevant to this action, defendant Town was a "person" within the meaning and definition of 42 U.S.C. § 1983.

8. Defendant Robert W. Cook, is, upon information and belief, a resident of Davie County, North Carolina. At all times pertinent to this action, defendant Cook has held the position of administrative chief of police of the MPD. Defendant Cook is sued in his official capacity as administrative chief of police, and in his individual capacity.

9. Defendant, Christine W. Bralley, is, upon information and belief, a resident of Davie County, North Carolina. At all times pertinent to this action, defendant Bralley has held the position of town manager. Defendant Bralley is sued

3

in her official capacity as town manager, and in her individual capacity.

## FACTS

### Kenneth L. Hunter

10. The plaintiff Kenneth L. Hunter ("Officer Hunter") has been certified as a sworn law enforcement officer by the State of North Carolina, pursuant to North Carolina General Statutes § 17C-2, since 1980.

11. On April 12, 1985, Officer Hunter was hired by the MPD as a patrol officer.

12. At that time, and for most of his tenure at MPD, Officer Hunter was one of the only, and sometimes the only, African-American officer in the MPD.

13. Officer Hunter's service to the MPD has been outstanding, and he has achieved a series of promotions over his 27-year career.

14. Specifically, as a result of his performance and experience, in 1996, Officer Hunter was promoted to the position of detective; in 2000, he was promoted to the rank/position of sergeant; in 2005, he was promoted to the rank/position of captain; and in 2008, he was promoted to the rank of major and position of assistant chief of police.

15. In 2008, at the time of his promotion to the position of assistant chief of police, defendant Cook informed Officer Hunter that he was also promoting

4

Daniel Matthews to the position of assistant chief because the town board would not permit him to appoint a single assistant chief of police who was African-American.

16.    From 2008 until November 28, 2011, Officer Hunter continuously served MPD as assistant chief of police. He was generally respected by police officers of the MPD and the public, and held an exemplary record.

17.    Officer Hunter has been consistently commended for his accomplishments, earning such honors as the Legion of Merit Award in 1988; the Jaycees Outstanding Officer of the Year in 1997; the Meritorious Service Award from the MPD in 1998; the N.C. Governor's Award for outstanding community service in 2000; Outstanding Executive of Who's Who for 2009; as well as multiple letters and expressions of commendation and appreciation.

18.    As his history reflects, at all times pertinent to this action, Officer Hunter has been an exceptional officer of the MPD and has diligently carried out his police duties.

## Rick A. Donathan

19.    The plaintiff Rick A. Donathan ("Officer Donathan") has been certified as a sworn law enforcement officer by the State of North Carolina, pursuant to North Carolina General Statutes § 17C-2, since 1997.

5

20.     Officer Donathan was hired by the MPD on May 7, 1998, as a patrol officer.

21.     Officer Donathan's service to the MPD has been outstanding, and he has achieved a series of promotions over his 13-year career.

22.     As a result of his performance and experience, on July 1, 2007, Officer Donathan was promoted to the rank/position of sergeant; and on November 28, 2011, he was promoted to the rank/position of lieutenant in the patrol division.

23.     At the time of his most recent promotion to lieutenant, defendant Cook informed Officer Donathan that he was an exemplary officer, and that he wanted to see Officer Donathan as the next captain over the patrol division in the near future.

24.     During Officer Donathan's 13 years of service with the MPD, he has been consistently commended for his accomplishments, earning the Officer of the Year Awards in 2000 and 2007; the 2007 Silver Star Award for Bravery; induction into the National Police Hall of Fame in Titusville, Florida, for saving the lives of eight people from a burning building while he was on duty; as well as multiple letters and expressions of commendation and appreciation.

6

25.     As his history reflects, at all times pertinent to this action, Officer Donathan has been an exceptional officer of the MPD and has diligently carried out his police duties.

### Jerry D. Medlin

26.     The plaintiff Jerry D. Medlin ("Officer Medlin") has been certified as a sworn law enforcement officer by the State of North Carolina, pursuant to North Carolina General Statutes § 17C-2, since 2002.

