# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil No: 1:12-cv-333

KENNETH L. HUNTER, RICK A.    )
DONATHAN, AND JERRY D.    )
MEDLIN,    )
            **Plaintiffs,**    )
   )
     **v.**    )
   )
TOWN OF MOCKSVILLE,    )
NORTH CAROLINA; ROBERT W.    )
COOK, in his official capacity as    )
Administrative Chief of Police of the    )
Mocksville Police Department and in    )
his individual capacity; CHRISTINE    )
BRALLEY, in her official capacity as    )
Town Manager of the Town of    )
Mocksville and in her individual    )
capacity,    )
            **Defendants.**    )

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

_____

## OPENING STATEMENT

From approximately 1:00 PM to 4:00 PM on the afternoon of December 29, 2011, plaintiffs, three distinguished officers of the Mocksville Police Department (MPD) were summarily fired by the administrative chief of police, Robert W. Cook, and the Mocksville Town Manager, Christine Bralley. The terminations of the officers were shocking for several reasons.

First, the three officers had exceptional records. Major Hunter had served the MPD for 27 years, and had risen to the second position from the top, as one of only two African-American officers of the MPD. Lieutenant Donathan had served the MPD for 13

1

years, and had been repeatedly commended as one of the top officers of the MPD, and had been promoted one month before his termination. Detective Medlin had served the MPD for seven years, investigating some of the most serious crimes reported to the MPD, and had been honored for his work in apprehending one of North Carolina's ten most wanted criminals.

Second, there were no credible grounds to support defendants' actions, based on the performance of the officers. As stated, each had an exceptional record, and none had ever received any significant disciplinary action. PX 12.[1]

Third, Cook's action was unprecedented. In his six years of managing and supervising the 25 officers of the MPD, Cook had never fired an officer. Even when credible grounds existed—when officers had engaged in threatening violence, substance abuse and other unlawful conduct—Cook had either overlooked their transgressions or permitted the officers to resign. PX 1.

In the light most favorable to plaintiffs—or even under a higher standard—there is only one plausible explanation for defendants' termination of three of the MPD's most experienced officers. Cook had discovered, directly or indirectly, that the three officers had reported his misconduct to the Office of Governor's Counsel ("Governor's Office") and requested an investigation of corruption within the MPD. In terminating the three

---

[1] Citations to "PX ___" refer to exhibits filed by plaintiffs in support of their response. *See* Plaintiffs' Notice of Exhibits Filed in Response to Defendants' Motion for Summary Judgment.

2

officers for their report, Cook, with the full approval of defendant Town Manager Bralley, violated the plaintiffs' rights to free speech.

## PROCEDURAL HISTORY

Plaintiffs filed this action seeking damages, pursuant to federal and state law, for violations of their rights under the First Amendment to the United States Constitution; Article I, §§ 1 and 14 of the North Carolina Constitution; and the public policy of North Carolina. [Doc. 1]. Defendants have denied the substantive allegations of the complaint. [Doc. 8]. Following full discovery, defendants have filed their motion for summary judgment as to all of plaintiffs' claims. [Doc. 37].

Plaintiffs' have filed their response, and this memorandum, along with declarations, documentary evidence, and sworn testimony raising genuine issues of material fact requiring a trial by jury as to each of plaintiffs' claims.

## THE EVIDENCE
### Background -- Cook's Administration

On May 2, 2005, defendant Cook was appointed administrative chief of police of the MPD. PX 16. It was known at the time that Cook was not a certified law enforcement officer. In response to concerns raised, Cook promised to obtain his certification. PX 19. He never did. When asked why, Cook attributed his failure to his health. PX 63 (pp. 41-44).

At the time of Cook's appointment, defendant Bralley was the Town Manager. The two were apparently very close. PX 16, 45-46. Bralley had worked for the town for

3

35 years, had married the former Town Manager, and had been elevated to her husband's former position when he took a similar position with County. PX 64 (p. 29).

Over the years, Cook's leadership of the MPD caused significant turmoil. While he never became certified, Cook apparently acted the part. He drove a police car equipped with blue lights and siren (PX 63, pp. 47-49), at a cost of approximately $ 2,500 to the town, although Cook was prohibited by law from using the equipment.[2]  PX 11; *N.C. Gen. Stat. § 14-277.*    Cook's drinking, apparently in public and private, had become the source of comments within the community. PX 9-10, 37-38. Both Cook and his assistant chief, Daniel Matthews, were suspected of financial mismanagement in their maintenance of the MPD's drug forfeiture account, as well as in their apparent dictatorial leadership over the Davie County Law Enforcement Association ("DCLEA"). PX 1-3, 8, 25. In addition, there were suspicions that Matthews was involved in "double-dipping," receiving town pay as a police officer while receiving pay from others for teaching. PX 1, 12. There also had been allegations of racism within the MPD and use of racial slurs. PX 1, 26, 33, 75 (pp. 45-46).

These and other concerns had been raised by the plaintiffs and others. In fact, when Town Manager Bralley, due to the demand of MPD officers, established an "open door" policy to receive complaints, her invitation triggered multiple complaints of

---

[2] On at least one occasion of record, Cook did "impersonate" a certified law enforcement officer when he stopped and detained a driver. PX 1-3.

improper conduct on the part of Cook and Matthews. Bralley provided a record of some of these complaints. PX 61, 29.[3]

With respect to some of the complaints, Cook made it clear in his actions, that officers who had complained about his conduct would face retaliation. On June 29, 2009, plaintiff Medlin wrote a letter to Bralley specifically identifying conduct of Cook which was destructive to the effectiveness of the MPD throughout the community. PX 29 Medlin wrote as a citizen concerned for his town.[4]   Shortly after submitting the letter and speaking with Bralley, plaintiff Medlin was removed from his position as a detective and transferred to patrol. PX 30. It was only at Bralley's subsequent intervention that Medlin was reinstated to his position. PX 31-32, 3. On another occasion, when the only African-American officer of the MPD other than plaintiff Hunter reported racism within its ranks, he was subjected to a series of actions which led to his being placed on probation. PX 1-3, 42-43, 60, 69 (pp. 32-34).

