IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KENNETH L. HUNTER, RICK A. DONATHAN, and JERRY D. MEDLIN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:12-CV-333 |
| TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his official capacity as Administrative Chief of the Mocksville Police Department and in his individual capacity; CHRISTINE W. BRALLEY, in her official capacity as Town Manager of the Town of Mocksville and in her individual capacity, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

The Court previously entered Orders, (Docs. 71, 88), ruling on Defendants' Motion for Summary Judgment, (Doc. 37), and Plaintiffs' Motion to Alter or Amend Judgment and for Relief from Judgment. (Doc. 80.) In those Orders, the Court indicated it would file an opinion explaining its rulings as time permitted. For the reasons stated herein, the plaintiffs have presented evidence sufficient to raise a disputed question of material fact as to whether their First Amendment rights were violated. Despite this, the individual defendants are entitled to qualified immunity on the 42 U.S.C. § 1983 claims, and there is no evidence the Town had a policy of retaliation, so all § 1983 claims will be dismissed. The related state law claims survive and may proceed to trial.

# FACTS

Viewed in the light most favorable to the plaintiffs, the evidence shows the following: The plaintiffs, Kenneth Hunter, Rick Donathan, and Jerry Medlin, were police officers with the Mocksville Police Department. Assistant Chief Hunter had worked for the MPD since 1985, Lieutenant Donathan since 1998, and Detective Medlin since 2006. (Doc. 43-1 at ¶¶ 4-5; Doc. 43-2 at ¶¶ 3-4; Doc. 43-3 at ¶¶ 3, 5.) Over the years, the plaintiffs developed a range of concerns about defendant Police Chief Robert Cook and his leadership of the MPD. Specifically, the plaintiffs observed Chief Cook drinking alcohol publicly, excessively, and while in uniform, and they feared that this was jeopardizing the MPD's credibility in the community, (Doc. 43-1 at ¶¶ 12-16; Doc. 43-2 at ¶¶ 9-10; Doc. 43-3 at ¶¶ 10-13); believed that Chief Cook was violating the law by driving a police car with blue lights flashing and otherwise engaging in activity that indicated he was a certified law enforcement officer, even though he had never been certified, (Doc. 43-1 at ¶ 17; Doc. 43-2 at ¶¶ 11-12; Doc. 43-3 at ¶¶ 14-15); suspected that Chief Cook and Assistant Chief Daniel Matthews were mismanaging MPD and Davie County Law Enforcement Association funds and in some cases improperly using those funds for personal uses, (Doc. 43-1 at ¶¶ 18-19; Doc. 43-3 at ¶¶ 16-18); felt that Chief Cook's failure to discipline other officers' serious misconduct undermined morale within the MPD and posed a threat to public safety, (Doc. 43-1 at ¶ 49; Doc. 43-2 at ¶¶ 14-16; Doc. 43-3 at ¶¶ 20-23); and perceived racial discrimination in the MPD. (Doc. 43-1 at ¶¶ 9, 15; Doc. 45-2 at 10-11).

Over the years, each of the three plaintiffs raised their concerns about Chief Cook and Assistant Chief Matthews with the Mocksville Town Manager, defendant Christine Bralley. (Doc. 37-2 at ¶¶ 8-9; Doc. 43-1 at ¶¶ 22, 28; Doc. 43-2 at ¶ 17; Doc. 43-3 at ¶ 24.) Assistant Chief Hunter did not notice any improvement on the part of Chief Cook or Assistant Chief

Matthews, and he worried about potential retaliation based on how Chief Cook had reacted to other individuals who questioned his policies or management. (Doc. 43-1 at ¶¶ 22, 28.) Lieutenant Donathan raised his concerns with Town Manager Bralley but was soon after criticized by Assistant Chief Matthews about one of the concerns he had raised. (Doc. 43-2 at ¶ 18.) A month after Detective Medlin sent Town Manager Bralley a letter detailing his concerns about the MPD, Chief Cook demoted him to the position of patrol officer. (Doc. 43-3 at ¶ 24.) Although Town Manager Bralley later overruled Chief Cook's decision, Detective Medlin came to believe that raising issues internally or with Town Manager Bralley could result in retaliation. (*Id.*) Lieutenant Donathan concluded that raising concerns about the MPD with Town Manager Bralley might result in retaliation from his supervisors. (Doc. 43-2 at ¶ 18.)

