IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KENNETH L. HUNTER, RICK A. DONATHAN, and JERRY D. MEDLIN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 12cv333 |
| TOWN OF MOCKSVILLE, NORTH CAROLINA, et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

In December 2011, Defendants Town of Mocksville ("Town"), Robert W. Cook, its administrative police chief at the time, and Christine W. Bralley, its town manager, terminated Plaintiffs Kenneth L. Hunter, Rick A. Donathan, and Jerry D. Medlin from their positions as officers with the Mocksville Police Department ("MPD"). Plaintiffs subsequently brought this action under 42 U.S.C. § 1983 for wrongful discharge in violation of their First Amendment rights and State-law claims for wrongful discharge in violation of public policy. Following an eight-day trial, a jury found in favor of Plaintiffs on all claims. Before the court now is Bralley's renewed motion for judgment as a matter of law, on which the court reserved ruling at trial, and Plaintiffs' motion for equitable relief, in the form of either reinstatement or front pay (Doc. 169). The motions are

fully briefed and are ready for resolution.

## I.  BACKGROUND

The evidence at trial demonstrated that on December 14, 2011, Plaintiffs called the office of North Carolina Governor Beverly Purdue and reported corruption and other malfeasance (including alleged misuse of authority and of alcohol by Chief Cook, financial improprieties, and racial bias) within the MPD. Approximately two weeks later, on December 29, 2011, Plaintiffs were summarily terminated on the same afternoon. Donathan had been promoted to lieutenant just one month prior, and it was the first time that then-Chief Cook had ever terminated an officer. Rather, the chief had always allowed officers to voluntarily resign, including one officer who had been involved in a hit-and-run while intoxicated and on duty. The central question at trial was why the Plaintiffs were terminated. Plaintiffs claimed they were terminated for exercising their First Amendment rights, whereas Defendants claimed the officers were terminated for poor performance. The jury believed the Plaintiffs, making separate determinations of liability against the Town, Chief Cook, and Bralley. (Doc. 167.)

Based on its finding of liability, the jury awarded Hunter $805,706, Medlin $288,293, and Donathan $310,830 in compensatory

2

(including back pay[1]) damages. (Id. at 2, 4, 6.) The jury awarded each Plaintiff $10,000 in punitive damages separately against Chief Cook and Bralley. (Id.) Based on the court's submission of the issue of front pay to the jury on an advisory basis under Federal Rule of Civil Procedure 39(c), the jury also recommended an advisory front pay award of $388,125 for Hunter, $857,403 for Medlin, and $1,353,585 for Donathan. (Id.)

At the close of evidence, Defendants renewed their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. The court found that there was sufficient evidence against the Town and Chief Cook to send the issue to the jury but reserved ruling on whether Bralley was entitled to judgment as a matter of law.

Defendants now ask this court to find that there was insufficient evidence to submit the issue to the jury as to her. (Doc. 170 at 1-4.) Plaintiffs oppose this request and move for equitable relief of either reinstatement or adoption of the jury's advisory verdict on front pay. (Docs. 171, 173.)

---

[1] Defendants acknowledged at trial that back pay was an issue for the jury on the State-law claim. The court raised the issue of whether back pay was an equitable remedy for the court on the federal claim, but Defendants waived any objection to the jury deciding back pay as to both the federal and State-law claims.

## II.  ANALYSIS

### A.  Bralley's Rule 50 Motion

Judgment as a matter of law is appropriate where a plaintiff has been fully heard on an issue but has failed to produce sufficient evidence for a jury to find for the party. Fed. R. Civ. P. 50(a); <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 149 (2000).  The standard for judgment as a matter of law under Rule 50(a) mirrors the standard for granting summary judgment "such that 'the inquiry under each is the same.'"  <u>Reeves</u>, 530 U.S. at 150 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986)).  The court is to "review the record as a whole" but "must disregard all evidence favorable to the moving party that the jury is not required to believe."  <u>Id.</u> at 151.  All reasonable inferences must be drawn in favor of the nonmoving party, and the court is not permitted to make credibility determinations or weigh the evidence.  <u>Id.</u> at 150.

At the summary judgment stage, this court rejected Defendants' claim that there was insufficient direct evidence of retaliation.  (Doc. 95 at 7-8.)  The court explained that evidence is not insufficient merely because it is circumstantial.  (<u>Id.</u>)  "The law gives no greater weight to direct evidence over circumstantial evidence, and circumstantial evidence is frequently relied on in employment retaliation or

4

discrimination cases because often only the defendants know the true motivation for their conduct." (Id. (citing Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1459 & n.12 (7th Cir. 1994)).) In light of the sequence of events and the forecast of evidence presented by Plaintiffs, this court found that "plaintiffs ha[d] offered sufficient evidence to support a jury finding that the Town fired them for reporting to the Governor's office that the Mocksville Police Department was experiencing corruption and other issues." (Id. at 8.)

Here, Defendants renew substantially the same argument rejected at summary judgment. They contend that there was insufficient direct evidence that Bralley was aware of Plaintiffs' call to the governor's office. (Doc. 170 at 2 ("Plaintiffs did not even attempt to present any direct evidence that Bralley was aware that they called the Governor's office, or anyone else, to report the alleged criminal misconduct.").) Plaintiffs' evidence at trial, however, mirrored the forecast of evidence at summary judgment and was sufficient to sustain a verdict by a reasonable jury against Bralley. Critically, in addition to establishing close proximity between the call and their terminations, Plaintiffs presented evidence from which a reasonably jury could infer that Bralley was aware of Plaintiffs' involvement in the call.