27.     Officer Medlin was hired by the MPD on June 25, 2006 as a patrol officer.

28.     Before his employment with the MPD, Officer Medlin served for four years as a patrol deputy and school resource officer for the Davie County Sheriff's Office.

29.     As a result of Officer Medlin's outstanding performance and experience, on January 1, 2008, he was promoted to the position of detective and was assigned to the investigations of felonies and misdemeanors, including murders, rapes, suicides, child sex abuse, and other serious crimes.

30.     In addition to serving the MPD, Officer Medlin was the co-founder and a board member of the Davie County Gang Awareness Task Force, and served the MPD as the designated gang officer; he was selected to develop and present the

7

Major Crimes Training Course for the MPD in 2011; and he has served as an instructor with the NC Justice Training and Standards Center since 2008.

31.    As a result of his service Officer Medlin has been consistently commended for his accomplishments, and in March 2010, he received the Meritorious Service Award for identifying and capturing one of North Carolina's ten most wanted criminals.

32.    As his history reflects, at all times pertinent to this action, Officer Medlin has been an exceptional officer of the MPD and has diligently carried out his police duties.

### The MPD

33.    The MPD is the primary law enforcement agency for the Town of Mocksville and was established by the Town pursuant to North Carolina General Statutes § 160A-281.

34.    In or about 2004, the Town employed defendant Cook as an administrative chief of police pursuant to North Carolina General Statutes § 160A-281.

35.    Defendant Cook is not a certified sworn law enforcement officer pursuant to North Carolina General Statutes, Chapter 17C.

8

## Corruption within the MPD

36. Since the Town's employment of defendant Cook, there has been a general perception, substantiated by facts and documents to which plaintiffs had access, that there was corruption within the MPD. The corruption was characterized by unlawfulness, dishonesty, self-dealing, abuse of power, racism, favoritism, and other misconduct detrimental and destructive to its mission of law enforcement in the community.

37. The general perception of corruption was held by officers within the MPD, and residents of the community.

38. The general perception of corruption was fueled by the fact that defendant Cook was surrounding himself with those who supported and protected him from scrutiny, and participated in unlawful and improper conduct; and was excluding those who objected to or questioned the legality or propriety of his practices.

39. The corruption involved defendant Cook and his closest confidantes, particularly Assistant Chief Daniel Matthews.

40. The plaintiffs, in good faith, and with supporting facts and documents, were aware of the corruption and the perception thereof within the MPD and the community, and the damage to the MPD and its reputation.

41. Upon information and belief, the corrupt practices on the part of the MPD include, but are not limited to, the following:

  a. Defendant Cook has impersonated a certified sworn law enforcement officer in violation of North Carolina General Statutes §14-277 in operating a police vehicle with blue lights and sirens, and in making traffic stops and detaining individuals for arrest.

  b. Defendant Cook has violated policy in openly displaying and consuming alcohol while in uniform and armed with a weapon.

  c. Defendant Cook has mishandled and misappropriated funds from the drug forfeiture account held by the MPD for his personal benefit and for the benefit of others.

  d. Defendant Cook has mishandled and misappropriated funds belonging to the local Law Enforcement Association in connection with the operation of their firing range for his personal benefit and for the benefit of others.

  e. Assistant Chief Matthews, with the approval of defendant Cook, has engaged in *double-dipping*, receiving pay for teaching classes for Davidson County Community College as a Firearms Instructor while on duty with MPD, thereby receiving double pay from the Town and

10

the community college for the same hours; and has used MPD facilities to teach other classes for his own financial gain.

f. Defendant Cook has repeatedly violated labor laws regarding overtime compensation owed to officers of the MPD by fabricating timesheets or altering officers' descriptions of time, failing to pay compensation due to the officers.

g. Defendant Cook has engaged in blatant racial discrimination against Officer Hunter and the only other African-American officer of the MPD, as set forth in more detail below, and has used racist epithets and approved the use of racist epithets by officers within the MPD.

h. Defendant Cook has engaged in and approved unlawful and improper actions on the part of MPD officers, including the unlawful breaking and entering of a motor vehicle; "fixing" tickets for favored citizens; and other actions which are unlawful, improper and corrupt.