Cook's questionable conduct and his abuse of power also became an issue in the management of the DCLEA, an organization which provides a shooting range and other facilities for law enforcement officers. Cook, Matthews and their counterparts in the Davie County Sheriff's Office (DCSO) had traditionally managed the organization with

---

[3] There is little evidence that Bralley ever made any serious efforts to determine the truth of the complaints or conduct an appropriate investigation.
[4] "We are going down hill at a fast pace and it appears that nothing is being done to stop it;" "the Police Department is supposed to be setting the example for the rest of the town and its citizens, but … we are falling very short … at this  time;" need "someone with the right mindset and morale [sic] character for the job;" "[p]lease don't let the department lose any more respect than it already has."

5

unquestioning control. For example, when a member of the organization raised issues about potential embezzlement or misuse of funds of the organization, he was muzzled, and rebuked by Sheriff Stokes. PX 1-3. When Jeff Allen, a dedicated hunting education teacher and shooting instructor for the local schools, questioned Matthews' use of money raised for the students, and asked for an accounting, he was banished from the DCLEA shooting range. PX 8.

Other conduct on the part of Cook and others raised significant public concern as to the effectiveness and reputation of the MPD with the community. For example, when an officer engaged in clearly unlawful conduct—breaking into a vehicle without probable cause, and mistreating a detainee—he was "slapped on the wrist" and allowed to retain his position. PX 1-3, 5, 29. After the institution of this action, the same officer was suspended after he was criminally charged and convicted of mishandling lottery tickets, and subsequently allowed to resign. PX 1, 64 (pp. 119-120).

### Plaintiffs' Terminations

In the months leading up to November 28, 2011, Cook was closing ranks around his inner circle of Daniel Matthews and others who shielded him. His move culminated with the restructuring of the MPD on November 21, 2011.

Prior to the restructuring, plaintiff Hunter and Matthews were assistant chiefs at an equal level reporting to Cook. PX 1, 20. Major Hunter supervised four detectives. He had an excellent record and was respected for his fair, but firm leadership and management. PX 3. While Hunter had encountered some problems due to his race, he

6

had overcome them, at least with respect to officers who were willing to accept his leadership. Hunter had never received any disciplinary action, reprimands or counseling. Yet, on November 28, he was relegated to a new position, subordinated to Matthews, a position in which his primary duties were to oversee the inventory of vehicles. He was stripped of all supervisory responsibilities. PX 1, 21.[5]

Prior to the restructuring, Officer Donathan was asked to come to Cook's house to talk to him. During the conversation, Cook praised Donathan for his "exemplary" performance, and told him that he was promoting him to lieutenant. Revealingly, Cook also implored Donathan to get in line with the "politics" in the office—presumably assuring him that if he did not raise issues and concerns, things would go well. PX 2. Donathan responded that he only wished to do his job, to be the best police officer he could be. Donathan was promoted, as informed, in early December. Additionally, as he was assisting Cook in reviewing applications for employment, Cook again confided to him that he was an excellent police officer. PX 2.

In the aftermath of the restructuring, plaintiffs and others believed that the reorganization held ominous signs for the community of Mocksville and the MPD. Five of the officers, including the three plaintiffs, met to discuss the issues. PX 1-3. They

---

[5] Plaintiff Hunter filed a grievance with Bralley concerning his "demotion," and reported some of Cook's misconduct over the years. PX 33. However, it became clear that Bralley would not take action, and when she indicated that she saw no unlawful or improper conduct in the grievance filed by Hunter, Hunter saw no reason to discuss the matters further, and told her he was going back to work. PX 1. Clearly, Bralley had confirmed her allegiance to Cook, and there was nothing to be gained and everything to be lost from further discussion. Defendants' contention that, in doing so, Hunter was purportedly acknowledging that there was no such misconduct, simply misses that point.

7

decided to seek an investigation, and plaintiff Hunter purchased a disposable cellphone ("Tracfone") at Wal-Mart under his daughter's name so that they could communicate with each other concerning their actions. PX 1, 15.

The plaintiffs arranged a meeting with several community leaders affiliated with the NAACP. They initially met in downtown Mocksville in an office, but moved to another location for fear of being seen by Cook or Matthews. Following their discussion, the leaders suggested that they seek help from a state agency. PX 1-3, 6-7.

In their quest for help in exposing the corruption of the MPD, the plaintiffs ultimately called the Governor's Office. Calling on their Tracfone, they initially spoke to an employee of the department, Vickie Jones. They reported specific examples of corruption, and expressed their fear of retaliation. While they called anonymously, they ultimately indicated that they were calling about the MPD. The Governor's Office advised the plaintiffs to seek assistance from the SBI, and offered to alert the State SBI office, and have them call the plaintiffs' Tracfone number. Plaintiffs assumed that the issues they had raised would be handled out of Raleigh since they had emphasized the closeness of the local law enforcement community. PX 1-3, 4-5.

During the week of December 19, 2011, Detective Medlin was at the MPD working one morning when he saw local SBI Agent D.J. Smith walking down the hall, approaching Matthews. Medlin was immediately concerned because Smith was closely acquainted with Cook and Matthews. Smith pulled out a piece of paper which he showed

8

to Matthews. Detective Medlin then heard Matthews ask the administrative assistant to call Cook, and shortly thereafter, the two left. PX 3.

Within a short time, two calls were made to the Tracfone. The first call at 9:59 a.m. on December 22 was from Detective Nelson Turrentine, who reported to Matthews. PX 13, 68, pp. 149-156, 12 (Timeline). The second call was from SBI Agent Smith who called at 2:39 p.m. on the same date. PX 15, 12 (Timeline), 59-60, 66-67. Neither call was answered by the plaintiffs. PX 1-3. Given the relationship between SBI Agent Smith, Matthews and Cook, plaintiffs became alarmed, and Major Hunter disposed of the Tracfone. PX 1-3.