In December 2011, five MPD officers, including the three plaintiffs, met privately and discussed their shared concern that Chief Cook and Deputy Assistant Chief Matthews were putting their personal interests ahead of the department. (Doc. 43-1 at ¶ 29; Doc. 43-2 at ¶ 31; Doc. 43-3 at ¶ 28.) At the meeting, the plaintiffs decided to seek an investigation by state officials of corruption within the MPD. (Doc. 43-1 at ¶ 30; Doc. 43-2 at ¶ 32; Doc. 43-3 at ¶ 28.) According to Assistant Chief Hunter, the plaintiffs made this decision because they "were ashamed of what the MPD had become in the community, and truly felt, as citizens of the community, that Mocksville deserved an effective police force that served everyone equally." (Doc. 43-1 at ¶ 31.)

The plaintiffs set up a meeting with local NAACP representatives, who, after hearing the plaintiffs' concerns about the MPD, advised them to contact a state agency. (*Id.* at ¶ 32; Doc. 43-2 at ¶ 33; Doc. 43-3 at ¶ 29; Doc. 43-6 at ¶¶ 3, 6; Doc. 43-7 at ¶¶ 3, 6.) Assistant Chief Hunter had his daughter buy a disposable cell phone ("Tracfone") for him. (Doc. 43-1 at ¶ 33.)

On December 14, 2011, the plaintiffs used the Tracfone to call the North Carolina Attorney General's Office but were told to refer their complaints to local authorities. (*Id.* at ¶¶ 35-36; Doc. 43-2 at ¶ 35; Doc. 43-3 at ¶ 32; *see also* Doc. 43-12 at ¶ 4(c) (stating Tracfone made contact with Attorney General's Office on December 15, 2011).) Because Chief Cook had close relationships with local authorities, the plaintiffs chose instead to contact the North Carolina Governor's Office, and again they used the Tracfone. (Doc. 43-1 at ¶¶ 36-37; Doc. 43-2 at ¶¶ 35-36; Doc. 43-3 at ¶¶ 32-33; Doc. 43-12 at ¶ 4(c).) The plaintiffs briefly conveyed many of their concerns to someone at the Governor's Office without revealing their identities or indicating which police chief, police department, or town was involved. (Doc. 43-1 at ¶ 37; Doc. 43-2 at ¶ 37; Doc. 43-3 at ¶ 33.) They provided their Tracfone number and were told that someone would call them back. (Doc. 43-1 at ¶ 38; Doc. 43-2 at ¶ 38; Doc. 43-3 at ¶ 34.) Later that day, a different person from the Governor's Office called the Tracfone, which Lieutenant Donathan answered, and the Governor's representative offered to request an investigation by the State Bureau of Investigation on the plaintiffs' behalf. (Doc. 43-2 at ¶ 39.) Lieutenant Donathan gave him permission to do so and identified the MPD as the police department in question. (*Id.*)

The following week, Detective Medlin observed SBI Agent D.J. Smith in the MPD offices. (Doc. 43-3 at ¶ 35.) Agent Smith was the local SBI representative in the Mocksville area. (Doc. 43-1 at ¶ 41; Doc. 48-3 at 3.) The plaintiffs had worked with Agent Smith and knew he was close to Chief Cook and Deputy Assistant Chief Matthews. (Doc. 43-1 at ¶ 41.) Detective Medlin observed Agent Smith show Deputy Assistant Chief Matthews a piece of paper and perceived that the two men were looking for Chief Cook. (Doc. 43-3 at ¶ 35.) Soon thereafter, the plaintiffs received a message on the Tracfone from Agent Smith, who stated he

4

was following up on their request for an investigation. (Doc. 43-1 at ¶ 40; Doc. 43-2 at ¶ 42; Doc. 43-3 at ¶ 37; Doc. 43-12 at ¶ 4(d).)