Viewed in the light most favorable to Plaintiffs, the

evidence at trial showed the following: Hunter, Medlin, and Donathan had been officers with the MPD for twenty-seven years, five years, and thirteen years, respectively. Their written service records were essentially unblemished, and they had received several awards and commendations. In December 2011, Plaintiffs set out to expose what they viewed as corruption and other malfeasance in the MPD. In an effort to keep their efforts anonymous, Hunter had his daughter purchase a disposable, prepaid "TracFone" cellphone. On December 14, 2011, Plaintiffs used the TracFone to call the governor's office and report the alleged corruption. The governor's office in turn noted Plaintiffs' complaint and communicated the TracFone number to the North Carolina State Bureau of Investigation ("SBI") for follow-up.

Between December 19 and 22, Medlin observed SBI Agent D.J. Smith enter the MPD holding a small slip of paper. Agent Smith asked to speak with Chief Cook, but instead spoke with Cook's second-in-command, Daniel Matthews. Medlin heard Matthews call to the secretary to get Chief Cook on the phone. After Chief Cook was reached by phone, Medlin observed Agent Smith and Matthews rush out of the MPD together. This activity led Medlin to believe that Plaintiffs' involvement in the call to the governor's office had been exposed.

Davie County Sheriff Deputy Chris Shuskey established a

6

second link between the TracFone number and the MPD. In the week before Christmas 2011, Agent Smith gave the TracFone number to Deputy Shuskey and explained that the cellphone had been used to allege misconduct against Chief Cook and the MPD. Agent Smith asked Shuskey to determine the owner of the phone. Shuskey ran the number through various databases and determined that the subscriber was an Hispanic female. He then contacted MPD Detective Nelson Turrentine and relayed what Agent Smith had communicated to him. Detective Turrentine did not recognize the number but he did recognize the name of the Hispanic female, who had recently been in a traffic stop with Hunter's nephew. Shuskey later communicated to Agent Smith that his investigation suggested a connection to the nephew. In addition, Detective Turrentine testified at trial that if he knew he had a phone number connected to allegations of corruption at the MPD, he would be expected to provide it to Chief Cook.

Despite purchasing the TracFone to assure anonymity, Medlin and Donathan inadvertently made calls to the TracFone from their MPD-issued cell phones. (Pl. Ex. 14.) Consequently, the Town's cellphone records logged these calls and tied Medlin and Donathan to the TracFone. (Id.) The evidence showed that Bralley played a key role in obtaining these phone records just before the terminations.

Bralley was Chief Cook's immediate supervisor, and in that

7

capacity she had the ultimate authority to approve or stop Plaintiffs' termination. On December 27, two days before Plaintiffs' terminations, Bralley made at least six calls to Sprint, the cellphone service provider, in an effort to obtain the Town's telephone billing statement for the November to December 2011 ("December statement") billing period. Absent her calls to Sprint, Bralley would not ordinarily expect to receive the December statement until it would arrive by mail a couple of days later. (Pl. Ex. 14.) Further, while talking with the Sprint representative, Bralley did not provide a call-back number and resisted providing the phone number on the account.

Bralley ultimately gained expedited access to the December statement, which was dated December 27. The statement detailed multiple outgoing and incoming calls between Medlin's and Donathan's MPD-issued cellphones and the TracFone. (Pl. Ex. 14 (MOCK 2173, 2178).) Moreover, Bralley told Chief Cook that Donathan used his cell phone thirty-seven hours, which was reflected by the December statement and ultimately was asserted as a ground for his termination. (Id. (Mock 2153).) Bralley conceded that she made an extraordinary effort to obtain the December statement, but nevertheless attributed her urgency to a six-month review of the Town's cellphone plan that was underway. The jury, however, was not required to credit this testimony. It instead could have inferred that her actions showed urgency

8

to determine whether any MPD officer (other than Hunter, who was implicated by the Shuskey-Turrentine inquiry) was connected to the TracFone.

Moreover, Bralley's review of the December Sprint statement for links to the TracFone was important to Chief Cook's liability, as it provided an evidentiary basis for the chief's knowledge of Medlin's and Donathan's involvement with the TracFone.[2] And the circumstantial evidence against Chief Cook was strong. For example, Medlin's and Donathan's termination notices listed "Been Insubordinate" as a ground for their termination. (Pl. Exs. 13, 30.) Hunter's termination notice listed "Rumored False Deter mental [sic] information" as a ground for his termination. (Pl. Ex. 22.) Chief Cook's memorandum to the MPD on the day of Plaintiffs' termination warned remaining officers that "[a]ny further rumors will be dealt with swiftly." (Pl. Ex. 26.) Davie County District Attorney Gary Frank even testified that Chief Cook called him the day after Plaintiffs' termination and said "you just can't have people constantly undercutting you and causing problems."

---

[2] There was evidence that Hunter and Medlin were close. Therefore, one plausible theory is that Chief Cook inferred Medlin's involvement in the call from Hunter's involvement (as revealed by the Shuskey-Turrentine inquiry). But Donathan was not so inherently linked. In fact, there was evidence that a month before Donathan's termination Chief Cook promoted him to lieutenant and told him to keep in line with the politics of the MPD.

9

Accordingly, the totality of the evidence presented at trial, viewed in the light most favorable to Plaintiffs, was sufficient for a reasonable jury to find that Bralley knew of Plaintiffs' call to the governor's office and would not have terminated Plaintiffs but for it. Consequently, Bralley's renewed motion for judgment as a matter of law will be denied.