42.     While officers were generally aware of the corruption, they did not have access to information necessary to prove specific acts of misconduct, and did not have the authority to initiate an investigation.

43.     Officers, including plaintiffs, who were committed to upholding the law, and who opposed the corruption within the MPD under defendant Cook's

11

leadership, feared retaliation if they spoke out against the corruption.

44.     Citizens within the community were aware of and publicly discussed the corruption within the MPD, and expressed disapproval of defendant Cook's leadership.

45.     The corruption in the MPD detrimentally affected the morale of the MPD, and impaired the ability of the MPD to carry out its mission.

46.     For the past several years, the town manager, defendant Bralley, was informed of corrupt practices within the MPD.   Because of the number of complaints, defendant Bralley announced to officers of the MPD that she had an "open door policy," in which officers of the MPD could come to her to report and discuss any concerns they had regarding the MPD without fear of retaliation.

47.     As a result of defendant Bralley's announcement, many officers of the MPD, including plaintiffs, went to her and reported incidents of corruption within the MPD.

48.     Nevertheless, despite defendant Bralley's assurances, defendant Cook retaliated against officers of whom he was aware, who had reported his misconduct to defendant Bralley.

49.     Officer Medlin delivered a sealed letter to defendant Bralley reporting defendant Cook's misconduct.   Thereafter, defendant Cook, informed of Officer

12

Medlin's reports to defendant Bralley, demoted Officer Medlin from his position as detective for investigations without cause. Officer Medlin appealed the demotion to defendant Bralley who, upon information and belief, prevailed upon defendant Cook to reinstate Officer Medlin to his former position.

50. Despite the many reports of corruption within the MPD, neither the Town nor defendant Bralley took any remedial action to address corruption within the MPD or to discipline defendant Cook.

## Events Leading to Plaintiffs' Terminations

51. In June of 2011, the hostile atmosphere within the MPD escalated as two detectives, who had previously used racist epithets and displayed racist conduct, harassed the only African-American officer within the MPD other than Officer Hunter. As a result of the harassment, on or about June 28, 2011, upon information and belief, the African-American officer made a complaint to the SBI.

52. On or about July 14, 2011, the African-American officer was helping some motorists start their car in the parking lot of a service station when he was publicly berated and cursed by the same two detectives.

53. The African-American officer reported the incident to Officer Donathan, his supervising officer. Officer Donathan encouraged him to stand up against the racial harassment, and report it to defendant Cook.

13

54.     In addition, Officer Donathan discussed the incident with the supervising detective, and informed the detective that he had conducted an investigation, and that witnesses at the scene had substantiated that the African-American officer had done nothing to provoke or justify the detectives' conduct. The supervising detective terminated the discussion when he received a call from Assistant Chief Matthews.

55.     On the same date, the African-American officer was called into a meeting with one or both of the detectives, defendant Cook, Assistant Chief Matthews and defendant Bralley.  The officer requested repeatedly that his supervising officer, Officer Donathan, be permitted to come to the meeting since Officer Donathan was familiar with the facts concerning the incident, and had conducted an investigation.  The officer's request was denied.

56.     At the conclusion of the meeting, defendant Cook imposed discipline of six months probation on the African-American officer although the officer had done nothing to provoke or justify the detectives' actions.  When the officer challenged the discipline, defendant Cook immediately terminated his employment.

57.     The officer appealed to defendant Bralley, and was ultimately reinstated under probation.

14

58.    In August, 2011, Officer Donathan objected to Assistant Chief Matthews' unlawful treatment of overtime compensation, and Matthews responded that he was following defendant Cook's orders.

59.    In November, 2011, defendant Cook called Officer Donathan and requested that he meet with him.  Officer Donathan, who was not on duty, went to defendant Cook's house and spoke with defendant Cook.   During their conversation defendant Cook informed Officer Donathan that he was an "exemplary" officer, and that defendant Cook was promoting him to the position of lieutenant, along with the promotions of other officers of the MPD.  Defendant Cook admonished Officer Donathan, however, that he would need to adhere to the "politics" of the MPD, and go along with defendant Cook's management of the MPD.  Officer Donathan responded that he was not interested in "politics," and that he simply wanted to do his job as a sworn law enforcement officer.