Nevertheless, the plaintiffs were discovered within the next week. SBI Agent Smith was assigned the task of checking out the Tracfone number. Perhaps because he failed to document his actions, or from a suspicious lapse of memory, he testified that he does not recall who he spoke to concerning the Tracfone and the plaintiffs' call to the Governor's Office. Specifically, Agent Smith testified that he did not recall whether or not he was on the hall of the MPD with Matthews at the time Medlin saw them, and he did not recall whether or not he had given the Tracfone number to anyone within the MPD. He did recall calling Deputy Shuskey of the DCSO, who determined that the Tracfone had been owned by an individual whom Shuskey (mistakenly, as it turned out) connected to Hunter. PX 57, 66 (pp. 59-60); 70 (p. 18).[6]

_____

[6] Shuskey and Major Hunter had an acrimonious history, of which Smith was aware. For some years Shuskey had falsely accused Hunter of being involved in the drug community, based on the

9

Smith and Shuskey met, but Smith testified that he did not recall what action he took thereafter. Shuskey recalled that Smith came to his office, located at DCSO, informed him of the reports of the MPD to the Governor's Office, had Shuskey run the Tracfone number through the "CP Clear" database to determine the identity of the apparent owner, and connected the person to Hunter. PX 70. At that point, with knowledge that the MPD was the subject of the reports and investigation, Shuskey called his colleague at the MPD, Nelson Turrentine, and gave him the number so that he could check the number through MPD resources. PX 60, 70. Turrentine called the Tracfone number on December 22, 2011, then gave the number to administrative assistant, Donna Lawrence, who reported directly to Matthews and Cook, and his colleague, Detective Preston. PX 68 (p. 151). Turrentine could not recall who else might have received the Tracfone number, but it was clearly accessible to Matthews and Cook.

On December 27, 2011, the Sprint phone record for the MPD cellphones was issued. PX 49. The records clearly documented that plaintiffs Medlin and Donathan had called or received calls from the Tracfone number. PX 12. On that same day, Bralley was attempting to establish an online account with Sprint, purportedly so she and Cook

fact that some of Hunter's relatives, including a brother and nephew, had gotten into trouble, and served time. While these associations followed him, no credible evidence has ever established any connection between Hunter and criminal activity of his family members. Shuskey was also involved, along with Turrentine, in a drug operation in December, 2011, in which it was claimed that a store owner who was the subject of the investigation because he was selling a synthetic substance which, although lawful in other states and lawfully obtained by the store owner, had been recently made unlawful in North Carolina. While defendants may argue to the jury that plaintiff Hunter's advice to the store owner was improper, they will not be able to establish that Hunter knowingly violated his duties, or was aware of the investigation, or most importantly, that the incident was the reason for his termination. PX 1, 76 (p. 68).

could determine who had used the Tracfone.  PX 14.  Apparently, after establishing that the three plaintiffs were the ones who had reported the incriminating information to the Governor's Office, Bralley and Cook met and decided to terminate the plaintiffs.[7]

On December 29, each of the plaintiffs was terminated in sequence.  PX 1-3. They were given almost identical letters with purported "grounds" for termination.[8]   PX 22-24.   And while Cook denied, under oath, in his deposition that there was any connection between the terminations of the three plaintiffs and their report to the Governor's Office, he informed District Attorney Garry Frank, on or about the next morning that he could not have officers "undercutting [him] and causing trouble,"  PX 69 (p. 36); and in his *after-the-fact* memorandum, Cook informed the town attorney that one

---

[7] Bralley and Cook testified that they did not know about the existence of the Tracfone or its number.  However, as set forth below, Bralley also testified that at some point she had received an anonymous call about reports to the Governor's Office.  Since the only known reports to the Governor's Office were made by plaintiffs, Bralley knew more than she was willing to testify to. PX 5.  In addition, Cook testified in his deposition that before the termination of the plaintiffs, Bralley had stated that plaintiff Donathan had used his cell phone "37 hours" which was to become a "ground" for his termination—information that could only have been derived from the Sprint records.  *See* PX 63 (pp. 165-167); 12 (Donathan's cell phone entries on the December 27 record add up to 36.9 hours).

[8] Defendants will ask the jury to believe that the stated grounds accounted for plaintiffs' terminations, and that it was "coincidental" that each of the plaintiffs was terminated on the same afternoon.  Cook indicated under oath that each termination was independent of the others—that there was no joint activity of the three which led to the firings.  PX 63 (pp. 284-285).  Cook's testimony in this regard is patently unbelievable.  And other evidence, including evidence from Cook, belies the incredible notion that these three officers, each of whom had an exceptional record, would be simultaneously and independently determined to be subject to termination.  In fact, the "grounds" put forth by Cook and Matthews in their *after-the-fact* writings were false or grossly distorted.  PX 1-3, 54.  More importantly, none of the grounds rises to the level of terminable offenses, and, as stated above, none had been the subject of even a reprimand in the past.  PX 1-3.

11

of the grounds for his action was that the plaintiffs "conspire[d]" to discredit him and others with the "Governor with false information."  PX 54.

These facts, raise a reasonable, if not conclusive, inference that each of the plaintiffs was terminated because he exercised his right to free speech in reporting Cook's misconduct and the general corruption of the MPD to the Governor's Office and others.

## ARGUMENT

Rule 56 of the Federal Rules of Civil Procedure provides that, upon motion by defendant, summary judgment should be denied unless it is established from the pleadings, affidavits, and other evidence, that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. Rules of Civ. P.  56(c)*.  In reviewing the record before it, the court "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992).  The non-moving party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to him." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990).  Upon review, if each element of the non-movant's claim can be made out from the facts and reasonable inferences presented, the motion should be denied.  *Love-Lane v. Martin,* 355 F.3d 766 (4th Cir 2004).