On or about December 20, 2011, Agent Smith contacted Captain Christopher Shuskey of the Davie County Sheriff's Office[1] and told him that an anonymous complaint about Chief Cook had been made to the Governor's Office. (Doc. 49-1 at 3-7.) Agent Smith asked Captain Shuskey to check whether the phone number used to make that complaint belonged to anyone listed in the Sheriff's Office's records. (*Id.* at 5-7; Doc. 48-3 at 16-17.) Captain Shuskey found only an old listing of questionable value associating the number with a Hispanic female. (Doc. 48-3 at 16; Doc. 49-1 at 6-7.) Captain Shuskey contacted Officer Nelson Turrentine of the MPD and asked Officer Turrentine to run the number through the MPD's records. (Doc. 49-1 at 7.) Officer Turrentine said he did not recognize the number but thought the name listed on the old record might be that of a Hispanic female who had recently been with a relative of Assistant Chief Hunter when the relative was arrested. (Doc. 49-1 at 4; Doc. 48-5 at 40.)

Both Lieutenant Donathan and Detective Medlin had placed calls to and received calls from the Tracfone using their MPD-issued cell phones, (Doc. 43-2 at ¶ 43), and this was reflected on the MPD's Sprint billing records. (Doc. 43-12 at ¶ 7.) On December 27, 2011, Town Manager Bralley contacted Sprint customer service for help in setting up an online account; she mentioned that she wanted to check the call records for a phone number that she did not identify. (Doc. 43-14 at 10.) Around this time, before any of the plaintiffs were terminated, Town Manager Bralley notified Chief Cook that Lieutenant Donathan had used his MPD-issued cell phone for thirty-seven hours in a month. (Doc. 48 at 43.) The Sprint invoice for the billing period ending on December 23, which was issued on December 27 and included the phone calls

---

[1] Mocksville is in Davie County.

between the plaintiffs and the Tracfone, listed Lieutenant Donathan as having used his cell phone for thirty-six hours and fifty-two minutes. (Doc. 43-12 at ¶ 6.)

On December 29, 2011, Chief Cook fired each of the plaintiffs. (Doc. 43-1 at ¶ 4 & p. 26; Doc. 43-2 at ¶ 3 & p. 25; Doc. 43-3 at ¶ 3 & p. 20; Doc. 48-1 at 20-21.) Termination letters handed to each plaintiff indicate the reasons were related to performance. (Doc. 43-1 at 26; Doc. 43-2 at 25; Doc. 43-3 at 20.) The plaintiffs have presented evidence that the performance-related reasons given were false and that none had been given any notice of any performance issues before they were fired. (Doc. 43-1 at ¶¶ 44-51; Doc. 43-2 at ¶¶ 48-50; Doc. 43-3 at ¶¶ 40-42.) Lieutenant Donathan discussed his termination with Town Manager Bralley, who indicated to him that she approved of Chief Cook's decision. (Doc. 43-2 at ¶ 46.) In an after-the-fact memo outlining all the performance issues with the plaintiffs, Chief Cook expressly mentioned the plaintiffs' telephone call to the Governor. (Doc. 51-6 at 3.)

The firings were the first by Chief Cook since Town Manager Christine Bralley hired him in 2005 and delegated to him the authority to hire and fire MPD employees. (*See* Doc. 37-2 at ¶ 4; Doc. 44 at 2; Doc. 48-1 at 36, 40.) In other cases involving egregious officer misbehavior, including cases of illegal drug use and criminal activity, the officers received lesser punishments or were allowed to voluntarily resign. (Doc. 48-1 at 36.)

## ANALYSIS

### I.     The First Amendment Claim

The plaintiffs contend that Chief Cook, Town Manager Bralley, and the Town of Mocksville violated their First Amendment rights by retaliating against them for contacting the Governor's office about corruption and misconduct by the police chief and others in the department. (Doc. 1 at 24-25.) The defendants first contend that their evidence shows the

6

plaintiffs were terminated for competence issues and that the plaintiffs have not offered sufficient proof that they were fired in retaliation for their speech.