**B. Equitable Relief**

Next, the court must consider Plaintiffs' request for equitable relief. Where a plaintiff has been discharged in violation of his constitutional rights under § 1983, the law seeks to place him in the position he would have occupied absent the unconstitutional discharge. See Duke v. Uniroyal, Inc., 928 F.2d 1413, 1423 (4th Cir. 1991); Squires v. Bonser, 54 F.3d 168, 172 (3d Cir. 1995) ("Under Title VII, the statute's make-whole purpose 'is shown by the very fact that Congress took care to arm the courts with full equitable powers.' The same is true under § 1983." (internal citations omitted)). Reinstatement and front pay fulfill the make-whole goal of § 1983 by accounting for losses past the time of judgment. See Uniroyal, 928 F.2d at 1423-24; Squires, 54 F.3d at 172-73; see also Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001) ("[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."). In the Fourth Circuit, both are considered

10

equitable remedies that must be decided by the court.[3]  Uniroyal,

928 F.2d at 1424.

Reinstatement is the much-preferred remedy.  Id.  In

certain circumstances, however, reinstatement may be "impossible

or inappropriate."  Id. at 1423.  Reinstatement has been found

to be "inappropriate when the litigation itself created such

animosity between the parties that any potential employer-

employee relationship was irreparably damaged."  Id. (citing

Whittlesey v. Union Carbide Corp, 742 F.2d 724, 728 (2d Cir.

1984)); E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n, 763 F.2d

1166, 1172 (10th Cir. 1985).  It has also been found to be

inappropriate when there is no comparable position and creating

a position would require displacement of innocent parties.

---

[3] Although Plaintiffs concede that front pay on their federal claim was
an issue for the court, they contend that front pay on their State-law
claims was an issue for the jury.  Plaintiffs rely on Blakeley v. Town
of Taylortown, 233 N.C. App. 441, 756 S.E.2d 878 (2014).  There, the
North Carolina Court of Appeals found future lost wages to be a form
of actual damages.  Id. at 451, 756 S.E.2d at 885-86.  Other courts,
however, have recognized that front pay and future lost wages are
different remedies.  See, e.g., Williams v. Pharmacia, Inc., 137 F.3d
944, 954 (7th Cir. 1998) ("[T]he calculation of front pay differs
significantly from the calculation of lost future earnings.  Whereas
front pay compensates the plaintiff for earnings from her old job for
as long as she may have been expected to hold it, a lost future
earnings award compensates the plaintiff for the diminution in
expected earnings in all of her future jobs for as long as the
reputational or other injury may be expected to affect her
prospects.").  In fact, it is clear that front pay was not submitted
to the jury in Blakeley, as the plaintiff moved for "equitable relief
of front pay in lieu of reinstatement" after the jury returned its
verdict.  233 N.C. App. at 445, 756 S.E.2d at 881.  The court
therefore concludes that front pay is an equitable remedy for the
court to decide on Plaintiffs' federal and State-law claims.

*Uniroyal*, 928 F.2d at 1423; *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993) (reinstatement inappropriate where "reinstatement would require displacement of a non-culpable employee").

A review of the complete record convinces the court that reinstatement would be inappropriate in this case. Defendants have presented evidence that there is no full-time position available in the Town and that the Town would have to terminate current employees to reinstate Plaintiffs. (Doc. 170-1 at 1; Doc. 170-2 at 1.) Defendants have also presented evidence that a working relationship would be infeasible in light of all that has transpired. (Doc. 170-1 at 1; Doc. 170-2 at 1-2.) Plaintiffs and several current MPD employees testified against each other at trial, and Defendants have presented evidence that mutual trust is vital to effective police work. (Doc. 170-2 at 2.) Although Cook is no longer the chief of the MPD, Bralley is still the town manager. (<u>Id.</u>) This is perhaps the greatest obstacle to reinstatement. In fact, Plaintiffs acknowledge that "reinstatement may not be feasible" "[u]nless the town decides to terminate the employment of defendant Bralley or remove her from any position of authority over plaintiffs, direct or indirect." (Doc. 175 at 2; Doc. 171 at 7.) The court is not aware of any authority to require the Town to terminate Bralley, and given her position as Town manager, this court is unaware of

12

any Town position that is not in her chain of command. On this record, the parties are effectively in agreement that reinstatement is infeasible, and the court agrees.

Because reinstatement is infeasible, the court must next consider if and to what extent an award of front pay is necessary to make Plaintiffs whole. Uniroyal, 928 F.2d at 1424 (stating that front pay may serve as a substitute where reinstatement is not practical). Although the jury reached an advisory verdict on a front pay award for each Plaintiff under Federal Rule of Civil Procedure 39(c), such an advisory verdict "is of no binding legal significance," and this court remains obligated to make its own findings. 9 Charles A. Wright et al., Federal Practice & Procedure § 2335 (3d ed. 2008 and Supp. 2016) (stating that courts finding that deference is owed to an advisory jury verdict "misconceive the function of an advisory jury and seem to overlook the complete freedom the trial judge has in using or disregarding its findings).[4]

An award of front pay is inherently speculative because it necessarily involves conjecture as to future events. Uniroyal, 928 F.2d at 1423; Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386, 392 (D. Md. 1997). These include questions such as "whether the discharged employee will ever work again despite

---

[4] Even if some deference were owed the advisory jury's findings, the court would still reach the same conclusions for the reasons noted.

his best efforts or will obtain gainful employment in two years, or immediately." Uniroyal, 928 F.2d at 1423. Given its potential for a windfall, the use of front pay must be "tempered." Id. at 1424. A plaintiff bears the burden of providing the court "with the essential data necessary to calculate a reasonably certain front pay award," Peyton v. DiMario, 287 F.3d 1121, 1129 (D.C. Cir. 2002) (citations omitted), and courts "must judiciously scrutinize the record to determine whether future events are sufficiently predictable to justify" an award of front pay, Taylor v. Republic Servs., Inc., 968 F. Supp. 2d 768, 802 (E.D. Va. 2013) (quoting Ford, 984 F. Supp. at 392).