60.    On or about November 28, 2011, defendant Cook announced promotions within the MPD.  As result of the promotions, Officer Donathan was promoted to the rank of lieutenant.

61.    On the same date, defendant Cook announced a new chain of command in which Matthews was promoted to the newly established position of deputy chief of police as defendant Cook's second-in-command.

15

62.     Officer Hunter, who had vastly more experience and was more highly qualified than Matthews, was effectively demoted, and required to report directly to Matthews for the first time.

63.     In addition, Officer Hunter's job duties were modified to strip him of his supervisory duties over four officers in the investigations division, and to place him over the department's vehicles.   When Officer Hunter questioned the reorganization, defendant Cook informed him that some of his subordinate officers—including officers who had used racist epithets and displayed racist conduct in the past—did not want to work under him.  Officer Hunter responded that he had never been notified of any problems in his supervision, but defendant Cook refused to provide any further explanation.

64.     Defendant Cook's "reorganization," placing Matthews over Officer Hunter and stripping him of his supervisory duties as assistant chief, resulted from the facts that Officer Hunter had refused to go along with defendant Cook's corrupt practices, and that defendant Cook and his supporters in the MPD, including Assistant Chief Matthews, did not want an African-American officer in the top command structure.

16

65.     On November 28, 2011, Officer Hunter filed a grievance with defendant Cook and defendant Bralley to contest Matthews' promotion over Officer Hunter, and other corrupt practices within the MPD.

66.     On November 30, 2011, defendant Cook informed Officer Hunter in a memorandum that he had "no avenue of appeal" and that the matter was considered "dropped."  Officer Hunter requested that his appeal be forwarded to the next level of resolution.

67.     Defendant Cook sent a second memorandum to Officer Hunter to notify him that Officer Hunter "will report directly to [his] next in command Deputy Chief Daniel Matthews."

68.     On December 1, 2011, Officer Hunter wrote to defendant Cook clarifying that he was appealing defendant Cook's actions to the next level.

69.     On December 13, 2011, when he did not receive any reply, Officer Hunter wrote directly to defendant Bralley, as town manager, explaining that defendant Cook's decision to promote Matthews over Officer Hunter was against Town policy, and was motivated by Officer Hunter's race, and his commitment to speak up against improper conduct on the part of defendant Cook.  Officer Hunter outlined incidents over the past several years that created the hostile and corrupt environment of the MPD.  Officer Hunter requested a hearing.

70. Defendant Bralley failed to respond, or take any action with respect to Officer Hunter's grievance, thereby approving and ratifying defendant Cook's decision.

## The Terminations of Plaintiffs on December 29, 2011

71. By early December, 2011, plaintiffs had concluded that the corrupt environment of the MPD had become a serious cause of concern for the Town of Mocksville and its residents.

72. As a result, plaintiffs met and determined that it was their duty as concerned citizens of Mocksville and committed law enforcement officers to seek an investigation by state officials concerning the corruption of the MPD.

73. Fearing for the security of their law enforcement careers, plaintiffs purchased a disposable cell phone that could be used to report their citizen complaints separately from their affiliation with the MPD.

74. On or about December 14, 2011, Officers Hunter, Donathan, and Medlin used the disposable cell phone to make telephone calls to the North Carolina Attorney General's Office and North Carolina Governor Beverly Purdue's Office, seeking an investigation of the MPD.

75. On that date the officers reached officials of Governor Purdue's Office. Concerned about retaliation if their identities were disclosed to defendants,

18

the officers informed the officials that they had serious concerns with a law enforcement agency in Mocksville; and reported defendant Cook's acts of corruption within the MPD, as described in ¶ 41 above. The officers requested an independent investigation.

76.     The officials in the Governor's Office informed the officers that they could request an investigation by the SBI, either directly or through the Governor's Office. The officers authorized the Governor's Office to make the request on their behalf, and provided their disposable cell phone number so the SBI could contact them to pursue an investigation without exposing their identities to defendant Cook.