# I.  PLAINTIFFS ARE ENTITLED TO TRIAL BY JURY ON THEIR FIRST AMENDMENT CLAIMS UNDER §1983

In their First Claim for Relief, plaintiffs allege that they were deprived of their rights to free speech under the First Amendment in violation of 42 U.S.C. § 1983. Plaintiffs have presented evidence: 1) that they exercised their rights to free speech on matters of public concern; 2) that plaintiffs' speech was not outweighed by the town's interests; and 3) that plaintiffs were terminated as a result of their speech. *Hall v. Marion School District No. 2*, 31 F.3d 183 (4th Cir. 1994); *Love-Lane v. Martin*, 355 F.3d 766 (4th Cir. 2004. Plaintiffs have forecast sufficient evidence to prove these elements.

## A.  Issues of public concern

The first issue presented is whether, considering the speech involved, plaintiffs were "speaking as [citizens], upon matters of public concern, or as [employees], upon matters of personal interest." *Hall*, 31 F.3d at 192. Defendants first argue, based on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), that plaintiffs' speech activity was not protected because they spoke as <u>employees</u>, and <u>not citizens</u>. In *Garcetti*, the Supreme Court found that a deputy district attorney, who complained about inaccuracies in affidavits supporting search warrants, spoke as an employee since he made the statements pursuant to his official duties. The Court reasoned that:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 US at 421-422. Significantly, the Court contrasted "expressions made by the speaker in *Pickering [v. Board of Educ.,* 391 U.S. 563 (1968)]*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day." *See also*, *Hall,* 31 F.3d 183.

In *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009), the Fourth Circuit clarified the distinction between speaking out as an employee and speaking out as a citizen. There, a Baltimore police officer claimed that defendants retaliated against him for releasing an internal memorandum which he had written to a newspaper reporter regarding a shooting incident in which a tactical unit of the police department had been involved. The court, distinguished *Garcetti*, recognizing that Andrew had acted as a concerned citizen, not pursuant to his official duties:

> Andrew was not under a duty to write the memorandum as part of his official responsibilities. He had not previously written similar memoranda after other officer-involved shootings. Andrew would not have been derelict in his duties as a BPD commander, nor would he have suffered any employment consequences, had he not written the memorandum. The memorandum was characterized by Clark as "unauthorized." The task of investigating officer-involved shootings falls upon the BPD's Homicide Unit and the Internal Affairs Division. Andrew did not work within either of these units nor did he have any control over their investigations.

561 F.3d at 264. The court reversed the district court's dismissal of Andrew's claim. *See also, Adams v. Trustees*, 640 F.3d 550 (4th Cir. 2011) (distinguishing *Garcetti*, finding that the plaintiff, a university employee, was protected in his publication of outspoken Christian and conservative views, even though he listed his publication on his promotion application); *Kirby v. City of Elizabeth City*, 388 F.3d 440 (4th Cir. 2004).

14

In *Walters vs. County of Maricopa, Arizona*, 2006 US Dist. LEXIS 60272 (D. Ariz. 2006), although the court ultimately found no adverse employment action, it analyzed and distinguished *Garcetti*, finding that plaintiff's "whistleblowing here does not fall within the scope of employment duties that he "was employed to do." The court admonished that "[a]ny attempt to inflate Walters' job descriptions so as to include blowing the whistle on other officers would likely exceed the 'practical inquiry' suggested by the Supreme Court," particularly in the context of "reporting misconduct to higher-ups in a separate governmental agency who do not have employment authority over Walters." 2006 US Dist. LEXIS 60272,*42-43. *See also, Dey vs. B Carlyle*, 2006 US Dist. LEXIS 46434 (M.D. Pennsylvania July 10, 2006) (holding that employment duties of police Corporal did not include reporting misconduct by a fellow officers); and *McLaughlin v. Pezzola*, 2010 US Dist. LEXIS 232 (NDNY 2010)(applicability of *Garcetti* depends on plaintiffs' job descriptions, person to whom speech was directed).

The plaintiffs blew the whistle on the practices of Cook and Bralley. In doing so, they spoke out, as citizens, on issues of public concern—issues on which they had no obligation to speak out pursuant to their official duties. The issues included excessive drinking of the police chief, the non-certified chief's impersonation as an officer, potential embezzlement by the chief and his assistant, the chief's apparent ratification of criminal misconduct by his officers, and issues including race discrimination.[9] None of

---

[9] There is some slight divergence between the reports of the Governor's Office (PX 5), and the plaintiff's recollections of their conversation (PX 1-3). Such divergence is, of course, explained

the plaintiffs had any obligation to report these issues, particularly to another entity of government; none was acting in his interest as an employee, given the relative security which each had within the MPD at the time, as opposed to the danger of retaliation; and none of the plaintiffs faced adverse action as an individual employee, if the issues were not resolved, or favorable action if they were. The issues were of unquestionable importance to citizens within the community who depended on their police department to function competently, with integrity and fairness, and a commitment to the law. PX 9-10, 8 (chief's drinking public concern), PX 8 (mismanagement of funds public concern), PX 6-7, 75, 1 (racial discrimination public concern), PX 1-3 (impersonation of officer public concern).

### B. Causation

Plaintiffs must establish that their protected speech was a substantial factor in the decision to terminate them, and "[i]f the causal facts . . . are in dispute, summary judgment is not appropriate." *Love-Lane*, 355 F.3d at 779.

The facts cited above provide a reasonable inference that plaintiffs were terminated as a direct result of their exercise of free speech. Given the near-undisputed pre-termination evidence of their excellent performance over the years, defendants cannot show, as a matter of law, any reason for their adverse action, other than plaintiffs' speech activity. Plaintiffs have presented near conclusive evidence that they were terminated solely because they spoke out, in an indisputably appropriate manner, concerning matters

by the tenseness of the call, as well as the preliminary nature of the exchange of information.

of public concern. *Hall*, 31 F.3d at 195; *Myers v. Town of Landis*, 957 F.Supp. 762

(MDNC 1996); *Love-Lane*, 355 F.3d at 781.