The plaintiffs have offered evidence that before they contacted the Governor's office, there was no indication that any of their long careers with the MPD were in jeopardy. (*See* Doc. 43-1 at ¶¶ 23-24; Doc. 43-2 at ¶¶ 4, 28; Doc. 43-3 at ¶¶ 3, 5-6.) The plaintiffs' evidence also shows that Chief Cook never before fired an officer, even in cases of egregious misbehavior, (Doc. 48-1 at 36), but that Chief Cook once tried to retaliate against Detective Medlin for filing a complaint with Town Manager Bralley. (Doc. 43-3 at ¶ 24.) The evidence about Agent Smith's investigation into the anonymous call to the Governor's office would allow a jury to infer that the call and the Tracfone number had come to the attention of Town Manager Bralley and Chief Cook; that Town Manager Bralley had been reviewing the Town's cell phone records as a result; and that she had discovered the connection between Detective Medlin and Lieutenant Donathan to the Tracfone number. On December 29, 2011, all three plaintiffs were fired in succession for performance-related reasons which had never been mentioned to them before and which are either false or unfounded. (Doc. 43-1 at ¶ 42; Doc. 43-2 at ¶ 44; Doc. 43-3 at ¶ 38.) The plaintiffs were terminated approximately two weeks after their call to the Governor, and Chief Cook mentioned the call to the Governor's office in an after-the-fact memo about the plaintiffs. (Doc. 51-6 at 3.)

The defendants have denied that the plaintiffs were fired in retaliation for calling the Governor's office, and they contend that the plaintiffs need more direct evidence of retaliation. This argument is misplaced. The fact that the plaintiffs' evidence is circumstantial does not mean it is insufficient. The law gives no greater weight to direct evidence over circumstantial evidence, and circumstantial evidence is frequently relied on in employment retaliation or

7

discrimination cases because often only the defendants know the true motivation for their conduct. *See, e.g.*, *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 & n. 12 (7th Cir. 1994) (holding timing of discharge decision in relation to protected expression supported inference of retaliation; defendants' self-serving denials not conclusive).

The plaintiffs have offered sufficient evidence to support a jury finding that the Town fired them for reporting to the Governor's office that the Mocksville Police Department was experiencing corruption and other issues. While the Town has offered evidence that the plaintiffs were fired for performance issues, that evidence does not entitle them to summary judgment. It merely creates a disputed question of material fact which a jury must decide. The defendants are not entitled to summary judgment on this basis.

The defendants next contend that the plaintiffs are not entitled to First Amendment protection for their communications to the Governor's office. They contend they could restrict the plaintiffs' speech under the circumstances of this case and specifically rely on cases that allow public employers to restrict speech "that owes its existence to a public employee's professional responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

"The First Amendment protects not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'" *Adams v. Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). On the one hand, "public employees do not surrender all their First Amendment rights by reason of their employment," *Garcetti*, 547 U.S. at 417, but on the other hand, the government "as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000).

8

Thus, courts must balance the interests of a public employee, "'as a citizen, in commenting upon matters of public concern'" against those of the government, "'as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Adams*, 640 F.3d at 560 (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). To balance those interests in the context of a retaliation claim, courts undertake a three-step inquiry:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's adverse employment decision.

*Adams*, 640 F.3d at 560-61 (quoting *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998)) (internal alteration omitted). In the first step of this inquiry, there are essentially two questions to ask: whether the employee was speaking as a citizen, and whether the speech was a matter of public concern. *Garcetti*, 547 U.S. at 419-21.

Corruption and malfeasance in a police department are, without question, matters of public concern. *Jurgensen v. Fairfax Cnty.*, 745 F.2d 868, 879 (4th Cir.1984) (stating that speech that attempts to bring to light actual or potential wrongdoing or breach of public trust generally implicates matters of public concern); *see also Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."). The defendants do not contend otherwise. Therefore, the Court concludes that the plaintiffs spoke on matters of public concern when they contacted the Governor's office. As noted *supra*, the plaintiffs have also offered sufficient evidence to establish that the speech was a substantial factor in their termination. The Court will turn to the remaining two aspects of the inquiry: whether the speech was "pursuant to official duties" and whether the Town's interest in regulating its employees' speech outweighs the employees' interests.

9

Even when speech is about a topic of public concern, public employees who make statements "pursuant to their official duties" are not speaking as citizens for First Amendment purposes and their speech does not warrant constitutional protection. *Garcetti*, 547 U.S. at 421; *see Mils v. City of Evansville*, 452 F.3d 646, 647-48 (7th Cir. 2006) ("*Garcetti* . . . holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job.") Because the parties in *Garcetti* agreed that the speech at issue was made pursuant to the plaintiff's official duties, the Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti*, 547 U.S. at 424. The Court did note that "[t]he proper inquiry is a practical one" that should focus on "the duties an employee actually is expected to perform," not on formal job descriptions. *Id.* at 424-25.