There is no bright line test for awarding front pay. See Uniroyal, 928 F.2d at 1423. "The appropriate method for addressing the difficult question of providing a remedy that anticipates potential future losses requires an analysis of all the circumstances existing at the time of trial . . ." Id. "The Fourth Circuit has not specifically enumerated a list of factors to consider in deciding to award front pay." Ford, 984 F. Supp. at 392; Taylor, 968 F. Supp. 2d at 802. Other courts, however, including a meticulous survey by the Northern District of Iowa in Ogden v. Wax Works, Inc., 29 F. Supp. 2d 1003 (N.D. Iowa 1998), have looked to the following non-exhaustive list of factors:

14

- **The plaintiff's age.** "The longer a proposed front pay period, the more speculative the damages become." McKnight v. GM, 973 F.2d 1366, 1372 (7th Cir. 1992); Uniroyal, 928 F.2d at 1424 ("If a plaintiff is close to retirement, front pay may be the only practical approach."); Peyton, 287 F.3d at 1128-29; Barbour v. Merrill, 48 F.3d 1270, 1280 (D.C. Cir. 1995); Ogden, 29 F. Supp. 2d at 1012-15; Ford, 984 F. Supp. at 392 (considering the "time period of the award").

- **The length of time the plaintiff was employed by the defendant employer.** The longer the plaintiff was employed, the more reasonable it is to infer that the plaintiff would have continued with the defendant employer absent unlawful discharge. See Barbour, 48 F.3d at 1280; Ogden, 29 F. Supp. 2d at 1012-15, 1017 (collecting cases).

- **The likelihood the plaintiff's employment would have continued absent the discrimination**. If the record evidence suggests the plaintiff would have been unlikely to remain in the position even absent the unlawful discharge, this weighs against a front pay award. See Barbour, 48 F.3d at 1280; Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 923 (6th Cir. 1984) (noting circumstances made it possible the plaintiff would have been lawfully terminated prior to his mandatory retirement date); Ogden, 29 F. Supp. 2d at 1012-15 (collecting cases).

- **The length of time it will take the plaintiff, using reasonable effort, to secure comparable employment**. If the plaintiff has the skill set and qualifications to secure comparable employment through reasonable effort moving forward, then this weighs against a long term front pay award. See Barbour, 48 F.3d at 1280; Ogden, 29 F. Supp. 2d at 1012-15 (collecting cases); Ford, 984 F. Supp. at 392; Snow v. Pillsbury Co., 650 F. Supp. 299, 300 (D. Minn. 1986). If the plaintiff has become incapacitated by the employer's wrongful conduct, a long term award may be warranted. See Gotthardt v. Nat'l R.R. Passenger Corp., 191 F.3d 1148, 1156-57 (9th Cir 1999).

- **The plaintiff's work life expectancy.** An award beyond a plaintiff's work life expectancy is more speculative than an award within it. See Ogden, 29 F. Supp. 2d at 1012-15 (collecting cases).

- **The length of time other employees typically held the position lost.** If the position is not typically held for a long duration or beyond a certain age, this weighs against a front pay award beyond that term. See Barbour, 48 F.3d at 1280; Ogden, 29 F. Supp. 2d at 1012-15.

- **The plaintiff's status as an at-will employee.** Ogden, 29 F. Supp. 2d at 1012-15 (collecting cases).

- **The plaintiff's ability to work, including the ability to work for the defendant employer.** Id.

- **The plaintiff's subjective intention to remain in the position.** If the plaintiff intended to remain in the position long term, then a front pay award is more reasonable. See Barbour, 48 F.3d at 1280; Ford, 984 F. Supp. at 392; and

- **The plaintiff's efforts to mitigate damages.** If the defendant can show that the plaintiff failed to make a reasonable effort to mitigate damages, then an award of front pay is inappropriate. See Barbour, 48 F.3d at 1280; Ogden, 29 F. Supp. 2d at 1012-15, 1018 (collecting cases)[5]; Ford, 984 F. Supp. at 389.

With these factors in mind, the court turns to an analysis of all the circumstances existing at the time of trial to determine what, if any, front pay award should be made to each Plaintiff. Uniroyal, 928 F.2d at 1423.

### 1. Hunter

**Age and work life expectancy**: Hunter was age fifty-four at the time of his termination and fifty-nine at the time of trial. (Pl. Exs. 37A-2, 37A-6b.) The jury recommended a front pay

---

[5] Ogden indicated that some courts have considered an award of punitive damages to be relevant to the appropriateness of front pay. However, this court agrees with Ogden that punitive damages are intended to punish and deter the defendant, whereas an award of front pay is intended to make the plaintiff whole. 29 F. Supp. 2d at 1019.

award of 5.35 years until Hunter reached his work life expectancy of 64.39 in the year 2021. (Doc. 167 at 2; Pl. Ex. 37A-6b.) Hunter's age weighs in favor of a front pay award. See Uniroyal, 928 F.2d at 1423 ("[W]hen the period for reinstatement was expected to be a relatively short one, such as if the plaintiff was close to retirement, the strong preference in favor of reinstatement has been found to be neutralized by the increased certainty of the potential loss of pay, permitting consideration of a front pay award."); Davis, 742 F.2d at 923 (upholding front pay award to fifty-nine year-old, but noting that awarding front pay to forty-one year-old until time he qualifies for a pension might be unwarranted).

**Length of time employed**: At the time of his termination, Hunter had served in the MPD for twenty-seven years. He was three months from being eligible to retire and three years from being eligible to retire with full retirement status. (Doc. 172 at 4; Doc. 175 at 4.) The long duration of Hunter's service and his proximity to retirement weigh in favor of a front pay award.

**Likelihood of continued employment, ability to work, and status as at-will employee**: Hunter was a major in the MPD at the time of his termination. In November 2011, before Plaintiffs' call to the governor's office, Chief Cook reorganized the MPD chain of command and removed Hunter from supervising other officers. (Pl. Ex. 11.) Chief Cook

17

attributed this change to officer complaints of an inability to work for Hunter. This reorganization (which Hunter viewed as a demotion) occurred prior to the call to the governor's office and therefore could not have been caused by it. This is some evidence that Hunter's status at the MPD was trending downward prior to his having engaged in the protected activity. This weighs somewhat against a front pay award.