77.     As of December 20, 2011, the officers still had not received a telephone call from the SBI on their disposable cell phone. On that date, however, Officer Medlin saw an SBI Agent who was known to be particularly close to defendant Cook and Deputy Chief Matthews in the MPD offices. The agent initially met with Matthews, and spoke with defendant Cook by telephone; and then, upon information and belief, the two left to meet with defendant Cook.

78.     On December 22, 2011, the same SBI agent called the plaintiffs' disposable cell phone and left a message for the owner of the phone to call him. Having seen the agent at the MPD in contact with defendant Cook and Matthews,

19

and having experienced the agent's interaction with defendant Cook previously, the officers were concerned that they would be exposed to defendant Cook for reporting the corruption of the MPD. Through fear of retaliation, the officers did not return the call at that time, but considered their next step in seeking an independent investigation.

79. On December 29, 2011, Officers Donathan and Medlin received calls from Matthews, requesting that they report to the office that afternoon. Between approximately 3:00 p.m. and 3:30 p.m., Officer Donovan and Officer Medlin each met separately with defendant Cook and Deputy Chief Matthews, and were abruptly terminated from their employment with the MPD. On the same date, Officer Hunter's employment with MPD was terminated at his home.

80. When the officers requested an explanation, defendant Cook refused to inform them of the true basis for his action.

81. The actual basis for defendant Cook's decision to terminate plaintiffs was to retaliate against them for seeking to expose his corruption, and to remove them from their positions in which they could challenge his misconduct within the MPD.

82. Officer Donathan requested assistance for the plaintiffs from a town board member and defendant Bralley. The town board member refused to take

20

action, instead referring Officer Donathan to defendant Bralley. Defendant Bralley, who was aware that defendant Cook had terminated plaintiffs because of their objections to and reports of his misconduct, approved and ratified defendant Cook's action, and refused to reinstate Officer Donathan.

83. Following their terminations, defendant Cook and Deputy Chief Matthews went through all items of property in plaintiffs' offices, and withheld personal property from them.

### ADDITIONAL FACTS ESTABLISHING LIABILITY OF OFFICIAL CAPACITY DEFENDANTS

84. As alleged above, at all times pertinent to this action, defendant Cook held the position of administrative chief of police of the MPD, and acted under color of state and local law and authority, within the scope of his employment with the Town, and in furtherance of his employer's business, pursuant to the authority vested in him as the highest and final policy and decision maker within the MPD; and was responsible for enforcing policies, regulations and rules to insure that MPD employees complied with the Constitution and laws of the State of North Carolina and of the United States. Defendant Cook's actions, as alleged herein and as defined under North Carolina law, were corrupt, malicious and beyond the scope of his official duties. Defendant Cook is liable in his official capacity, as well as his individual capacity, for his violations of plaintiffs' Constitutional and

21

legal rights; and for the acts of his subordinates, specifically including Deputy Chief Matthews, of which he was aware or of which he was deliberately indifferent.

85.     As alleged above, at all times pertinent to this action, defendant Bralley held the position of town manager of the Town of Mocksville, and acted under color of state and local law and authority, within the scope of her employment with the Town, and in furtherance of her employer's business, pursuant to the authority vested in her as the highest and final policy and decision maker of the Town; and was responsible for enforcing policies, regulations and rules to insure that MPD employees complied with the Constitution and laws of the State of North Carolina and of the United States.  Defendant Bralley's actions, as alleged herein and as defined under North Carolina law, were corrupt, malicious and beyond the scope of her official duties.  Defendant Bralley is liable in her official capacity, as well as her individual capacity, for her violations of plaintiffs' Constitutional and legal rights; and for the acts of defendant Cook, of which she was aware or of which she was deliberately indifferent.

86.     As alleged above, at all times pertinent to this action, the defendant Town acted through its managers and policymakers, including its administrative chief of police, town manager and members of the town board; and the acts, edicts,

22

and practices of these persons represent the official policies of defendant Town. At all times pertinent to this action, defendant Town condoned, acquiesced in, and ratified the conduct of its town manager and administrative chief of police, and acted with gross and deliberate indifference to plaintiffs' Constitutional and legal rights to report corruption within the MPD. Accordingly, the Town is liable for the violations of plaintiffs' Constitutional and legal rights.