Defendants rely, primarily, on their contention that Cook and Bralley were not

aware of plaintiff's' reports to the Governor's Office. To the contrary, there is ample

evidence, direct and circumstantial, that defendants were aware of plaintiffs' reports, and

acted on their knowledge. Indeed, their actions cannot be explained otherwise.

The federal courts have recognized that, in proving causation in a First

Amendment case, as in analogous retaliatory discharge cases, a plaintiff may rely on

circumstantial evidence. For example, the Ninth Circuit has stated the following:

> In the free speech cases in which we have held that circumstantial evidence
> created a genuine issue of material fact on the question of retaliatory
> motive, the plaintiff, in addition to producing evidence that his employer
> knew of his speech, produced evidence of at least one of the following three
> types. First, … where he produced … evidence that the proximity in time
> between the effective action and the allegedly retaliatory employment
> decision was one in which a jury logically could infer that the plaintiff was
> terminated in retaliation for speech. Second, … where he produced …
> evidence that his employer expressed opposition to his speech, either to him
> or to others. Third, … where he produced … evidence that his employer's
> proffered explanations for the adverse employment action were false and
> pretextual.

*Walters vs. County of Maricopa, Arizona*, 2006 US Dist. LEXIS 6272 * 30 (D. Ariz.

2006).

The courts in various employment cases have noted that circumstantial evidence is

sufficient to prove knowledge of the employer of the protected activity. For example, in

a Title VII retaliation case, the court in *Sass v. MTA Bus Co.*, 2012 US Dist. LEXIS

17

142567, 116 Fair Empl. Prac. Cas. (BNA) 348 (ED NY 2012), recognized that a jury can base a finding of the employer's knowledge on circumstantial evidence, such as evidence that some employees in the decision-making chain were aware of the plaintiff's protected speech, even if the decisionmaker denies such knowledge. *See also, Hicks v. SSP America, Inc.*, 2012 US App. LEXIS 16233, 115 Fair Empl. Prac. Cas. (BNA) 1336 (6th Cir. 2012) (unpublished) (Attachment 1) (where the court held that knowledge of plaintiff's protected activity on the part of management employees and their interaction with the decisionmaker during the period supports an inference that the decisionmaker knew of the activity prior to the termination); *Dey vs. Colt Constr. and Dev. Co.*, 28 F.3d 1446, 1458-59 (7th Cir. 1994) (knowledge of protected activity in a retaliatory discrimination case may be shown by circumstantial evidence; "courts must be quite circumspect in evaluating the movant's factual averments [at the summary judgment] stage 'when *evidence bearing on a particular matter lies within the exclusive possession of the [defendant]'… and because "only [defendants] were privy to their own discussions, we must consider their self-serving denials with some circumspection."*)(emphasis provided).

Applying these principles, plaintiff has presented significant direct and circumstantial evidence establishing defendants' knowledge of their protected activity, coupled with temporal proximity between their protected activity and their terminations, and the fact that their employer's "proffered explanations of the [terminations] were false and pretextual," *Keyser*, 265 F.3d at 752, as follows:

18

- Each plaintiff had an exemplary record with MPD and was, based on all pre-termination evidence, secure in his position. PX 1-3.

- While plaintiff Hunter had been "restructured,"[10] there had been no indication that his job was in jeopardy. PX 1.

- Plaintiff Donathan had been promoted in November, and had been praised as an "exemplary" officer by Cook before and after the restructuring. PX 2.

- While plaintiff Medlin had raised issues concerning Cook's management and leadership in the past, there had been no indication that his job was in jeopardy. PX 3.

- On December 20-22, after plaintiffs had reported their concerns to the Governor's Office and provided their disposable cell phone number, SBI Agent D.J. Smith was on the hall of MPD, approached Matthews and showed him a paper, went into Matthews' office for a short time and Matthews came out and requested that Donna Lawrence, the administrative assistant, get in touch with Cook, and then they left, presumably to be with Chief Cook. PX 3.[11]

- Within the same time frame, Agent Smith provided the information he had received from the Governor's Office, including the disposable cell phone number, to Deputy Shuskey of the DCSO, an officer who had had a particularly acrimonious relationship with Hunter. Deputy Shuskey ran the number through the CP Clear database and determined that the disposable phone belonged to one Grimilda Rizera, whom he believed was connected to plaintiff Hunter. PX 57; 66, p. 59; 70 p. 9.

- After discussing his findings with Agent Smith, Deputy Shuskey called Detective Nelson Turrentine, with whom he worked closely in drug investigations, gave Turrentine the disposable cell phone number, and asked him to run the number through the MPD database. PX 70, p. 10.

---

[10] Defendants denied that Hunter was "demoted." PX 63, p. 75.
[11] Smith did not document any of his actions concerning his investigation of the disposable cell phone number, and, predictably, had significant "lapses" of recollection as to whether he had spoken to Matthews or Cook, whether he had gone to the MPD during the week, or whether he had talked to anyone else at the MPD concerning his inquiries. PX 66, p. 60. Nevertheless, the inference is clear in light of the sequence of events. PX 12 (Timeline).

- Detective Turrentine received the number and called it, but did not leave a message.[12] Turrentine recalls that he gave the number to his fellow detective, Preston, and administrative assistant, Donna Lawrence, both of whom reported directly to Matthews and Cook. When pressed as to whether he provided the number to Matthews, Turrentine initially stated that he did not recall doing so, and subsequently testified that he did not believe that he did so. He acknowledged that his direct superior, Matthews, would want to have that information. PX 68, pp. 159-160.

- SBI Agent Smith called the number, to his recollection, 3-4 times from December 22-23, and left a message on at least one call; and reported back to his superior, Agent Carson, that he had been unsuccessful in his effort to speak with the caller to the Governor's Office. PX 57, 59.