Before *Garcetti*, the Fourth Circuit held, in reliance on *Connick*, 461 U.S. at 148 n.7, that "whether speech is that of a private citizen addressing a matter of public concern is a question of law for the court." *Urofsky*, 216 F.3d at 406. Since *Garcetti*, courts have uniformly continued to treat the "public concern" question as one of law, but the circuits have split over whether the determination of whether a public employee's speech was made as a citizen or as an employee pursuant to official duties is a question of law or a mixed question of law and fact. *See* Sarah L. Fabian, *Garcetti v. Ceballos: Whether an Employee Speaks as a Citizen or as a Public Employee – Who Decides?*, 43 U.C. Davis L. Rev. 1675, 1692 (2010). The Fourth Circuit has not yet taken an authoritative position on this issue.

In *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009), decided at the Rule 12(b)(6) stage, the Fourth Circuit noted the factual nature of this kind of question, but did not address who would

10

ultimately resolve the question. *Id.* at 267-68. However, in *Bevis v. Bethune*, 232 F. App'x 212, 215-16 (4th Cir. 2007), and *Shenoy v. Charlotte-Mecklenburg Hosp. Auth.*, 521 F. App'x 168, 172-73 (4th Cir. 2013), the Fourth Circuit appears to have treated it as a question of law appropriate for resolution at summary judgment, and several district courts have taken the same approach. *See, e.g.*, *Miller v. Hamm*, Civil No. CCB-10-243, 2011 WL 9185, at *4 (D. Md. Jan. 3, 2011); *Jackson v. Alleghany Cnty.*, No. 7:07CV0417, 2008 WL 3992351, at *9-10 (W.D. Va. Aug. 28, 2008). In this case, the answer is the same regardless of whether it is viewed as a question of law or as a mixed question of law and fact.

There is no evidence before the Court that the Governor's office had any regular interaction with MPD police officers for purposes of investigating and enforcing criminal laws and no evidence of any MPD policy, practice, or protocol suggesting MPD officers should or could request the Governor to investigate crimes in Mocksville generally or under specific circumstances. The defendants have not pointed to anything in the Mocksville Police Manual or elsewhere which imposes such a specific duty on its officers or says anything about contacting the Governor if the police chief was engaged in improper conduct.

Rather, all of the evidence indicates the plaintiffs intended to act and did act as private citizens. The plaintiffs first met in private about perceived misconduct and corruption in the MPD. (Doc. 43-1 at ¶ 29.) They then met with local NAACP representatives, a private, non-governmental entity with no law enforcement responsibilities, for guidance on addressing the issue. (*Id.* at ¶ 32.) To avoid retaliation and to keep their complaints separate from their affiliation with the MPD, the plaintiffs used a disposable phone to contact the Governor's office. (*Id.* at ¶¶ 33, 37.) In their first call with the Governor's office, the plaintiffs did not identify themselves or the MPD. (*Id.* at ¶ 37.) Only after someone in the Governor's office offered to

11

request an SBI investigation did the plaintiffs say that their concerns were about the MPD. (Doc. 43-2 at ¶ 39.) The plaintiffs then awaited SBI action. (Doc. 43-1 at ¶ 38.) The plaintiffs thus acted in private and took numerous steps to dissociate themselves from the MPD and maintain their anonymity.

This is not a case like those cited by the defendants where police officers were retaliated against for reporting issues to outside agencies with which they had regular working relationships. *See, e.g., Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011) (plaintiff had regular contacts with district attorney's office). Nor is this case like *Cheek v. City of Edwardsville*, 514 F. Supp. 2d 1220 (D. Kan. 2007), where the plaintiffs had experience and protocols for addressing internal corruption and misconduct, and considered it part of their official duties. *See id.* at 1225-26, 1231 (plaintiffs testified that they had investigated internal police misconduct in the past in cooperation with outside agencies, knew which agencies to work with, and that such work was part of their official duties).