There was also evidence that in December 2011 Hunter had allowed a local business owner, who (unbeknownst to Hunter) was under investigation by the Davie County Sheriff, to walk out of Hunter's MPD office with illegal drugs. Although Hunter explained that this decision reflected the fact that the controlled substance had only recently been scheduled as illegal and the business owner (who consequently sought to return them for a refund) lacked the requisite intent, Chief Cook could have fired him on this basis. In fact, in light of Hunter's status as an at-will employee, Chief Cook could have fired Hunter for any reason other than the unlawful reason the jury found was the basis for his termination. This also weighs somewhat against a front pay award.

On the other hand and aside from these incidents, Hunter's service record was effectively unblemished and in fact supported by several awards and commendations. Moreover, the evidence showed that Chief Cook had never terminated an officer of the

18

MPD.  And this was not due to a perfectly-behaved department.
For example, one MPD officer was involved in a hit-and-run
accident while intoxicated and on duty but was not disciplined;
instead, he was ordered not to return to work until he was
sober.  Another time, the same officer recklessly pointed a gun
at random members of the public walking down the sidewalk
because they were "looking at him."  That officer was eventually
allowed to voluntarily resign.  The evidence showed that Chief
Cook was willing to tolerate a lot of behavior, but just not, as
the jury found, a call to the governor's office about corruption
in the MPD implicating the chief.  This strongly suggests that
if Hunter had accepted his new non-supervisory position in the
MPD, he likely would not have been terminated.  This weighs in
favor of a front pay award.

    Despite his current age of fifty-nine, it also appears that
Hunter is still capable of doing the job from which he was
terminated.  He has asked for reinstatement.  Hunter's
responsibilities at the time of his termination included
overseeing the MPD vehicle fleet, training officers, and working
cases.  (Pl. Ex. 11.)  This represented a decrease in Hunter's
responsibilities, as he previously had been tasked with
supervising other officers.  (Pl. Ex. 9.)  There is no evidence
to suggest that Hunter presently is incapable or soon will
become incapable of performing these tasks.  This weighs in

favor of a front pay award.

**Ability to obtain comparable employment and the plaintiff's efforts to mitigate damages**: Three months after his termination, Hunter began to look for other supervisory law enforcement positions. He applied to over sixty law enforcement agencies across the state. (Pl. Ex. 24.) In response, he received three to five applications. All of the positions were entry level, did not offer comparable salary, were located far away, and would have required Hunter to uproot himself and his young son from Mocksville. He did not receive a single interview or job offer for a position comparable to the one he lost. But even if he had, the MPD indicated on Hunter's F5 personnel form that he was not eligible for rehire. The F5 form is sent to the agency that oversees police officers in North Carolina and would have been available to prospective employers. Plaintiffs' police expert testified that this alone would stand as a substantial barrier to gaining employment with another agency.

Nine months after his termination, Hunter withdrew the balance of his retirement account. Defendants contend that by withdrawing his retirement benefits, Hunter retired (Doc. 172 at 4) and that any liability is precluded beyond the date of this event (Doc. 170 at 8). Defendants argue that Hunter's behavior is analogous to that in <u>Roush v. KFC Nat'l Mgmt. Co.</u>, 10 F.3d

20

392 (6th Cir. 1993). In Roush, the plaintiff obtained a comparable job following her wrongful discharge. Id. at 400. When her new employer reduced her hours, she elected to receive social security benefits rather than seeking alternative employment. Id. The court found front pay to be inappropriate as a matter of law in light of this fact. Id. Here, by contrast, Hunter applied to dozens of agencies across the state but eventually was forced to accept that, in light of his age, prior position, and termination, the only way to sustain himself and his young son was to withdraw his retirement benefits. Prior to the withdrawal of funds, Hunter was living in a motel, and he has now depleted his retirement account. Hunter credibly denied that he had actually retired or voluntarily taken himself out of the workforce. As he had done before his termination, Hunter continued to obtain supplemental income by refereeing sporting events and teaching classes at a local community college. These activities were not sufficient to sustain Hunter once he lost his job at the MPD. In light of the evidence presented at trial, Defendants have failed to show that Hunter "did not exert reasonable efforts to mitigate [his] damages," Edwards v. Sch. Bd. of City of Norton, Va., 658 F.2d 951, 956 (4th Cir. 1981), or that the withdrawal of his retirement funds stands as a bar to an award of front pay.

**Length of time other employees typically held the position lost and subjective intention to remain:** Plaintiffs' expert has pegged Hunter's work life expectancy to the work life expectancy of all active males. (Pl. Ex. 37A-2 n.6.) Defendants contend that this is inappropriate because police officers tend to retire at earlier ages than the average active male. (Doc. 172 at 5.) This may be true, but Defendants have not cited to any persuasive evidence to support this claim. (E.g., id.) Rather, during cross-examination of Plaintiffs' police expert, Defendants asked whether it is "fairly typical" for police officers to retire at a "fairly young age." Contrary to agreeing, the expert instead denied knowing whether that was typical or not. As a result, this court has no reliable evidence on how long other employees typically held the position that Hunter lost. What the court does have is conflicting evidence on how long Hunter intended to remain at the MPD. On cross-examination, Hunter testified that his goal was to "stay to reach 30 years [of service] and retire." This testimony suggests a front pay award is unwarranted, as Hunter's back pay award covered the date he would have reached thirty years of service on October 28, 2015. On redirect, however, Hunter testified that, while he would have been eligible to retire with thirty years of service, his intention at the time of his termination was to stay with the MPD for as long as he possibly

22

could.  Hunter thus argues that a front pay award to his work life expectancy of 64.39 is warranted.

Based on all the evidence presented, including Hunter's reduction in responsibilities within the MPD, the court finds that a front pay award between these two dates – that is, just past age 62 – is proper.  Accordingly, the court finds that a front pay award of $193,676[6] (equal to 2.75 years of front pay) is appropriate.[7]  (See Pl. Ex. 37A-6b); Snow, 650 F. Supp. at 300-01 (awarding three years of front pay).