87.     During the time period pertinent to this action, defendant Town, including its town board members, its town manager and its administrative chief of police, to whom it had delegated authority over the MPD, failed to carry out their official responsibilities and duties, as follows:

    a.  In failing to supervise Town employees as to their legal obligations;

    b.  In retaliating against plaintiffs for their reports and complaints of corruption within the MPD, and their requests for assistance and protection;

    c.  In ratifying, condoning and acquiescing in the discriminatory and retaliatory actions of Town employees; and

    d.  In failing to take prompt corrective and/or disciplinary action to address corruption within the MPD.

23

## WAIVER OF IMMUNITY

88.    Upon information and belief, defendants have waived sovereign or governmental immunity through the purchase of one or more policies of liability insurance pursuant to N.C. Gen. Stat. § 160A-485, and/or by participating in a local government risk pool pursuant to N.C. Gen. Stat. § 58-23-5.

## CLAIMS FOR RELIEF

### First Claim for Relief
### First Amendment Violations – U.S. Constitution
### 42 U.S.C. §1983

89.    Plaintiffs hereby incorporate by reference the above paragraphs as if fully set forth herein.

90.    As set forth above, plaintiffs engaged in protected activity in that they exercised their Constitutional rights to free speech, as guaranteed by the First Amendment to the United States Constitution, in the following actions:

a.  In objecting to the corrupt acts on the part of defendant Cook and his confidantes within the MPD;

b.  In reporting the corrupt acts on the part of defendant Cook and his confidantes within the MPD to the Governor's Office; and

24

      c.  In seeking an independent investigation of the corrupt acts on the part of defendant Cook and his confidantes within the MPD.

91.    Plaintiffs' Constitutional rights, as alleged in ¶ 90, were clearly established at the time of defendants' violations, and a reasonable manager in defendants Cook's and Bralley's positions would have known that his or her conduct violated plaintiffs' rights.

92.    The above actions, described in ¶ 90, were not part of plaintiffs' official duties or within the scope of their employment as law enforcement officers of the MPD.

93.    In taking the above actions, as described in ¶ 90, plaintiffs exercised their rights to free speech on matters of immense public concern to the community which outweighed any claimed interest on the part of the Town.

94.    In taking the above actions, as described in ¶ 90, plaintiffs spoke out as citizens of the community.

95.    In their terminations of plaintiffs, defendants, acting under color of state and local law, denied to plaintiffs their Constitutional rights to free speech; and retaliated against them for the exercise of their rights, guaranteed by the First Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.

25

96.     As a proximate result of said violations, plaintiffs have suffered and incurred substantial damages, and are entitled to punitive damages and equitable relief, as more fully described below.

**Second Claim for Relief**
**Free Speech Violations -- N.C. Constitution**
**Article I, Sections 1 and 14**

Pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, plaintiffs state the following claim against the defendant Town and the individual defendants in their official capacities, alternatively to their Third Claim for Relief below:

97.     Plaintiffs hereby incorporate by reference the above paragraphs as if fully set forth herein.

98.     As set forth above, plaintiffs engaged in protected activity in that they exercised their state Constitutional rights to free speech, as guaranteed by Article I, §§ 1 and 14 of the North Carolina Constitution, in the following actions:

a. In objecting to the corrupt acts on the part of defendant Cook and his confidantes within the MPD;

b. In reporting the corrupt acts on the part of defendant Cook and his confidantes within the MPD to the Governor's Office; and

c. In seeking an independent investigation of the corrupt acts on the part of defendant Cook and his confidantes within the MPD.

99.   Plaintiffs' state Constitutional rights, as alleged in ¶ 98 were clearly established at the time of defendants' violations, and a reasonable manager in defendants Cook's and Bralley's positions would have known that his or her conduct violated plaintiffs' rights.

100.   The above actions, described in ¶ 98, were not part of plaintiffs' official duties or within the scope of their employment as law enforcement officers of the MPD.

101.   In taking the above actions, as described in ¶ 98, plaintiffs exercised their rights to free speech on matters of immense public concern to the community.

102.   In taking the above actions, as described in ¶ 98, plaintiffs spoke out as citizens of the community.

103.   In their terminations of plaintiffs, defendants, acting under color of state and local law, denied to plaintiffs their state Constitutional rights to free speech, guaranteed by §§ 1 and 14 of Article I of the North Carolina Constitution.