- On the afternoon of December 27, 2011, Town Manager Bralley called Sprint; stated that she "need[ed] to get the call detail for a number;" was instructed as to how to set up an online account; "placed [agent] on hold for more than 2 minutes;" and wouldn't "provide [agent] with a call back number." PX 14, 12 (Timeline). In making this call, Bralley, who was presumably with Cook, used a cell phone at the MPD, previously assigned to Wayne Stoneman, a retired officer of the MPD. PX 12. Bralley tried to access the online records six times within an hour, but failed due to "invalid PIN." She apparently succeeded in setting up the online account on the morning of December 28. PX 14.

- The Sprint records for the MPD, dated December 27, 2011, covering the period from November 24 to December 24, documented calls to and from the disposable cell phone number on plaintiff Donathan's and Medlin's phones. PX 12; 49, pp.23,28.[13]

---

[12] Turrentine denies that he intentionally called the number. Instead, he claims that in saving the number in his phone (allegedly, so he wouldn't have to write it down), he hit "send" and, with some delay "end," and the call was recorded on the Sprint Wireless Records. *See* PX 13. Turrentine, like Shuskey and Smith, also claims that he failed to document any of his actions, and no longer had the phone he used at the time. The failure to document by a police officer means, effectively, that "it didn't happen." PX 1, 55, 76. In any event, Turrentine's intent in calling the cell phone number is not significant, given his actions in turning over the number to others within the MPD, as set forth above.

[13] Cook and Bralley have denied that they saw cell phone records prior to the terminations, or knew of plaintiffs' call to the Governor's Office. Whether they saw the records, or indirectly received information from Turrentine, Shuskey or Smith as to their substance, their testimony is incredible, in view of the above sequence of events. In fact, Cook and Bralley had two means of discovering the information and identifying Donathan and Medlin, along with Hunter, as the

20

- During the time frame in which Cook and Bralley (or someone at their direction) were investigating the Sprint records, they also met to discuss the terminations of the three plaintiffs.  PX 64, pp. 79-82.

- On the afternoon of December 29, 2011, in sequence, defendants terminated plaintiffs without notice.  PX 1-3.[14]

- In his letters of termination, Cook claimed that each plaintiff was "insubordinate," and that Hunter "Rumored False Deter Mental [sic] Information"—charges which could only have referred to plaintiffs' report of their concerns to the Governor's Office.  PX 22-24.

- On or about the next morning, Cook called the District Attorney and reported that he had fired plaintiffs because he could not have officers "undercutting [him] and causing trouble."  PX 69, pp 34-36.

- In his *after-the-fact* memorandum to the town attorney, cataloging his grounds for terminating plaintiff Hunter, Cook stated that the plaintiffs had "conspire[d]" to discredit him and others with the "Governor with false information., and that the "SBI and DA have determined it to be slanderous and false."[15]  PX 54.

---

officers who were connected to the disposable cell phone, either by reviewing the hard copy after receiving it by mail on December 28 or 29, or online, as indicated in the Sprint Account Records. As further proof that defendants Cook and Bralley had the information from the cell phone records, Cook recalled that Bralley had mentioned, in the context of making a case that Donathan was being fired because of his cell phone usage, that Donathan had used his cell phone "37 hours" during a previous billing, which he vaguely recalled may have been in November.  PX 63, pp. 165-167.  In fact, the records in question document, predictably, that the "37 hours" was used by Donathan in December, a fact which Bralley could not have known without reviewing the records prior to the terminations.  PX 12.

[14] When asked why the three plaintiffs were selected for termination on the same afternoon, Cook denied that he suspected that they had "conspired" to take any collective actions, and claimed, incredibly, that it was a "coincidence."  PX 63, pp. 284-285.

[15] This final claim was absolutely untrue.  Neither the SBI nor the DA even conducted an investigation.  PX 66, 69.  In fact Smith refused to characterize his assignment concerning the cell phone number an *investigation*, instead calling it a *follow-up*.  PX 66, p. 12.

21

The above facts, coupled with Cook's demonstrated pattern of discipline,[16] and the lack of any evidentiary grounds for his actions, establish that Cook and Bralley terminated plaintiffs as a direct result of their exercise of their First Amendment rights in reporting to the Governor's Office issues of public concern. *See Jones v. Mathai*, 2010 U.S. Dist. LEXIS 31471 (ED MI. 2010) (issue of fact even when defendants deny knowledge of speech by sworn affidavit).

Defendants also argue, essentially, that plaintiffs' speech was, potentially disruptive, and that the interests of the MPD outweighed plaintiffs' rights to report corruption to the Governor's Office and request an investigation. As argued above, plaintiffs' speech raising issues concerning corruption within the MPD "involved core First Amendment expression," requiring that the "state must make a stronger showing of disruption in order to prevail." *Hall*, 31 F.3d at 195. Given the fundamental importance of the issues raised by plaintiffs, defendants cannot demonstrate a "countervailing interest" which outweighs plaintiffs' rights to free speech. *See Hall*, 31 F.3 at 194-195. Initially, defendants' claim of disruption is totally inconsistent with their persistent, albeit unbelievable, claims that they were not aware that plaintiffs had called the Governor's Office. In any event,

---

[16] As stated above, from his initial appointment of 2005 to 2011, Cook had never terminated an employee. He, presumably, had accepted resignations from two employees, one of whom had committed violent acts, and the other of whom had substance abuse issues. PX 1. He had failed to take any significant action against another officer who had apparently committed criminal conduct. PX 1-3. That same officer was subsequently, after this litigation was instituted, placed on administrative leave when he was charged with criminal offenses, and allowed to resign after he was convicted. PX 65 pp. 119-120. Indeed, the only consistency in Cook's personnel management was that officers who were loyal to him could count on leniency, and officers who raised issues would be subjected to retaliatory disciplinary action. PX 29-31.

22

plaintiffs' manner of reporting their concerns was designed to minimize any disruption, avoiding any public expression as in *Hall* and *Andrew*, and limiting their expression to those who have a *need-to-know*—the state agency they had requested to investigate the issues.

Defendants' argument in this respect should be overruled.