The defendants' contention that the plaintiffs acted pursuant to their official duties because all sworn police officers have a duty to enforce North Carolina's criminal law, (Doc. 38 at 12), is inconsistent with *Garcetti*'s command that courts determine this issue by engaging in a practical inquiry. Obviously police officers have a duty to enforce the law, but that does not mean they have a duty to call the Governor and report criminal offenses or other misconduct by the police chief. The Police Manual's general directives to "take appropriate action on the occasion of a crime," (Doc. 57-7 at p. 17, ¶ 117), to "cooperate with all Law Enforcement agencies," (*id.* at p. 27, ¶ 307), to "detect and arrest violators of the law," (*id.* at 26, ¶ 303), and to "enforce all Federal, State, and City laws," (*id.*), do not impose a duty on police officers to

12

contact the Governor about criminal conduct in Mocksville. Moreover, these general obligations are not dispositive.

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424-25. As noted *supra*, Defendants have offered no evidence to suggest the plaintiffs were actually expected to contact the Governor's office to seek assistance with apparent misconduct and corruption at high levels in the MPD.[2]

Finally, the plaintiffs were not exclusively reporting criminal activity. (Doc. 43-1 at ¶¶ 31, 37.) Although some of their concerns involved potentially criminal activity, many involved only malfeasance which did not rise to the level of criminal conduct or were otherwise related to the plaintiffs' concern that Chief Cook's and Assistant Chief Matthew's activities were lowering the MPD's reputation in the community. (*Id.*) For example, the plaintiffs alerted the Governor's office to perceived racial discrimination in the MPD. (Doc. 43-1 at ¶ 37; Doc. 43-2 at ¶ 37; Doc. 43-3 at ¶ 33.) While the alleged discrimination may violate certain laws, reporting it to the NAACP and the Governor's office cannot be construed as criminal law enforcement.

The plaintiffs' evidence establishes without contradiction that they were acting as concerned citizens, not police officers enforcing the criminal law. The Court therefore concludes that the plaintiffs acted as citizens, not as employees pursuant to official duties, when they contacted the Governor's office.

---

[2] The Manual directs officers who know of other "members or employees violating laws, ordinances, rules of the department or disobeying orders shall report same in writing to the Chief of Police via official channes [sic]." (Doc. 57-7 at 39, ¶ 363.) The defendants have not directed the Court's attention to anything in the Manual, which is over 75 pages long, which tells an officer what to do when the Police Chief himself is violating the law and department policy.

13

The Court must next consider whether the plaintiffs' "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." *Adams*, 640 F.3d at 560-61 (quotation marks omitted). There are numerous factors relevant to this analysis, but the core consideration is "the extent to which [the plaintiff's speech] disrupts the operation and mission of the agency." *McVey*, 157 F.3d at 278. Although police departments receive "greater latitude" in this analysis, the balance does not tip automatically in their favor. *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992). The defendants have not presented any evidence that the plaintiffs' private report to state authorities caused or was likely to cause disruption in the MPD.[3] The defendants rely on *Maciariello*, but the facts of that case are distinguishable. In *Maciariello*, the plaintiffs conducted their own "devious" and unauthorized internal investigation into the police department, and the Fourth Circuit found that in such cases "the potential for disruption is self-evident." *Id.* at 297, 300. In contrast, the plaintiffs here placed a single anonymous call to the Governor's office, awaited a response, then accepted the Governor's office's offer to initiate an SBI investigation. (Doc. 43-1 at ¶¶ 37-38.)

If the plaintiffs' conduct in this case is sufficient to find the balance favors the MPD, it is difficult to imagine any situation where police officers who report internal misconduct and corruption to someone outside the department would receive any First Amendment protection. Given the limited nature of the plaintiffs' conduct and the defendants' lack of evidence on this issue, the Court concludes that plaintiffs' interest in rooting-out corruption and misconduct in the MPD outweighs the MPD's interest in avoiding the limited risk of any associated disruption.

---

[3] Indeed, such an argument is inconsistent with the defendants' contention that the plaintiffs had a duty to report the Chief's criminal conduct to the Governor.

14

The public interest in exposing corruption and malfeasance in law enforcement also supports First Amendment protection.

Because the plaintiffs have offered substantial evidence that their speech on a matter of public concern was a substantial factor leading to their discharge, there is no evidence they were acting in their official capacities, and the Town has not established that its interests outweigh the plaintiffs' interests, the defendants are not entitled to summary judgment on the § 1983 First Amendment claims.