### 2.  Medlin

**Age and work life expectancy**: Medlin was age forty-four at the time of his termination and forty-nine at the time of trial.  (Pl. Exs. 37C-2, 37C-6b.)  The jury recommended a front pay award of 13.75 years – until Medlin reached his work life expectancy of 62.09 in the year 2029.  (Doc. 167 at 6; Pl. Ex. 37C-6b.)  Generally, lifetime awards of front pay are disfavored for plaintiffs in their forties.  See, e.g., Dotson v. Pfizer,

---

[6] This figure represents the present value of lost earnings and benefits for 2.75 years of front pay.  (See Doc. 37A-6b.)  It also appears that Hunter would be entitled to the present value of the loss of retirement benefits (Id. (Ex. 7)) for the 2.75 year front pay period.  These calculations are not readily apparent from the evidence submitted by the parties.  As noted in the order at the end of this memorandum opinion, therefore, the parties are invited to submit this amount to the court within ten days.

[7] In evaluating all the evidence presented, the court has considered the testimony as to the psychological effects Hunter claims the discharge had on him.

23

Inc., 558 F.3d 284, 300 (4th Cir. 2009); Peyton, 287 F.3d at
1130 ("[C]ourts seem to agree that plaintiffs in their forties
are too young for lifetime front pay awards." (citations
omitted)); Davis, 742 F.2d at 923 ("[T]he award of front pay to
a discriminatorily discharged 41 year old employee until such
time as he qualifies for a pension might be unwarranted.  On the
other hand, the failure to make such an award for an employee
age 63, likewise discriminatorily discharged, might be an abuse
of discretion."); Stafford v. Elec. Data Sys. Corp., 749 F.
Supp. 781, 788-89 (E.D. Mich. 1990); Foit v. Suburban Bancorp,
549 F. Supp. 264, 267 (D. Md. 1982) ("[T]he plaintiff's argument
that at age 49 his number of employable years is limited is
somewhat hard to swallow.").  Medlin's relative youth therefore
weighs against an extended front pay award.

     **Length of time employed**: At the time of his termination,
Medlin had served in the MPD for over five years.[8]  For almost
the last four years of his tenure at the MPD, Medlin served as a
detective.  The duration of Medlin's service weighs somewhat in
favor of a front pay award.

     **Likelihood of continued employment, ability to work, and
status as at-will employee**: Medlin was a MPD detective at the

---

[8] Plaintiffs contend that Medlin had served as a detective of the MPD
for seven years.  (Doc. 175 at 3.)  His testimony made clear that he
"accepted a position at [the] Mocksville Police Department June 26,
2006," and was terminated on December 29, 2011.

24

time of his termination. (Pl. Ex. 11.) His service record was effectively unblemished, and he had received several awards and commendations. Medlin had one of the highest case clearance rates among MPD detectives. Unlike Hunter, Medlin was not affected in rank or stature by the November 2011 restructuring.[9] (Pl. Ex. 11.) His status as an at-will employee made him subject to discharge for any lawful reason but, as noted above, Chief Cook had never terminated an MPD officer prior to Plaintiffs' terminations. Accordingly, it is more likely than not that, but for his wrongful discharge, Medlin would have remained a detective with the MPD for the foreseeable future.

**Ability to obtain comparable employment and the plaintiff's efforts to mitigate damages:** Following his termination from the MPD, Medlin applied to over twenty law enforcement agencies for predominantly entry level positions. Medlin continued to pursue these applications for more than a year. He targeted agencies within driving distance of his home in Mocksville because his children were in school and his wife had a job as an administrative assistant at a Winston-Salem radiology office. His efforts led to two phone calls in response. One was from

---

[9] In 2009, Medlin made certain allegations of impropriety against Chief Cook to Bralley. (Pl. Ex. 3.) As a result, Chief Cook demoted him to patrol. (Pl. Ex. 4.) Medlin filed a formal grievance with Bralley and she subsequently reinstated him as a detective. (Pl. Ex. 5.) This incident occurred years prior to Medlin's termination and does not support an inference that Medlin would have been lawfully terminated notwithstanding Plaintiffs' call to the governor's office.

the Asheboro Police Department ("APD"), which showed interest but would have required Medlin to live within twenty minutes of its department located about an hour away from Mocksville. Medlin viewed this opportunity as infeasible given that it would have required him to uproot his family.

The second phone call was from the Winston-Salem Police Department ("WSPD"). During a phone conversation, a WSPD recruiter told Medlin that if he were to receive a position at the WSPD he would have to complete their six- to eight-month academy. The recruiter never offered Medlin a job or invited him to attend the academy; he was merely describing openings and the process to apply. Medlin decided not to pursue a position at the WSPD for at least two reasons. First, by attending the WSPD academy, he would have been repeating the basic law enforcement training ("BLET") certification that he had already completed prior to working for the MPD. Second, because Medlin paid for his BLET training prior to working for the MPD, he assumed the six to eight months at the WSPD academy would be unpaid. This belief was likely erroneous, as Plaintiffs' police expert testified that large agencies such as the WSPD actually pay for and provide benefits to individuals completing BLET. Medlin conceded that he did not ask the WSPD recruiter whether such pay and benefits would have been provided and, if that were

Case 1:12-cv-00333-TDS-JEP   Document 176   Filed 08/12/16   Page 26 of 36

the case, in hindsight he should have investigated the WSPD opportunity further.

After following up on his law enforcement applications for over a year, Medlin felt compelled to withdraw his retirement funds in 2013 and started a bail bondsman business. The business started off well but has "dropped off considerably" over time. Medlin attributes this drop off to local knowledge about the stated reason for his termination and the Davie County sheriff's statement to deputies not to work with him. Medlin is still a licensed bondsman and still operates his bail bondsman business. However, Plaintiffs' financial expert testified that his business was not profitable, and Medlin showed a loss from it on his tax returns.