104.   To the extent plaintiffs' Third Claim for Relief is barred by the defense of governmental immunity, plaintiffs allege that they have no adequate remedy under state law for the defendants' violation of their rights to free speech, as alleged herein.

105.   As a proximate result of said violations, plaintiffs have suffered and

27

incurred substantial damages, and are entitled to punitive damages and equitable relief, as more fully described below.

### THIRD CLAIM FOR RELIEF
**Wrongful Discharge Against Public Policy**

Pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, plaintiffs state the following claim alternatively to their Second Claim for Relief above:

106. Plaintiffs hereby incorporate by reference the above paragraphs as if fully set forth herein.

107. It is the public policy of the State of North Carolina, as mandated by Article I, § 14 of the North Carolina Constitution, that employees of local government be encouraged to object to and to report dishonest, unscrupulous, illegal, improper and unethical acts by public officials; to request an independent investigation of potentially unlawful and improper acts by public officials; and that they be protected from retaliation for reporting and objecting to said acts, and for exercising their rights to free speech.

108. Plaintiffs were discharged from their employment with the MPD as a direct result of and in retaliation for their protected activity in objecting to and reporting the above acts; for seeking an independent investigation thereof; and for exercising their rights to free speech. Accordingly, defendants' discharge of

28

plaintiffs was wrongful and unlawful and in violation of the public policy of the State of North Carolina.

109.   As a proximate result of said violations, plaintiffs have suffered and incurred substantial damages, and are entitled to punitive damages and equitable relief, as more fully described below.

## DAMAGES AND INJUNCTIVE RELIEF

110.   Plaintiffs hereby incorporate by reference the above paragraphs as if fully set forth herein.

111.   As a proximate result of defendants' termination of plaintiffs, each plaintiff has suffered substantial personal injuries and other damages in the deprivation of his Constitutional and legal rights, and the termination of his employment, including: lost income and benefits; emotional distress and mental anguish; loss of enjoyment and quality of life; damage to his employment reputation, and the potential loss of his law enforcement career.  Accordingly, each plaintiff is entitled to compensatory damages in an amount in excess of $100,000.

112.   Defendants' actions, as described above, were willful and wanton, and evinced an intentional or reckless indifference to and disregard for the legal rights of the plaintiffs.  Accordingly, each plaintiff is entitled to punitive damages against the individual defendants in an amount to be determined in the discretion of the jury.

113.    There is no fully adequate remedy at law in that plaintiffs cannot be totally compensated in damages for the loss of their livelihoods.  Thus, in the absence of injunctive relief, plaintiffs will sustain irreparable harm.  Accordingly, plaintiffs should be reinstated to their positions with the MPD, and the defendants should be enjoined from further violations of plaintiffs' rights.

### REQUEST FOR RELIEF

WHEREFORE, plaintiffs hereby request the following relief:

1.      That the Court declare that the terminations and other actions against plaintiffs by defendants were in violation of plaintiffs' federal and state Constitutional rights to free speech, and the public policy of North Carolina;

2.      That each plaintiff be reinstated to his respective position as a law enforcement officer with the Mocksville Police Department;

3.      That each plaintiff recover of defendants, jointly and severally, compensatory damages in an amount in excess of $100,000;

4.      That each plaintiff recover punitive damages against the individual defendants in an amount in the discretion of the jury;

5.      That plaintiffs recover pre-judgment and post-judgment interest on all amounts recovered herein;

6.      That plaintiffs recover the costs of this action, including reasonable

30

attorneys' fees for their representation herein pursuant to 42 U.S.C. § 1988; and

7.     That this Court grant additional relief which it deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury on all issues presented herein.


This the 5th day of April, 2012.


/s/ Robert M. Elliot
Robert M. Elliot (7709)
Alison L. Maddux (39877)
ELLIOT PISHKO MORGAN, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Telephone:  (336) 724-2828
Facsimile:   (336) 714-4499
rmelliot@epmlaw.com
amaddux@epmlaw.com
Attorneys for Plaintiffs

31