## II. PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH LIABILITY OF THE TOWN AND THEIR OFFICIAL CAPACITY CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

Under § 1983 an employer is responsible for constitutional violations which arise from policy, custom or practice. *City of Canton v. Harris*, 489 U.S. 378 (1989). Official policy may be established by omission, in the failure of responsible officials to make policy or enact regulations. *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992); *Avery v. County of Burke*, 660 F.2d 111 (4th Cir. 1981). Liability can also be founded upon a single action by an officer with final decisionmaking authority. *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985); and can be established when a supervising officer is deliberately indifferent to her subordinate's violation of his employee's constitutional rights. *See, e.g. Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001); *Board of County Comm'rs. of Bryan County v. Brown*, 520 U.S. 397 (1997) (municipal decisionmakers' "continued adherence to an approach that they know or should know has failed to prevent [unlawful] conduct by employees may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger municipal liability."); *McNulty v. Prince*

23

*George County*, 1993 U.S. App. LEXIS 3363 at *13-14 (4th Cir. 1993) (*citing* City of Canton v. Harris, 489 U.S. 378, 388-91 (1989)).

Defendants claim that the town is not liable under § 1983 because plaintiffs' rights were not violated through a policy of the town. The evidence establishes that Bralley was the final decisionmaker with respect to the employment of the plaintiffs, and that Cook was the final policymaker of the MPD. Although the pertinent statute, N.C. Gen. Stat. § 160A-148, indicates that the town board was authorized to make policy, the evidence is clear that the Board did not do so. It delegated all authority to make employment policies, particularly concerning police officers, to Bralley and Cook. And as town manager, Bralley was required to see that the town adhered to all laws. *Id*. There is no evidence that Bralley or Cook ever looked to the town board for approval of their decisions. To the contrary, Bralley had apparently unfettered authority to determine the fate of town police officers; she delegated that authority at the initial level to Cook. Indeed, when Donathan sought out a town board member after his discharge, he was sent back to Bralley. PX 2, 61. There are issues of fact as to the degree of control which Bralley exercised over Cook, and as to who the final policymaker was with respect to the hiring and firing of police officers. Bralley emphasized that she delegated hiring and firing decisions to Cook with respect to the MPD. PX 64, pp. 45-47; PX 22-24, 61. However, on several previous occasions, Bralley had retained the authority to reverse Cook's decisions. PX 2, 29-31.

24

In any event, the evidence, at minimum, raises issues of fact as to whether the town board (to the extent it was interested) and Bralley were aware of Cook's retaliatory motives, and either approved them, or were deliberately indifferent to Cook's retaliatory actions. *See Purdy v. Town of Greenburgh*, 178 F. Supp. 2d 439, (S.D.N.Y. 2002) (summary judgment denied due to issue as to who final policymaker is for personnel decisions in police department resolved in favor of plaintiff); *See also Gros v. The City of Grand Prairie, Texas,* 181 F.3d 613, (5th Cir. 1999) (summary judgment denied because there was a genuine dispute whether police chief had final policymaking authority); *Weeks v. City of Plano*, 1989 US Dist. LEXIS 2353 (N.D. Ill. 1989).

Defendant's motion as to the town's liability under § 1983 and plaintiffs' official capacity claims against the individual defendants should be denied.

### III. DEFENDANTS COOK AND BRALLEY ARE NOT ENTITLED TO QUALIFIED IMMUNITY SINCE THEY VIOLATED PLAINTIFFS' CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS TO FREE SPEECH IN THE TERMINATION OF PLAINTIFFS' EMPLOYMENT.

In order to defeat a qualified immunity defense, the burden is initially on the plaintiffs to: (1) articulate the constitutional right violated; (2) determine whether the right was clearly established at the time of the discharges; and consider whether a reasonable person in defendants' positions would have known that their actions were in violation of plaintiffs' rights. *Love-Lane*, 355 F.3d at 783.

Neither Cook nor Bralley can establish their defense of qualified immunity as a matter of law. Plaintiffs' rights were established at the time they exercised them. *Hall v.*

*Marion School District No. 2*, 31 F.3d 184 (4th Cir. 1994); *Andrew v. Clark*, 561 F.3d 261 (2009), and a reasonable police chief and town clerk, both required to uphold the law, would have known that their deceptive actions in terminating the plaintiffs for pretextual reasons was in violation of plaintiffs' rights. PX 55, 76, pp. 62-69. At minimum, there are issues of fact concerning the defense of qualified immunity as to each individual defendant which must be decided by the jury.

### IV. PLAINTIFFS' FREE SPEECH CLAIMS UNDER THE NORTH CAROLINA CONSTITUTION

As stated in *Corum v. University of North Carolina*, 330 NC 761, 413 S.E.2d 276, 289 (1992):

> . . . one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution. The provision of our Constitution which protects the right of freedom of speech is self-executing.
>      . . . .
> A direct action against the State for its violations of free speech is essential to the preservation of free speech.

413 S.E.2d at 289. Furthermore, the doctrine of sovereign immunity is not available to defendants with respect to such claims. 413 S.E.2d at 291 ("the doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their [Constitutional] rights."). Our North Carolina courts have generally applied federal constitutional principles to state constitutional claims. *Id*.

Plaintiffs, whose state constitutional rights have been abridged, have a direct claim under the appropriate constitutional provision. *Corum v. University of North Carolina*,

26

330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). However, the constitutional claim is available only in the absence of an adequate state remedy. *Id; Phillips v. Gray*, 163 N.C. App. 52, 592 S.E.2d 229, 233 (2004).

Whether plaintiffs have an adequate state remedy is an unresolved disputed issue. Plaintiffs' constitutional claim should be upheld unless this Court determines that plaintiffs' wrongful discharge claim provides them with an adequate state remedy.