## II.     Qualified Immunity for § 1983 Claims

Chief Cook and Town Manager Bralley contend they are entitled to qualified immunity under § 1983 because their discretionary conduct did not violate "[c]learly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be clearly established, "the contours of the right must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (quotation marks omitted). In the First Amendment context, rights will "only infrequently" be clearly established. *McVey*, 157 F.3d at 277.

The plaintiffs contend it is clear that an employer cannot discharge law enforcement officers for anonymous off-duty reporting of apparent corruption in their police department to outside agencies, or for seeking an investigation of such malfeasance, where such reporting does not cause any disruption. (Doc. 81 at 5-6.) Based on this Court's review, however, analogous cases are ambiguous. *Compare Anemone*, 629 F.3d at 115 (holding MTA officer's report of suspected corruption to district attorney was not protected speech because contacts were made pursuant to official duties), *and Morales v. Jones*, 494 F.3d 590, 597-98 (7th Cir. 2007) (holding

15

officers' report of supervisors' possible criminal conduct to district attorney was not protected speech because officers had duty to report all potential crimes and thus speech was pursuant to official duties), *with Andrew*, 561 F.3d at 266-68 (concluding officer stated claim under First Amendment where he alleged retaliation for releasing memo to press and threatening to sue department), *and Walters v. Cnty. of Maricopa*, No. CV 04-1920-PHX-NVW, 2006 WL 2456173, at *14 (D. Ariz. Aug. 22, 2006) (holding officer's speech was entitled to First Amendment protection because whistleblowing was not within officer's official duties).

This ambiguity in authorities precludes finding that the plaintiffs' rights were clearly established. Therefore, Chief Cook and Town Manager Bralley are entitled to qualified immunity, and the plaintiffs' § 1983 claims against them are dismissed.

### III. Municipal Liability

The plaintiffs seek to hold the Town liable for Chief Cook's and Town Manager Bralley's retaliatory actions in this case. The Town may be held liable under § 1983 only if the plaintiffs can demonstrate that their injury stems from a policy or custom of the Town. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "To hold a municipality liable for a single decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'" *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986)).

Whether an individual has final policymaking authority is a question of state law to be resolved by the trial judge. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). North Carolina vests the city or town council with the power to make personnel policies, N.C. Gen. Stat. 160A-164, and the Supreme Court has held that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable

16

law purports to put it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). Further, the Fourth Circuit has held, in a case similar to this, that even where a police chief has been delegated final decision-making authority for personnel decisions, that does not make the police chief the final policymaker for purposes of imputing municipal liability. *Crowley v. Prince George's Cnty.*, 890 F.2d 683, 686-87 (4th Cir. 1989).

The plaintiffs contend that despite the statute vesting personnel policymaking authority in the Town Council, in fact Town Manager Bralley and/or Chief Cook were the final policymakers relevant to this case. (Doc. 81 at 12-13.) The plaintiffs have offered evidence that Town Manager Bralley and Chief Cook never sought the Town Council's approval for their personnel decisions. (*See id.* at 13.) Further, when plaintiff Donathan attempted to speak to a Town Council member about his discharge, that member referred him back to Town Manager Bralley. (*Id.*) At best, the plaintiffs' evidence suggests that Town Manager Bralley and/or Chief Cook were the final decision-makers for personnel matters. Under *Crowley*, this is not enough to demonstrate that Town Manager Bralley and/or Chief Cook were the final policymakers for the Town. Therefore, the plaintiffs' § 1983 claims against the Town will be dismissed because there is no basis to infer that their discharge stemmed from a policy or custom of the Town.

### IV. State Wrongful Discharge Claims

At-will employees in North Carolina may not be terminated "for an unlawful reason or purpose that contravenes public policy." *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989) (quoting *Sides v. Duke Univ.*, 74 N.C. App. 331, 342, 328 S.E.2d 818, 826 (1985)). The North Carolina Supreme Court has found public policy to include the "express policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992). North Carolina appellate courts have found

17

public policy to include the State Constitution, in particular its guarantee of free speech in Article I, Section 14.  *See Lenzer v. Flaherty*, 106 N.C. App. 496, 515, 418 S.E.2d 276, 287 (1992). Plaintiffs contend they were wrongfully discharged in violation of public policy when they were terminated for exercising their free speech.