Defendants contend that Medlin has "abandoned" his bail bondsman business and that his failure to more vigorously pursue an opportunity with the WSPD precludes an award of front pay. (Doc. 170 at 8.) The court disagrees given the surrounding context. As noted above, Medlin has not abandoned his bail bondsman business; it is just unprofitable, and he is taking a loss from it. Moreover, Medlin's application to the WSPD does not present a situation where Medlin "refus[ed] a substantially equivalent job." Dominic v. Consol. Edison Co. of New York, Inc., 822 F.2d 1249, 1258 (2d Cir. 1987) (stating that a plaintiff's refusal of a substantially equivalent job would

27

constitute a failure to mitigate damages and foreclose any front pay award). Medlin never received an interview, an invitation to the WSPD academy, or a job offer from the WSPD. Medlin's conversation with the WSPD recruiter occurred relatively early in his mitigation efforts. He had applied to approximately two dozen agencies and had yet to realize the true effect of his termination on his future job prospects. As a result, he quite reasonably assumed that the position at the WSPD requiring six to eight months of retraining would not be his only opportunity. Moreover, given that Medlin had previously paid for his own BLET training and only worked in small agencies, his assumption that he would not be paid to complete the WSPD academy was not unreasonable and thus not a liability severing event.

Nevertheless, the fact that Medlin's bail bondsman business was once profitable and his dealings with the WSPD are relevant to the appropriate duration of any front pay that is awarded. See Dominic, 822 F.2d at 1258 ("[T]he court must estimate the plaintiff's ability to mitigate damages in the future. . . . [The district court did not abuse its discretion] in finding that two years was a reasonable amount of time for [the plaintiff] to find comparable employment."); Mattenson v. Baxter Healthcare Corp., 438 F.3d 673, 771 (7th Cir. 2006) (finding that a fifty-one year-old plaintiff's failure to obtain a position based on twenty-three applications did not entitle him

28

to a front pay award until age sixty-five "in order that he can play golf eight hours a day"); Snow, 650 F. Supp. at 300 ("[P]laintiff can secure other employment. He looks presentable and healthy. . . . [A]n award of almost nine years would be inappropriate and speculative."). Despite his F5 indicating that he was ineligible for rehire, Medlin received interest from two police agencies soon after being terminated. His prospects have only improved as a result of the jury's verdict in this case, as any cloud over his reputation as a result of his termination and this litigation should be lifted by the jury's finding that he was wrongfully discharged. The fact that he had the skill and ability to start a business that was at least temporarily profitable also speaks to his future prospects. Accordingly, although Defendants have failed to show that Medlin "did not exert reasonable efforts to mitigate [his] damages," Edwards, 658 F.2d at 956, Medlin's age and mitigation efforts suggest that his prospects of obtaining comparable employment moving forward are good. In light of these factors, a long term front pay award would create a substantial risk of a windfall for Medlin.

**Length of time other employees typically held the position lost and subjective intention to remain:** As noted above, there is no evidence of how long other employees typically held the position that Medlin lost. All the available evidence,

including the fact that Chief Cook had never terminated an MPD police officer, suggests that Medlin would likely have remained with the MPD for the foreseeable future. Nevertheless, Medlin's relative youth and the circumstances surrounding his mitigation efforts weigh strongly against a long term front pay award.

The totality of the evidence suggests that Medlin will be able to secure comparable employment moving forward through reasonable diligence. The court therefore considers a front pay award of $85,360[10] (equal to 1.75 years of front pay) to be appropriate.[11] See, e.g., Dominic, 822 F.2d at 1258 (upholding two year front pay award); Snow, 650 F. Supp. at 300-01 (awarding three years of front pay); Reeder-Baker v. Lincoln Nat'l Corp, 649 F. Supp. 647, 664 (N.D. Ind. 1986) (awarding two years of front pay), aff'd, 834 F.2d 1373 (7th Cir. 1987).

### 3. Donathan

**Age and work life expectancy**: Donathan was age thirty-six at the time of his termination and forty-one at the time of

---

[10] This figure represents the present value of lost earnings and benefits for 1.75 years of front pay. (See Doc. 37C-6b.) It also appears that Medlin would be entitled to the present value of the loss of retirement benefits (Id. (Ex. 7)) and loss of supplemental separation allowance (id. (Ex. 8)) for the 1.75 year front pay period. As noted in the court's order, the parties are invited to submit this amount to the court within ten days.

[11] In evaluating all of the evidence presented, the court has considered testimony that Medlin is currently being treated for an anxiety disorder and a major depressive disorder as a result of his discharge.

30

trial. (Pl. Exs. 37B-2, 37B-6b.) The jury recommended a front pay award of 19.73 years until Donathan reaches his work life expectancy of age 60.50 in the year 2035. (Doc. 167 at 4; Pl. Ex. 37B-6b.) As noted above, lifetime awards of front pay are disfavored for plaintiffs in their forties. See, e.g., Dotson, 558 F.3d at 300; Peyton, 287 F.3d at 1130; Davis, 742 F.2d at 923; Stafford, 749 F. Supp. at 788-89; Foit, 549 F. Supp. at 267. Donathan's youth, even as compared to Medlin's, weighs strongly against a long term front pay award.

**Length of time employed**: At the time of his termination, Donathan had served in the MPD for approximately thirteen years. (Doc. 175 at 5.) The duration of Donathan's service weighs in favor of a front pay award.

**Likelihood of continued employment, ability to work, and status as at-will employee**: Donathan was a lieutenant in the MPD at the time of his termination, having been promoted one month prior to his termination as part of the November 2011 restructuring, and Chief Cook told him he hoped to see him in a captain's position one day. (Pl. Ex. 11.) Donathan's service record was effectively unblemished, and he had received several awards and commendations, including an award for "officer of the year" in 2000. He was an at-will employee, but Chief Cook had never terminated an MPD officer prior to Plaintiffs' terminations. Accordingly, it is more likely than not that, but

31

for his wrongful discharge, Donathan would have remained as a lieutenant with the MPD for the foreseeable future.