In ¶ 88 of their complaint, plaintiffs allege: "defendants have waived sovereign or governmental immunity through the purchase of one or more policies of liability insurance pursuant to N.C. Gen. Stat. § 160A-485, and/or by participating in a local government risk pool pursuant to N.C. Gen. Stat. § 58-23-5." [Doc. 1]. Defendants denied plaintiffs' allegation and affirmatively pled sovereign immunity and public official immunity as defenses. *See* [Doc. 8 (¶ 88, Third and Fourth Defenses)].

In discovery, defendants provided plaintiffs a copy of the insurance policy covering the Town of Mocksville, titled "IRFFNC Employment Practices Liability Coverage Form." PX 62. The policy contains numerous exclusions from coverage, including an exclusion "[f]or any damages arising out of the willful violation of any federal, state, or local statute, ordinance, rule or regulation committed by or with the knowledge and consent of any insured." *See* PX 62 at Mock 1801.

"A governmental entity does not waive sovereign immunity if the action brought against them is excluded from coverage under their insurance policy." *Patrick v. Wake County Department of Human Services*, 188 N.C. App. 592, 596, 655 S.E.2d 920, 923

27

(2008); *Lunsford v. Renn*, 207 N.C. App. 290, 308, 700 S.E.2d 94, 100 (2010); *Norton v. SMC Bldg. Inc.*, 156 N.C. App. 564, 577 S.E.2d 310 (2003).

If defendant Town's insurance policy effectively provides coverage for the wrongful discharge claims alleged by plaintiffs and the Town has waived sovereign and public official immunity as to those claims, then plaintiffs have an adequate remedy of wrongful discharge. However, if the Town's insurance policies do not provide coverage for the wrongful discharge claims and the Town has not waived sovereign and public official immunity, then plaintiffs' state constitutional claims are viable because they have no adequate remedy under state law.

The test for whether an adequate state remedy exists is whether there is a remedy available to plaintiffs for the violation. If defendants have immunity from plaintiffs' tort claim for wrongful discharge in violation of public policy, there is no adequate state remedy and plaintiffs' constitutional claim is viable. Defendants' motion for summary judgment of plaintiffs' state constitutional claims should be denied at this stage. See *Andrew v. Clark*, 561 F.3d at 271 (district courts have discretion to deny summary judgement motions when the record is not sufficiently developed).

## V. PLAINTIFFS' CLAIM FOR WRONGFUL DISCHARGE IN VIOLATION OF THE PUBLIC POLICY OF FREE SPEECH

To prevail on their wrongful discharge claim, plaintiffs must demonstrate that they were terminated for an unlawful reason or for a purpose that contravenes public policy. *Sides v. Duke Univ.*, 74 N.C. App. 331, 328 S.E.2d 818, *disc. rev. denied*, 314 N.C. 331,

28

333 S.E.2d 490 (1985); *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 381 S.E.2d 445 (1989); *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166 (1992). Terminations that contravene public policy include, terminating an employee for exercising his constitutional right to free speech. *Lenzer v. Flaharty*, 106 NC App 496, 418 SE 2d 276 (1992) (public policy found in free speech guarantee of NC constitution). *Warren v. New Hanover County Bd. of Educ.*, 104 N.C. App. 522, 410 S.E.2d 232 (1991) (school teacher presenting survey of teachers to school board); *Phillips v. Gray*, 163 N.C. App. 52, 592 S.E.2d 229 (2004) (deputy sheriff cooperating with FBI and U.S. Customs agents investigating Sheriff).

To establish their claim, plaintiffs have forecast sufficient evidence that their speech qualified as protected speech or activity and that their protected speech or activity was the motivating cause for their termination. Id.; *Swain v. Elfland*, 145 N.C. App. 383, 386, 550 S.E.2d 530, 533 (2001); *Phillips v. Gray*, 163 N.C. App. 52, 57, 592 S.E.2d 229, 233 (2004). The evidence is sufficient to support the claim that their discharge was in violation of public policy.

## VI.    PLAINTIFFS' PUNITIVE DAMAGES CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

In their complaint, plaintiffs seek punitive damages only against the individual defendants, and not against the Town. *See* Complaint ¶ 112: "Accordingly, each plaintiff is entitled to punitive damages against the individual defendants in an amount to be

determined in the discretion of the jury." Plaintiffs do not seek to recover punitive damages from the Town.

Plaintiffs do seek and are entitled to recover punitive damages from the individual defendants acting in their individual capacities. *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (punitive damages recoverable in a §1983 action if defendant acted with a reckless or callous disregard for the plaintiff's rights or intentionally violated federal law); *Sides v. Duke University*, 74 N.C. App. 331, 328 S.E.2d 818, 830 (1985) (punitive damages recoverable for the tort of wrongful discharge if defendant acted to cause plaintiff's injury willfully, with malice, or with a reckless disregard for plaintiff's rights.)

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment should be denied as to all claims, and this case should be tried before the jury.

Pursuant to LR 7.3(c), plaintiffs hereby request oral argument, given the voluminous nature of the evidence, in the event that the Court deems it advisable.

This the 8th day of July, 2013.

/s/ Robert M. Elliot
Robert M. Elliot (7709)
Attorney for Plaintiffs
Elliot Morgan Parsonage PA
426 Old Salem Road
Winston-Salem, NC 27101
Telephone: 336-724-2828
Facsimile: 336-714-4499
E-Mail:     rmelliot@emplawfirm.com

30

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2013, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following counsel for defendants:

Patrick H. Flanagan
Cranfill Sumner & Hartzog, LLP
2907 Providence Road, Suite 200
Charlotte, North Carolina 28211
Email: phf@cshlaw.com

Philip M. Van Hoy
Van Hoy, Reutlinger, Adams & Dunn
737 East Boulevard
Charlotte, NC 28203
Email: phil.vanhoy@vradlaw.com

/s/ Robert M. Elliot
Robert M. Elliot (7709)
Attorney for Plaintiffs
Elliot Morgan Parsonage PA
426 Old Salem Road
Winston-Salem, NC 27101
Telephone: (336) 724-2828
Facsimile: (336) 724-3335
E-mail: rmelliot@emplawfirm.com

31