"Under North Carolina law, a plaintiff may only bring a wrongful-discharge action against the plaintiff's employer, not against the employer's agents." *Iglesias v. Wolford*, 667 F. Supp. 2d 573, 590 (E.D.N.C. 2009), *aff'd*, 400 F. App'x 793 (4th Cir. 2010); *see Sides*, 74 N.C. App. at 343, 328 S.E.2d at 826-27, *overruled on other grounds by Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 333, 493 S.E.2d 420, 423 (1997).  The plaintiffs were employed by the Mocksville Police Department, and so the Town of Mocksville was their employer, not Chief Cook or Town Manager Bralley.  *See Houpe v. City of Statesville*, 128 N.C. App. 334, 344-45, 497 S.E.2d 82, 89 (1998) (finding police officer's wrongful discharge claim only available against the city, not the City Manager or Chief of Police).  Therefore, the plaintiffs' wrongful discharge claims against Chief Cook and Town Manager Bralley are dismissed.

The plaintiffs have presented evidence from which a jury could find that the Town fired them for a reason violating public policy.  While the Town has asserted immunity defenses against the plaintiffs' wrongful discharge claims, it has not made any arguments on that basis in connection with the motion.  Therefore, summary judgment on this claim will be denied.

## V. State Constitutional Claims

The North Carolina Constitution provides a direct cause of action against the state and state officials acting in their official capacity for violations of Article I, Section 14's guarantee of free speech.  *Corum v. Univ. of N. Carolina*, 330 N.C. 761, 785-88, 413 S.E.2d 276, 291-93

18

(1992). The plaintiffs have sued the Town, as well as Chief Cook and Town Manager Bralley in their official capacity under this provision. (Doc. 1 at 26.) However, "where the governmental entity may be held liable for damages resulting from its official policy, a suit naming public officers in their official capacity is redundant." *Moore v. City of Creedmoor*, 345 N.C. 356, 367, 481 S.E.2d 14, 21 (1997). Therefore, these claims against Chief Cook and Town Manager Bralley will be dismissed.

The plaintiffs also assert free speech claims under the North Carolina Constitution against the Town. "The standards for free speech retaliation claims under the state constitution are the same as those for free speech claims under the federal constitution." *Sheaffer v. Cnty. of Chatham*, 337 F. Supp. 2d 709, 729 (M.D.N.C. 2004); *see also Evans v. Cowan*, 132 N.C. App. 1, 9, 510 S.E.2d 170, 175-76 (1999) (applying First Amendment standard delineated in *Connick*, 461 U.S. at 147-48, to Section 14 claim); *Lenzer v. Flaherty*, 106 N.C. App. 496, 515, 418 S.E.2d 276, 287-88 (1992) (evaluating Section 14 claim under First Amendment standard). Both parties appear to concede this point. (Doc. 38 at 24-25; Doc. 52 at 26.) As noted earlier in Section I, the plaintiffs have produced sufficient evidence for a jury to find that they were fired for exercising their free speech rights under the North Carolina Constitution.

The defendants contend that this claim should be dismissed because the plaintiffs otherwise have an adequate state remedy by virtue of their public policy wrongful discharge claim. *See Corum*, 330 N.C. at 782, 413 S.E.2d at 289; *Phillips v. Gray*, 163 N.C. App. 52, 58, 592 S.E. 229, 233 (2004). However, it is not yet clear whether the plaintiffs' wrongful discharge claim will provide an adequate state remedy against the Town. Because the record is inadequate to decide this question as a matter of law, the motion for summary judgment should be denied.

19

## VI. Punitive Damages

The plaintiffs seek punitive damages for their claims against Chief Cook and Town Manager Bralley. Because the plaintiffs' § 1983 claims and state law claims against Chief Cook and Town Manager Bralley are being dismissed, their claims for punitive damages must also be dismissed.

## CONCLUSION

For the reasons set forth above, the plaintiffs' § 1983 and punitive damages claims against all defendants are dismissed. The plaintiffs' state law claims against Chief Cook and Town Manager Bralley are also dismissed. The plaintiffs' state law claims against the Town may proceed to trial.

This the 21st day of October, 2013.

_____
UNITED STATES DISTRICT JUDGE

20

Case 1:12-cv-00333-TDS-JEP   Document 95   Filed 10/21/13   Page 20 of 20