**Ability to obtain comparable employment and the plaintiff's efforts to mitigate damages**: Following his termination, Donathan applied to twenty-eight law enforcement agencies across the state. (Pl. Ex. 31.) He decided not to pursue an application with the Statesville Police Department ("SPD") after learning that officers were required to share take-home cars. Eight months after his termination, Donathan was hired by the Burlington Police Department ("BPD") as a patrol officer. Because the BPD required officers to live within thirty minutes of the city of Burlington, Donathan and his wife moved to Burlington.[12] Donathan listed his family's house for sale in Mocksville, but it did not sell. He testified that, between paying for rent in Burlington, paying for a mortgage in Mocksville, and his other costs of living, his expenses were substantially greater than what he was making at the BPD. This caused him to leave the BPD after six months and seek more sustainable employment. In the interim, Donathan stayed on as a reserve officer with the BPD and applied to police departments

---

[12] Donathan owned a graphics design business that he sold to another individual when he moved to Burlington. Donathan testified that the business was more of a hobby than a money-maker. His wife testified that she worked at the business but "didn't get a paycheck." Defendants failed to establish that the graphics design business was a viable alternative to moving to Burlington.

near Mocksville. He received interviews from the SPD, the Salisbury Police Department, and the Kernersville Police Department ("KPD"). His interviews went well until his termination and this litigation were raised. He did not receive a job offer from any agency and eventually withdrew his retirement benefits to sustain his family. Donathan has since begun a school program in computer programming and coding.

Defendants contend that Donathan's voluntary departure from the BPD and failure to pursue a position with the SPD bars any front pay award. (Doc. 170 at 8.) The court disagrees. It is true that Defendants' cross-examination of Plaintiffs' financial expert demonstrated that Donathan's losses would have been smaller had he remained with the BPD, but it did not show that continuing with the BPD was sustainable for Donathan. Donathan left the BPD because his house would not sell and his living expenses exceeded his pay. The court does not find it unreasonable that he reduced his status to that of a reserve officer, moved back to Mocksville to reduce duplicative expenses, and sought other employment in hopes of finding a sustainable financial situation for his family.

Donathan's failure to pursue an application with the SPD in the first instance also does not bar a front pay award. First, as Donathan testified, the SPD had a hiring freeze in effect at this time. Second, this decision occurred during the same

33

application process that resulted in a job offer from the BPD. Finally, even if Donathan did make a mistake by not pursuing an application with the SPD in the first instance, he did not repeat this mistake after leaving the BPD. He applied to and interviewed with the SPD but was not offered a position.

Nevertheless, as with Medlin, the fact that Donathan was hired by the BPD soon after his termination, received three local interviews after leaving the BPD, and attended school for computer programing is relevant to the appropriate duration of any front pay that is awarded. See Dominic, 822 F.2d at 1258; Snow, 650 F. Supp. at 300. Donathan's F5 may have indicated that he was ineligible for rehire, but this did not prevent him from being hired by the BPD in light of his age and other skills. The cloud of this litigation that potentially affected his interview with the SPD, Salsbury PD, and KPD has been lifted. The jury has vindicated his rights and declared that he was wrongfully terminated. This can only help his future employment prospects in law enforcement. Moreover, a long term front pay award would create a significant risk of a windfall given that he is currently pursuing a career in computer programming. The court views these factors as weighing against a long term front pay award.

**Length of time other employees typically held the position lost and subjective intention to remain:** Once again, there is no

34

evidence of how long other employees typically held the position that Donathan lost. All the available evidence, including the fact that Chief Cook had never terminated an MPD police officer, suggests that Donathan would likely have remained with the MPD for the foreseeable future. Still, Donathan's youth, employment at the BPD, and subsequent education weigh strongly against a long term front pay award.

The totality of the evidence suggests that through reasonable diligence Donathan will be able to secure comparable employment moving forward. The court therefore considers a front pay award of $89,063[13] (equal to 1.75 years of front pay) to be appropriate.[14] See, e.g., Dominic, 822 F.2d at 1258 (two years); Snow, 650 F. Supp. at 300-01 (three years); Reeder-Baker, 649 F. Supp. at 664 (two years).

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motion for judgment as a matter of law as to Bralley is DENIED and

---

[13] This figure represents the present value of lost earnings and benefits for 1.75 years of front pay. (See Doc. 37B-6b.) It also appears that Donathan would be entitled to the present value of the loss of retirement benefit (Id. (Ex. 7)) and loss of supplemental separation allowance (id. (Ex. 8)) for the 1.75 year front pay period. As with the other Plaintiffs, the parties are invited to submit this calculation to the court within ten days.

[14] In evaluating of all the evidence presented, the court has considered testimony that Donathan suffers anxiety and depression as a result of his discharge.

Plaintiffs' motion for judgment and equitable relief (Doc. 169) is GRANTED. Plaintiff Hunter is awarded 2.75 years of front pay in the amount of $193,676, plus any retirement benefit to be determined by the court; Plaintiff Medlin is awarded 1.75 years of front pay in the amount of $85,360, plus any retirement and supplemental separation allowance to be determined by the court; and Plaintiff Donathan is awarded 1.75 years of front pay in the amount of $89,063, plus any retirement and supplemental separation allowance to be determined by the court.

IT IS FURTHER ORDERED that within ten days of this order the parties shall submit (jointly, if they agree) their calculation of the retirement and supplemental separation allowance owed to Plaintiffs Hunter, Medlin, and Donathan, as noted in this memorandum opinion. An appropriate judgment will be entered upon submission of these calculations.


                                        /s/   Thomas D. Schroeder
                                        United States District Judge

August 12, 2016