IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KENNETH HUNTER, RICK A.         )
DONATHAN, and JERRY D. MEDLIN,  )
                                )
            Plaintiffs,         )
                                )
        v.                      )
                                )
TOWN OF MOCKSVILLE, NORTH       )
CAROLINA; ROBERT W. COOK, in    )
his official capacity as        )
Administrative Chief of Police  )
of the Mocksville Police        )
Department and in his           )        1:12cv333
individual capacity; and        )
CHRISTINE W. BRALLEY, in her    )
official capacity as Town       )
Manager of the Town of          )
Mocksville and in her           )
individual capacity,            )
                                )
            Defendants,         )
                                )
and THE INTERLOCAL RISK         )
FINANCING FUND OF NORTH         )
CAROLINA,                       )
                                )
            Intervenors.        )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

        This case is before the court on various post-trial motions

of the parties and a proposed intervenor following a jury verdict

for Plaintiffs and the court's award of equitable relief in this

action for wrongful discharge in violation of the First Amendment

under 42 U.S.C. § 1983 and State law.  The purpose of this

memorandum opinion and order is to resolve all outstanding motions

so that a final judgment may be entered.

## I.  BACKGROUND

A more complete recitation of the background is set forth in the court's August 12, 2016 memorandum opinion and order (Doc. 176) and need not be repeated here.

Based on this court's rulings on post-trial equitable relief, and incorporating the information submitted by the parties at the court's request (Doc. 178), Plaintiffs' recovery against the Town of Mocksville ("Town") and Defendants Robert W. Cook and Christine W. Bralley[1] as to Plaintiffs' First Amendment Free Speech claim under § 1983 (first claim for relief) and wrongful termination claim under North Carolina law (third claim for relief) is as follows:

Kenneth L. Hunter:

|  | |
|---|---|
| Compensatory Damages: | $805,706 |
| Front Pay: | $211,893 |

Rick A. Donathan:

|  | |
|---|---|
| Compensatory Damages: | $310,830 |
| Front Pay: | $197,523 |

Jerry D. Medlin:

|  | |
|---|---|
| Compensatory Damages: | $288,293 |

---

[1] Counsel for Defendants Cook and Bralley contended for the first time during a February 1, 2017 telephonic hearing that these Defendants should not be liable for equitable relief on the § 1983 claim. Insofar as this issue has not been briefed or raised before, the court declines to consider it now.

Front Pay:                    $176,299

In addition, on their § 1983 claims each Plaintiff was awarded,

and shall recover, $10,000 in punitive damages against Defendants

Cook and Bralley, individually, for a total of $20,000 per

Plaintiff. (Doc. 167.)

    In the current motions before the court, the following issues

are raised. First, Plaintiffs Donathan and Medlin ask the court

to reconsider its denial of reinstatement of their employment.

(Doc. 191.) Second, the Interlocal Risk Financing Fund of North

Carolina ("Fund"), the Town's municipal risk pool trust carrier

which provides liability coverage for the Town, moves to intervene

in order to argue that its policy limits total insurance coverage

for Plaintiffs' combined claims to $1 million. (Doc. 195.) Third,

the Town argues that its governmental immunity makes it liable

only to the extent it has insurance coverage and that the court is

precluded from awarding judgment for any amount in excess of such

coverage. (Doc. 186.)

    Each issue will be addressed in turn.

## II.  ANALYSIS

### A.  Motion for Reconsideration and Reinstatement

    Plaintiffs Donathan and Medlin move the court to reconsider

its post-trial decision to deny their request for reinstatement to

their previous employment as lieutenants in the Mocksville Police

Department ("MPD"). (Doc. 191.) Both men had been promoted to

                                3

that position just before their termination.  They argue that since the court's ruling, two factual circumstances relied upon by the court have changed: Town Manager Bralley retired from her position, and even more recently a MPD lieutenant has departed, thus creating an open position.  (Doc. 204-1 at 2.)[2]  The Town continues to oppose reinstatement.  It relies on the opinion expressed by its current Chief of Police, Todd Penley, that reinstatement "would result in hostility and antagonism within the [MPD]" because the litigation has "damaged the relationships between the plaintiffs and individuals in the local law enforcement community to such an extent that reinstatement of the plaintiffs would jeopardize public safety." (Doc. 197-1 at 2.)  The Town also argues that no funding exists to create a new officer position and states that it does not wish to terminate any current officer in order to reinstate either Plaintiff.  (Id.)  Of course, to the extent there is an opening within the MPD, the latter concerns would be moot.

As the court acknowledged earlier, reinstatement is the preferred remedy.  (Doc. 176 at 11.)  Reinstatement was declined in part because there was no position available, Defendants indicated there was no budget money to fund additional positions,

_____

[2] Medlin has also filed a declaration in which he states that based on a conversation with a former MPD officer who spoke with "close acquaintances" at the MPD, a lieutenant intends to retire in June 2017 and a "reliable source" indicates that at least three other MPD officers intend to give notice of their resignations.  (Doc. 206-2 at 2.)  As Defendants note (Doc. 207 at 1), this is unreliable hearsay that the court declines to credit.

and the Town Manager opposed it. The Town also presented evidence that, in its view, a working relationship would be infeasible in light of all that has transpired. That was based in part on the opinion of Bralley, who has since left. (See Doc. 170-1 at 1 (Bralley testifying that the trial "damaged the relationships between the plaintiffs and individuals employed by the Town," making reinstatement "unworkable").) Chief Penley also stated that mutual trust is vital to effective police work (Doc. 170-2 at 2), that the events of the case "damaged the relationships between the plaintiffs and individuals in the local law enforcement community," and that reinstatement "would result in hostility and antagonism within the Department" (id. at 1-2).

As to Medlin, there is evidence that his relationship with the MPD following these events has only deteriorated. On August 28, 2016, after trial in this case, Medlin posted on social media that Mocksville is a "crooked [expletive] hole of a town." (Doc. 197-1 at 2.) On November 13, 2016, he offered another online posting that questioned law enforcement's actions as to an active investigation, an action Medlin seems to acknowledge was at best ill-advised. (Id.) Chief Penley finds these statements "unprofessional and incompatible with employment as a Mocksville police officer." (Id.) The Town argues that these actions reinforce its concern that Medlin lacks trust within the MPD.

The court accepts the Town's statement that trust within a

law enforcement department is serious. See Wootten v. Virginia,
No. 6:12-cv-00013, 2016 WL 7496145, at *3 (W.D. Va. Dec. 30, 2016)
(finding unique need for deference to law enforcement
decisionmaking as to personnel in the chain of command), appeal
docketed, No. 17-1117 (4th Cir. Jan. 26, 2017). MPD officers
testified at trial that Medlin was "insubordinate" because he
refused to follow orders (Doc. 37-1 at 3-4; Doc. 37-2 at 5), used
MPD property for personal use (Doc. 37-1 at 3-4, 6), and colluded
with Hunter to intimidate fellow MPD employees (id. at 3-4; Doc.
37-2 at 5). An additional problem for Medlin is that he is no
longer certified as a law enforcement officer and thus lacks the
minimum qualification to be an MPD officer. (Doc. 197-1 at 2.)
Considering the complete record as to Medlin and considering his
negative post-trial comments about the Town and ongoing law
enforcement, the court will not change its ruling.

Donathan is in a more favorable posture, however. Testimony
at trial revealed he is a decorated officer. Donathan received
the "Silver Star" in 2007 for his involvement in saving several
elderly residents of a nursing home during a fire. For his
actions, he was inducted into the National Police Hall of Fame and
received a letter of commendation from then-President George W.
Bush. Donathan also received the "outstanding officer of the year
award" in 2002 and 2007. The Davie County Sheriff, Andy Stokes,
whom the court found credible, testified that he knew Donathan

personally when they both worked the nursing home fire and was "very impressed" by him. The trial evidence revealed that Donathan was invited to Chief Cook's house a month before he was terminated, told he was a good officer, promoted to lieutenant, and advised that he was likely to be promoted to captain. Cook warned him, however, that he needed to adhere to MPD politics. (Doc. 43-2 at 8.)

Concerns of trust expressed as to Medlin[3] are not evident with respect to Donathan. At trial, Defendants contended that they terminated Donathan largely because he was distracted by his operation of his personal business. The jury necessarily rejected this conclusion, and in any event there is no indication that Donathan still operates this business.[4] Unlike Medlin, Donathan remains a certified law enforcement officer, ready to go to work. It has been over five years since his termination. Unlike as to Medlin, the Town has not offered any specific example of animosity as to Donathan; indeed, Chief Penley encountered him after the trial and told him he has "no preconceived notions" about him and an "open door" if he wished to talk. (Doc. 197-1 at 2-3.) Any lingering resentment within the MPD as to Donathan has likely

---

[3] Sheriff Stokes' knowledge of Medlin was not based on personal information, and Medlin left the sheriff's office before Stokes became sheriff.

[4] Indeed, Donathan explained during his deposition in November of 2012 that the business was in the process of being sold. (Doc. 37-5 at 2.)

dissipated, and he would start with a new Chief of Police who was not involved in the MPD at the time of the events leading to his termination. It is thus difficult to say that the employment relationship is irreparably damaged as to Donathan. Moreover, Chief Penley's concerns about any damaged relationships between other Plaintiffs and local law enforcement do not appear to be an issue with respect to Donathan.

However, the Town acknowledged during the February 1, 2017 telephonic hearing that the only MPD position presently available is at the entry level.[5] Despite the court's inquiry, counsel for Plaintiffs would not commit that Donathan (or Medlin) was interested in that position. As the court noted before, it is disinclined to order immediate reinstatement to a position where there are no funds to support it or it would require the displacement of a current employee. (Doc. 176 at 11-12 (citing Duke v. Uniroyal, Inc., 928 F.2d 1413, 1423 (4th Cir. 1991); Roush v. KFC Nat'l Mgmt. Co., 10 F.3d 392, 398 (6th Cir. 1993)).) The court will therefore not require the Town, which operates a small police department, to fund a new position or displace a current lieutenant.

Having carefully considered Plaintiffs' request in light of

---

[5] The Town represents that the opening was created by the departure of an MPD lieutenant, but by the time Plaintiffs raised the issue with the court, that position had been filled by a promotion and only an entry level position remained open. (See Doc. 206-1.)

the new circumstances and conscious of the law's preference for reinstatement, the court will order that the Town reinstate Donathan to a lieutenant's position upon the next available opening. Until then, Donathan will be entitled to the equitable relief of front pay up to the expiration of that award. Spagnuolo v. Whirlpool Corp., 717 F.2d 114, 121 (4th Cir. 1983) (explaining that district court's order that the employer reinstate employee to a comparable position if it so chose and pay the employee-plaintiff in the meantime was "fully authorized"); Patterson v. Am. Tobacco Co., 535 F.2d 257, 269 (4th Cir. 1976) (ordering that employees who were unlawfully denied promotions receive pay until they "obtain a job commensurate with their status"); see also Briseno v. Cent. Tech. Cmty. Coll. Area, 739 F.2d 344, 348 (8th Cir. 1984) (remanding to district court to order that plaintiff be reinstated to a comparable position and be paid "monthly payment equal to the difference between what he would have earned in a comparable position and the amount that he earns in mitigation of damages" until he is placed in that position).

If Donathan is returned to his former position, his award of front pay must be prorated, as the remedies are mutually exclusive. His front pay award of $197,523 was broken down into future loss of compensation and benefits ($89,063), future loss of retirement benefits ($88,631), and future loss of supplemental separation allowance ($19,829). (Doc. 178-2.) The court will exercise its

9

authority to make a reasonable approximation of present value in determining front pay, Xiao-Yue Gu v. Hughes, STX Corp., 127 F. Supp. 2d 751, 763 (D. Md. 2001), and will simply divide Donathan's total award of front pay ($197,523) by the number of months it covered (21) to arrive at a prorated amount of $9,405 per month. He is thus entitled to that monthly amount until he is reinstated or until the 21 month front pay period expires, whichever occurs first.

### B. Intervention by the Fund

The Town enjoys sovereign immunity from damages claims arising from actions of their officers and employees committed while performing a governmental function. Clayton v. Branson, 153 N.C. App. 488, 493, 570 S.E.2d 253, 256-57 (2002). Under North Carolina law, the Town waives its immunity to the extent it has purchased insurance. N.C. Gen. Stat. § 160A-485; Combs v. Town of Bellhaven, 106 N.C. App. 71, 73, 415 S.E.2d 91, 92 (1992). Beyond the extent of its insurance coverage, however, there is no waiver. Wilhelm v. City of Fayetteville, 121 N.C. App. 87, 89, 464 S.E.2d 299, 300 (1995); see also Cunningham v. Riley, 169 N.C. App. 600, 602, 611 S.E.2d 423, 424 (2005) ("A county may waive sovereign immunity by purchasing liability insurance, but only to the extent of coverage provided." (citations omitted)). North Carolina law prohibits the entry of judgment against a municipality to the extent of the municipality's immunity. See

10

N.C. Gen. Stat. § 160A-485(c) ("No judgment may be entered against a city in excess of its insurance policy limits on any tort claim for which it would have been immune but for the purchase of liability insurance pursuant to this section."). Thus, the parties agree that it is incumbent on the court to determine the extent of the Town's insurance coverage before entering final judgment.

The Fund seeks to intervene as of right, and permissively, pursuant to Federal Rules of Civil Procedure 24(a)(2) and (b)(1)(B), respectively, to argue the limits of coverage. (Doc. 195.) It argues that failure to permit intervention would impair its ability to protect the Fund's interests. (Doc. 196 at 2.) Plaintiffs oppose intervention, contending that the motion is untimely and unnecessary because the Fund's position is adequately advocated by Defendants. (Doc. 202 at 2-3.) It argues further that if intervention is permitted, no additional delay or briefing should be allowed. (Id. at 3.)

"Under Rule 24(a)(2), a district court must permit intervention as a matter of right if the movant can demonstrate '(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation.'" Stuart v. Huff, 706 F.3d 345, 349 (4th Cir. 2013) (quoting Teague v. Bakker,

11

931 F.2d 259, 260-61 (4th Cir. 1991)).  Under Rule 24(b), the
court may permit anyone who "has a claim or defense that shares
with the main action a common question of law or fact" to intervene
on timely motion.  Fed. R. Civ. P. 24(b)(1)(B).  "In exercising
its discretion, the court must consider whether the intervention
will unduly delay or prejudice the adjudication of the original
parties' rights."  Fed. R. Civ. P. 24(b)(3).  Thus, where a movant
seeks permissive intervention as a defendant, the movant must
satisfy three requirements: (1) the motion must be timely; (2)
the defenses or counterclaims must have a question of law or fact
in common with the main action; and (3) intervention must not
result in undue delay or prejudice to the existing parties.  See
Wright v. Krispy Kreme Doughnuts, Inc., 231 F.R.D. 475, 479
(M.D.N.C. 2005); Solo Cup Operating Corp. v. GGCY Energy LLC,
Civil No. WDQ-12-3194, 2013 WL 2151503, at *2 (D. Md. May 15,
2013); Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co., 223 F.R.D.
386, 387 (D. Md. 2004).[6]  Trial courts are directed to construe
Rule 24 liberally to allow intervention, where appropriate.
Feller v. Brock, 802 F.2d 722, 729 (4th Cir. 1986) (noting that
"liberal intervention is desirable to dispose of as much of a
controversy involving as many apparently concerned persons as is

---

[6] Intervention will not upset the court's subject matter jurisdiction,
which is based on the presence of a federal question.  See, e.g.,
Radchyshyn v. Allstate Indem. Co., 311 F.R.D. 156, 158-61 (W.D.N.C.
2015).

compatible with efficiency and due process" (citations and internal quotation marks omitted)); <u>Capacchione v. Charlotte-Mecklenburg Bd. of Educ.</u>, 179 F.R.D. 505, 507 (W.D.N.C. 1998) (same).

The scope of coverage under the Fund's insurance policy is surely an interest in the action that would be impaired by the court's interpretation of the policy. Plaintiffs argue, nevertheless, that the Town is an adequate advocate for the Fund's position. In light of the potential conflict of interest between the Town, as insured, and the Fund, as insurer, and considering the Fund's clear interest in construing its policy limits, the court cannot agree.

Moreover, even if there were any serious doubt about that question, the motion should be granted under Rule 24(b)'s permissive intervention standards. The Fund's motion is timely. The question of insurance coverage has arisen only recently. Plaintiffs' argument that the Fund should have sought intervention much earlier ignores reality. No one knew what verdict the jury would return, and until a verdict in excess of the alleged $1 million coverage amount was rendered, the court had no reason to have entertained any such request.

Moreover, the Fund shares common questions of law and fact with the parties to this action. Indeed, the Fund's arguments directly address the scope of coverage, the resolution of which

13

is essential to this court's entry of a final judgment because the Town's liability rises or falls on it. N.C. Gen. Stat. § 160A-485(c).

Finally, the addition of the Fund will not cause undue delay or prejudice to the parties.[7] As the Fund's contentions directly overlap the legal and factual issues already present in the case, the addition of the Fund will not complicate the proceedings or expand their scope. In fact, the Fund has already filed its brief and evidence as to coverage, and all parties agreed during the February 1, 2017 telephonic hearing that the court should decide the coverage issue on the current record with no additional proceedings. Thus, apart from what delay has already transpired, the addition of the Fund does not prove to provide any further delay.

For these reasons, the court will allow the Fund to intervene to present its contentions as to the nature of insurance coverage provided the Town under the Fund's policy.

## C. Scope of Insurance Coverage and Governmental Immunity

Next, the court must determine the scope of insurance coverage and the extent of governmental immunity. Two issues are presented. First, what is the extent of coverage in this case under the Fund's

---

[7] While the court has pressed to resolve all post-trial motions and enter final judgment, it is notable that Plaintiffs consented to much of Defendants' requests for additional time. <u>See, e.g.</u>, Docs. 185, 188, and docket text entries dated October 7, 2016, and October 17, 2016.

14

policy?  Second, if that insurance fails to cover the complete award in this case, are Plaintiffs entitled to additional recovery for which immunity is waived pursuant to their claim for violation of the North Carolina Constitution (second claim for relief)?  Each question will be addressed below.

### 1. Scope of Coverage under the Fund's Policy

The parties and the Fund agree that Plaintiffs' claims are covered by the Fund's policy; their disagreement is as to the extent of coverage.  Plaintiffs argue that the policy provides up to $1 million for each Plaintiff and $3 million in the aggregate, while the Fund and Town contend that all three Plaintiffs' claims are limited to a total of $1 million.

The interpretation of an insurance policy presents a question of law, and the parties accept that the Fund's policy must be interpreted under the law of the State of North Carolina.  Under North Carolina law, "an insurance policy is a contract between the parties which must be construed and enforced according to its terms."  Graham v. James F. Jackson Assoc., Inc., 84 N.C. App. 427, 430, 352 S.E.2d 878, 880 (1987) (citing Allstate Ins. Co. v. Shelby Mut. Ins. Co., 269 N.C. 341, 152 S.E.2d 436 (1967)).  The court is obliged to use the definitions supplied in the policy to determine the meaning of words contained in it.  Durham City Bd. of Educ. v. Nat'l Union Fire Ins. Co., 109 N.C. App. 152, 156, 426 S.E.2d 451, 453 (1993) (quoting Wachovia Bank & Trust Co. v.

15

<u>Westchester Fire Ins. Co.</u>, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970)). "In the absence of such definition[s], nontechnical words are to be given a meaning consistent with the sense in which they are used in ordinary speech . . . ." <u>Id.</u> (quoting <u>Wachovia Bank & Trust Co.</u>, 276 N.C. at 354, 172 S.E.2d at 522) (alterations in original).

Any ambiguity in a policy must be strictly construed in favor of providing coverage to the insured. <u>City of Greenville v. Hayward</u>, 130 N.C. App. 271, 275, 502 S.E.2d 430, 433 (1998); <u>Maddox v. Colonial Life & Accident Ins. Co.</u>, 303 N.C. 648, 650, 280 S.E.2d 907, 908 (1981). In other words, when confronting ambiguity, courts should interpret the policy as having greater coverage. <u>Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield L.L.C.</u>, 364 N.C. 1, 9-10, 692 S.E.2d 605, 612 (2010) (policy provisions that extend coverage must be liberally construed in order to provide coverage wherever possible by reasonable construction). "An ambiguity exists when the language used in the policy is susceptible to different, and perhaps conflicting, interpretations." <u>McLeod v. Nationwide Mut. Ins. Co.</u>, 115 N.C. App. 283, 290, 444 S.E.2d 487, 492 (1994). The court cannot assume the existence of an ambiguity, however, "simply because a plaintiff makes a claim based on a construction of the insurance policy's language contrary to that of the company's interpretation." <u>Christ Lutheran Church by & Through Matthews v. State Farm Fire & Cas.</u>

16

<u>Co.</u>, 122 N.C. App. 614, 471 S.E.2d 124, 125 (1996).

If the policy is not ambiguous, "the court must enforce the contract as the parties have made it and may not, under the guise of interpreting an [allegedly] ambiguous provision, remake the contract and impose liability upon the insurance company which it did not assume and for which the policyholder did not pay." <u>Wachovia Bank & Trust Co.</u>, 276 N.C. at 354, 172 S.E.2d at 522.

Here, the Fund's insurance is a "claims made" policy, which means it covers claims actually made during the policy period of July 1, 2011, to July 1, 2012. (Doc. 186-1 at 6.) Section I of the policy provides: "We will pay those sums that the insured becomes legally obligated to pay as damages resulting from 'claims', to which this insurance applies, against the insured by reason of 'employment wrongful act(s).'" (<u>Id.</u> at 27.) "Employment wrongful acts" are broadly defined and include "termination of employment." (<u>Id.</u> at 36.)

The insuring agreement further provides: "The amount we will pay for damages is limited as described in SECTION III - LIMITS OF INSURANCE." (<u>Id.</u> at 27.) Section III provides:

SECTION III - LIMITS OF INSURANCE

1.  The *Limits of Insurance* shown in the Declarations *and the rules below* fix the most we will pay *regardless of the number of*:

    a. Insureds;
    b. "*Claims*" *made* or "suits" brought; or

17

>> c. *Persons or organizations making "claims" or bringing "suits."*

> 2. The Annual Aggregate Limit is the most we will pay for all damages.

> 3. Subject to 2. above, *the Each Claim Limit is the most we will pay for all loss arising out of any "employment wrongful act(s)" covered by this policy. "Claims" based on and arising out of the same act or interrelated acts of one or more insureds shall be considered to be a single "claim."*

(<u>Id.</u> at 31 (emphasis added).) The pertinent Declarations page provides:

| | |
|---|---|
| Each Claim Limit | $1,000,000 |
| Annual Aggregate Limit for all Claims | $3,000,000 |
| Deductible (Each Claim) | $5,000 |

(<u>Id.</u> at 6.) Section IV defines a "claim":

> 5. "Claim" means a demand received by the insured for money damages, non monetary damages as provided in the SUPPLEMENTARY PAYMENTS, filing and or service of suit papers or arbitration proceedings filed against the insured arising out of "employment wrongful act(s)" to which this insurance applies.

(<u>Id.</u> at 36.) Finally, the policy provides:

> 8. Deductible

>> a. Our obligation under Section I of this policy to pay damages on behalf of the insured applies only to the amount of damages in excess of any deductible amount stated in the Declarations.

>> b. The deductible amount stated in the Declarations, if any, applies to all damages sustained by any person or organization as the result of any one "claim". *"Claims" based on*

> *or arising out of the same act or interrelated*
> *acts of one or more insureds shall be*
> *considered a single "claim".*

> *    *    *

(Id. at 33 (emphasis added).)

Plaintiffs argue that the policy provides $1 million for each Plaintiff for a total of $3 million coverage.[8]  They reason that "each plaintiff's loss resulting from an independent 'wrongful employment act[]' constitutes a separate claim subject to the Each Claim Limit of $1M."  (Doc. 193 at 4.)  Consequently, they read paragraph 3 of Section III to "subject[] a single claimant with multiple claims for loss arising from 'employment wrongful acts' to the 'Each Claim Limit'" of $1 million.  (Id. at 6.)  They contend that this interpretation reflects the policy objective "to limit the losses of multiple persons to the $3M Annual Aggregate, and the loss of a single claimant to the $1M limit."  (Id. at 7.)

As further support for their argument, Plaintiffs contend that the use of the term "loss" in paragraph 3 of Section III ("the Each Claim Limit is the most we will pay for all loss arising out

---

[8] Plaintiffs object to two items attached to the Town's brief: a letter from the Fund's counsel explaining her opinion as to the scope of coverage under the policy (Doc. 186-1 at 39-42); and a statement in an affidavit of the Fund's director of claims that expresses his opinion that Plaintiffs' claims collectively constitute a single claim under the policy that is subject to the $1 million "each claim" limit (id. at 1-2).  The court sustains the objection to the extent the court acknowledges it is not bound by an insurer's interpretation of its coverage, Wiggins v. City of Monroe, 73 N.C. App. 44, 50, 326 S.E.2d 39, 44 (1985), and the court will treat the argument of counsel as just that.

19

of any 'employment wrongful acts'" (Doc. 186-1 at 31)) describes a singular "loss" of an individual and not the "losses" of multiple persons (id. at 8). The use of the phrase "arising out of an employment wrongful act" is further proof of this, they contend, because a singular "loss" must be caused by the termination of a single claimant and not by the termination of some other claimant. (Id.) Finally, they note that the absence of the word "persons" in paragraph 3, in light of the inclusion of the words "claims" and "insureds," reflects an intent to apply the Each Claim Limit to a claimant irrespective of only the number of "claims" or "insureds," but not as to the number of "persons" bringing claims. (Id.) To interpret the policy otherwise, they contend, would "potentially obliterate the insurer's promise to provide $3M coverage 'for all claims.'" (Id.)

The Fund[9] disagrees and contends that Plaintiffs' argument misreads the policy and reads out Section III(1)(c), which provides that the Declarations limits (i.e., the Each Claim and Annual Aggregate limits) and "the rules below" (i.e., the provisions of Section III(3)) "fix the most we will pay regardless of the number of . . . Persons . . . making 'claims' or bringing 'suits'" (Doc. 203 at 9.) The "rules below," the Fund notes, refers to Section

---

[9] The Town does not contest the Fund's construction of the policy. (Doc. 186 at 2.) This may be because the Town enjoys governmental immunity otherwise.

(3), which declares all "Claims based on and arising out of the same or interrelated acts of one or more insureds" to be a "single 'claim'" and limits "all loss arising out of" such "employment wrongful acts" to the Each Claim Limit. (Id. at 2-3.) The Fund concludes, therefore, that when all provisions are given meaning and read together, they reflect a clear intent that, "regardless of the number of . . . Persons . . . making 'claims' or bringing 'suits,'" all "[c]laims based on and arising out of the same or interrelated acts of one or more insureds" will be treated as a single claim, subjecting "all loss" to the $1 million Each Claim Limit.[10]

No party cites binding authority from North Carolina that addresses this situation. However, application of the appropriate rules of construction employed by North Carolina courts compels the court to agree with the Fund.

All provisions of an insurance policy must be read together so as to give each provision meaning. Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978); Wachovia Bank & Trust Co., 276 N.C. at 355, 172 S.E.2d at 522. The policy should also be construed in the context of the facts of the particular case, and not simply in the abstract. Highwoods Prop.,

---

[10] Of course, under no circumstance would the Fund be obligated to pay more than $3 million during the policy period for the combination of these and other unrelated claims.

Inc. v. Exec. Risk Indem., Inc., 407 F.3d 917, 923 (8th Cir. 2005) (applying North Carolina law, noting that "the same language may be found both ambiguous and unambiguous as applied to different facts"); Lexington Ins. Co. v. Lexington Healthcare Grp., Inc., 311 Conn. 29, 42, 84 A.3d 1167, 1175 (2014). Here, the unambiguous language of Section III, read as a whole, provides that all Plaintiffs' claims based on and arising out of the insured's interrelated wrongful employment acts are subject to the $1,000,000 Each Claim Limit, regardless of the number of persons bringing claims. To adopt Plaintiffs' construction – that the provisions of Section III limit only *each Plaintiff's* recovery for multiple claims, but no more – requires a strained reading of unambiguous terms and would read out of the policy the express reference to the limitation as to "persons."

Plaintiffs' interpretation also misreads the meaning of "claim," ascribing it too narrow a scope. The policy defines "claim" as "a demand received by the insured for money damages, non monetary damages . . ., filing and or service of suit papers or arbitration proceedings filed against the insured arising out of 'employment wrongful act(s)' to which this insurance applies." (Doc. 186-1 at 36.) Plaintiffs attempt to equate "claim" with each cause of action (or "claim for relief") alleged by each Plaintiff in the complaint while simultaneously limiting "claim" to only those causes of action of a single Plaintiff. This

22

construction finds no support in the definition, which is not limited to any number of claimants. Here (putting aside the possibility that the single complaint filed by the three Plaintiffs may constitute a single "claim"), each Plaintiff's demand for damages and reinstatement constitutes at best a separate "claim." Indeed, Plaintiffs seem to accept this much when they argue that "each plaintiff's loss resulting from an independent 'wrongful employment act,' constitutes a separate claim." (Doc. 193 at 4.) When the provisions of Section III(3) are applied, therefore, the multiple claims made by Plaintiffs are "considered to be a single 'claim'" if they are "based on and aris[e] out of the same act or interrelated acts" of the insured. (Doc. 186-1 at 31.)

Plaintiffs argue that the terminations of three Plaintiffs was not "one act" or "interrelated acts" under the policy. (Doc. 193 at 7-10.) But Plaintiffs do not address why their claims are not "based on and aris[e] out of[11] the same act or interrelated acts" of the Town, which is the precise language of the policy. (Doc. 186-1 at 31.) As Plaintiffs point out elsewhere, it was the

---

[11] "The words 'arising out of' are not words of narrow and specific limitation but are broad, general, and comprehensive terms affecting broad coverage. They are intended to, and do, afford protection to the insured against liability imposed upon him for all damages caused by acts done in connection with or arising out of such use. They are words of much broader significance than 'caused by.' They are ordinarily understood to mean . . . 'incident to,' or 'having connection with . . . .'" State Capital Ins. Co. v. Nationwide Mut. Ins. Co., 318 N.C. 534, 539, 350 S.E.2d 66, 69 (1986).

Town that defended the action by arguing that each Plaintiff was fired for separate employment-related reasons – a defense Plaintiffs argued against and the jury rejected. Bound by that position, Plaintiffs now suggest that the Town's defenses raised distinct issues and Plaintiffs' damages were different. (Doc. 193 at 10 n.3.) But the policy covers "claims" as articulated by claimants, not defenses. And the fact that each Plaintiff may have different damages based on years of service does not mean that his claim was not based on or arose out of the same or interrelated employment wrongful acts.

Given the jury's verdict, the jury necessarily found that the reason Bralley and Cook terminated all three Plaintiffs was because Bralley and Cook learned that Plaintiffs had jointly participated in a call to the Governor's office on December 14, 2011, to complain about the MPD, which these Defendants viewed as an act of insubordination, as alleged in the complaint. (Doc. 1 at 18.) The trial evidence supported this conclusion. On the day before Plaintiffs were fired, Bralley and Cook met with the Town's attorney to discuss the prospect of firing Plaintiffs and to review the letters of terminations. All three Plaintiffs were fired on the same day within hours of each other. Prior to that, Cook had never terminated anyone before for the reasons Cook, Bralley, and the Town asserted as a defense. Donathan had been told shortly before that he had to "fall in line" with Cook's leadership and

24

the "politics" of the MPD.  On the day of the terminations, Cook posted a note in the MPD that "it was a tough but clear decision to make" and "[a]ny further rumors will be dealt with swiftly." Cook had described his opinion that "it was the purpose of these gentlemen [Plaintiffs] to degrade the department."  Cook also told the local District Attorney, "You can't have three people in house undercutting you and causing trouble."  In light of the verdict, the only conclusion that can be drawn from the evidence is that the jury determined that Plaintiffs' terminations were "based on and aros[e] out of the same act" by the Town; namely, the Town's approval of Plaintiffs' joint terminations upon the urging of Bralley and Cook, who viewed their call to the Governor as insubordinate.

Even if that were not so, the wrongful termination of each Plaintiff was at least "interrelated" under the terms of the policy.  Plaintiffs argue that the phrase "interrelated" is ambiguous and "more restrictive" than "related."  (Id. at 9-10.) They contend therefore that "it must be interpreted in favor of coverage."  (Id. at 10.)  But they do not say why this would be so, other than to say that it does not necessarily mean "related." (Id.)

Plaintiffs offer no competing definition of "interrelated" that would render the term ambiguous in the context of this case. There is no need to search for guidance on construing the term

25

"related," because it is defined in the policy: "Related 'employment wrongful act(s)' means two or more wrongful acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of related facts, circumstances, situations, events, transactions, or causes." (Doc. 186-1 at 27.) "Interrelated" is not defined in the policy. But it is commonly defined as meaning "having a mutual or reciprocal relation." Webster's Third New International Dictionary 1182 (1986). Mutual means "shared in common," id. at 1493, and reciprocal means "shared" or "mutually existing," id. at 1895.[12] Some courts have found the term "interrelated" to be more restrictive than "related," while others have been more willing to find acts to be interrelated. See Sigma Fin. Corp. v. Am. Intern. Specialty Lines Ins. Co., 200 F. Supp. 2d 697, 704-05 (E.D. Mich. 2001) (analyzing cases and finding "interrelated" to mean "having a 'mutual relationship'" and narrower than "related"). One court has noted that some insurers have defined "interrelated wrongful acts" as acts "which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." Informix Corp. v. Lloyd's of London, No. C-91-1506-FMS, 1992 WL 469802, at *3 (N.D. Cal. Oct. 15, 1992). This is, of course, the definition the Fund gave to

---

[12] These same definitions can be found at https://www.merriam-webster.com/dictionary, last accessed Feb. 16, 2017.

the term "related" in this case.

Even if the term "interrelated" could be said to be ambiguous in the abstract, the use of the term is not ambiguous when applied to the facts of Plaintiffs' case. For Plaintiffs' claims to be considered a single claim because they are interrelated, the employment wrongful acts must have some common nexus of fact, circumstance, situation, event, transaction, or cause that is shared or mutually existing. The claims of the Plaintiffs easily meet this standard, as they allege – indeed the jury found – that all three Plaintiffs were wrongfully terminated on the same day for the same reason as already discussed – their jointly having exercised their First Amendment rights by calling the North Carolina Governor's office to complain about misconduct within the MPD.[13] Given the jury verdict, the terminations had, at a minimum, a common cause. Thus, in the context of Section III(3), Plaintiffs' claims were "based on" and "aros[e] out of" the insured's "interrelated acts" in firing them and constitute a single claim. Cf. Gregory v. Home Ins. Co., 876 F.2d 602, 606 (7th Cir. 1989) (noting that the term "related" should be found unambiguous where the facts comfortably fit within the commonly accepted definition).

---

[13] As noted, in doing so the jury necessarily rejected Defendants' defense and evidence that each Plaintiff was terminated for independent reasons. Plaintiffs' contention that the Fund's interpretation "would transform most claims into a 'single claim' subject to the $1M limitation" (Doc. 193 at 8-9) is wholly unsupported.

Furthermore, Plaintiffs offer no plausible explanation for the inclusion of the limitation of "Persons or organizations making 'claims'" in Section III(1)(c). They contend that it serves to "reiterate that multiple 'persons' with multiple claims are limited to the Annual Aggregate of $3M." (Doc. 193 at 7.) If that were the case, it would be a redundancy. Courts should not reach interpretations that render contractual terms meaningless or redundant. Lane v. United States, 286 F.3d 723, 731 (4th Cir. 2002) (noting it is a basic principle of statutory interpretation to "avoid a reading which renders some words altogether redundant" (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995))); Maddox v. Colonial Life & Acc. Ins. Co., 303 N.C. 648, 654, 280 S.E.2d 907, 910 (1981) (discussing the "general rules of insurance contract construction" to interpret a policy in a way that does not render "any provision of the [insurance] policy redundant or ineffectual").

It is true that exclusions to coverage should be strictly construed. City of Greenville v. Hayward, 130 N.C. App. 271, 276, 502 S.E.2d 430, 433 (1988). But this does not give license to expand coverage where none was bargained for between the insurer and the insured. Wachovia Bank & Trust Co., 276 N.C. at 354, 172 S.E.2d at 522; Ledford v. Nationwide Mut. Ins. Co., 118 N.C. App. 44, 453 S.E.2d 866, 869 (1995) (stating that "the court must enforce the [insurance] policy as written and may not reconstruct

28

[it] under the guise of interpreting an ambiguous provision" (citations omitted)).

The court's construction is consistent with other provisions of the policy. For example, the insurance agreement provides coverage for all "claims" made within the policy period, and it deems "all 'claims' based on or arising out of the same or related 'employment wrongful act(s)' or offenses by one or more insureds" to have been "first made when the first of such 'claims' is made." (Doc. 186-1 at 27.) In addition, the policy treats multiple "claims" that are "based on or arising out of the same act or interrelated acts of one of more insureds" to be a "single 'claim'" for purposes of the deductible. (Id. at 33.) The deductible applies to "all damages sustained by any person or organization as the result of any one 'claim.'" (Id.) In this case, therefore, the policy applies only one deductible to Plaintiffs' claims.[14] These provisions reflect an intent across the policy to treat all claims arising out of the same or related employment wrongful act(s) as a single claim.

This result is also consistent with cases interpreting similar policies. See, e.g., Gregory, 876 F.2d at 604-06 (rejecting claim that the "each claim" limit of $500,000 applied

---

[14] Indeed, counsel for the Fund confirmed during the telephonic hearing on February 1, 2017, that the Town is subject to one deductible in order to receive coverage for Plaintiffs' claims.

separately to claims against the insured law firm brought by a class of investors who purchased a securities offering (alleging securities fraud, common law fraud, and RICO violations) and crossclaims brought by the investment broker (alleging malpractice) where the policy provided that "[t]wo or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim"); Highwoods Props., Inc., 407 F.3d at 924 (applying North Carolina law and holding that a class action brought after dismissal of a prior putative class action nevertheless constituted a "related" claim subject to the policy's "single claim" limit even though it alleged different legal claims and "the two cases did not arise out of identical facts," but "were grounded in actions taken by the defendants in relation to the [same company's] acquisition"); Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp., 162 F. Supp. 3d 1068, 1078–79 (C.D. Cal. 2016) (finding that seven separate lawsuits against a law firm, each alleging false representations as to sales of properties, constituted a "single claim" under the policy provision stating, "Claims alleging, based upon, arising out of or attributable to the same or related wrongful acts shall be treated as a single claim regardless of whether made against one or more than one of you" because they were "related" and arose out of a "single course of conduct" reflecting a fraudulent scheme), appeal

30

docketed, No. 16-55711 (9th Cir. May 16, 2016); <u>Barr v. Colo.</u>
<u>Ins. Guar. Ass'n & W. Guar. Fund Servs.</u>, 926 P.2d 102, 104-05
(Colo. Ct. App. 1995) (finding that claims against officers and
directors of cooperative of member grocery stores for damages
relating to a failed loan asserted a single claim under policy
providing "Losses arising out of the same Wrongful Act by one or
more of the Directors and/or Officers or interrelated Wrongful
Acts by one or more of the Directors and/or Officers shall be
considered a single Loss"); <u>cf.</u> <u>Lexington Ins. Co. v. Lexington</u>
<u>Healthcare Grp., Inc.</u>, 311 Conn. 29, 39, 44, 84 A.3d 1167, 1174,
1176 (2014) (finding multiple claims by nursing home residents
injured by a fire not to be "related" under policy providing that
"[a]ll claims arising from continuous, related, or repeated
medical incidents shall be treated as arising out of one medical
incident"; the court noted that "each individual defendant
[claimant] was differently situated . . . [and] the particular
array of negligent shortcomings that ultimately led to his or her
injury or death necessarily varied").

Plaintiffs rely on <u>Beaufort County School District v. United</u>
<u>National Ins. Co.</u>, 392 S.C. 506, 709 S.E.2d 85 (2011). There, the
court, applying South Carolina law, found no error in the trial
court's conclusion that the claims of seven students who brought
two lawsuits against the school district for sexual abuse were not
subject to the district's insurance policy combining related

31

claims.  Id. at 523.  The case is readily distinguishable.  The policy defined "claim" as "all notices or suits . . . based on, or arising out of the same sexual abuse or series of sexual abuses by one or more employees."  Id. at 516-17.  "Sexual abuse" was defined as "any actual, attempted or alleged criminal sexual conduct *of a person* by another person."  Id. at 514 (emphasis added).  The endorsement provided that "related sexual abuses" would be deemed "one sexual abuse" for "all claims based on or arising out of the same sexual abuse or a series of related sexual abuses by one or more employees."  Id. at 514, 517.  The court reasoned that the policy's inclusion of "sexual abuse" in the definition of "claim" reflected an intent to use the singular "person" in reference to the victim.  Id. at 517.  Thus, the court concluded, a series of sexual abuses refers to a series of abuses against "a person."  Id. at 517-19.  In contrast to these facts, the Fund's policy contains no such specific terms upon which to make an analogous finding.

The present case is also distinguishable from the line of cases finding that claims brought by separate claimants are not "related" for purposes of being treated as a single claim under a claims made policy.  In those cases, while some courts refer to the fact that each plaintiff has separate damages, they frequently rely on the fact that the insureds owed separate and different duties to each claimant that resulted in different and distinct

32

harms.  See, e.g., Scott v. Am. Nat'l Fire Ins. Co., 216 F. Supp.
2d 689, 693-95 (N.D. Ohio 2002) (finding that insured owed
different duties to a corporate claimant and individual
investors); St. Paul Fire & Marine Ins. Co. v. Chong, 787 F. Supp.
183, 188 (D. Kan. 1992) (finding three malpractice claims arising
out of an attorney's joint representation of three clients in a
criminal trial to be unrelated because the attorney owed each
client a separate legal duty and rendered separate legal services
to each); Beale v. Am. Nat'l Laws. Ins. Reciprocal, 379 Md. 643,
666, 843 A.2d 78, 92-93 (2004) (finding unrelated claims on behalf
of children injured by lead exposure where the attorney/insured
owed separate duties to each child).  Here, the duty owed to each
Plaintiff, employed at will, was the same, and the harm caused –
termination of employment – is identical.  Only the calculation of
damages differs, but not because of any different conduct by the
insured, but based on the circumstances of the Plaintiff's
employment history.

For these reasons, the court finds that Plaintiffs'
collective claims constitute a "single claim" within the Fund's
policy, which limits coverage to $1 million for the loss claimed
by them.[15]

---

[15] Neither the Fund nor any party raises any argument regarding the Fund's
policy endorsement and provisions as to "back pay."  The court therefore
reaches no conclusion as to it.

33

### 2. Governmental Immunity and State Constitutional Claim

Based on the court's finding that the Fund's policy is limited to $1 million for Plaintiffs' aggregated claims, the Town enjoys governmental immunity for damages exceeding that coverage. Plaintiffs argue, however, that they are entitled to recover against the Town their full damages beyond the insurance coverage based on their second cause of action under the Declaration of Rights contained in Article I of the North Carolina Constitution.[16] They contend that the lack of adequate insurance coverage and the barrier of governmental immunity render their remedies inadequate as a matter of law, entitling them to recovery under the North Carolina Constitution. (Doc. 193 at 12-20.)

In Corum v. University of North Carolina, where a university faculty member discharged for exercising his free speech rights brought an action under the Declaration of Rights in Article I of the North Carolina Constitution, the North Carolina Supreme Court held that "in the absence of an adequate state remedy, one whose

---

[16] The Town argues that the State constitutional claim cannot proceed because it was not submitted to the jury. (Doc. 186 at 3.) But, as Plaintiffs properly point out, Defendants conceded during the September 16, 2016 telephonic hearing that the elements of the State constitutional claim are subsumed in the jury interrogatory for Plaintiff's claim for wrongful discharge based on the North Carolina Constitution (question 2 on the verdict sheet). (Doc. 167 at 1-2.) Indeed, this was the intent expressed at the charge conference in order to simplify the verdict sheet in this case, as all parties agreed that the viability of a remedy under the constitutional claim presented a post-verdict question of law for the court if the jury found in Plaintiffs' favor on the wrongful discharge claim.

state constitutional rights have been abridged has a direct claim against the State under our Constitution" despite governmental immunity that would otherwise be present. 330 N.C. 761, 782, 786, 413 S.E.2d 276, 289, 291-92 (1992). Relying on Merriam-Webster's definition of "adequate" as "sufficient for a specific requirement; lawfully and reasonably sufficient," Plaintiffs argue that "*adequacy* can only mean the remedy that was awarded by the jury and then modified by the Court." (Doc. 193 at 13.) Relying further on a 1985 law review article, Plaintiffs argue that a recovery limited to the $1 million in insurance coverage would be inadequate because it denies them the "make-whole relief" to which they are entitled. (Id.)

As Defendants point out, adequacy of a remedy for purposes of a constitutional claim is a matter addressed by North Carolina case law, not dictionaries. The North Carolina Supreme Court has directed that before invoking the "extraordinary exercise of its inherent constitutional power," a court "must bow to established claims and remedies," Corum, 330 N.C. at 784, 413 S.E.2d at 291, and find inadequacy only where there is a *complete* absence of a remedy under State law, Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 339-40, 678 S.E.2d 351, 355 (2009) (finding that "to be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim"). "[A]dequacy" is found

35

not in success, but in chance." Debaun v. Kuszaj, 238 N.C. App. 36, 41, 767 S.E.2d 353, 357 (2014) (finding that plaintiff's failure to overcome public official immunity did not render claim inadequate to provide for constitutional liability); see Davis v. Blanchard, 175 F. Supp. 3d 581, 594 n.6 (M.D.N.C. 2016) (equating an "adequate remedy as 'an "available, existing, applicable" [remedy] but not necessar[ily] successful, remedy'" (quoting Frye v. Brunswick Cty. Bd. of Educ., 612 F. Supp. 2d 694, 704 (E.D.N.C. 2009))). As this court has explained, "Corum never guaranteed a recovery; rather, it guarantees an opportunity to seek redress for the constitutional wrong." Edwards v. City of Concord, 827 F. Supp. 2d 517, 523 (M.D.N.C. 2011) (citing Craig, 363 N.C. at 340, 678 S.E.2d at 355–56).

Where North Carolina courts have found inadequacy, they have predicated it on the existence of a complete bar to any recovery. They have noted that the North Carolina Supreme Court has "used the language of impossibility, noting that governmental immunity stood as 'an absolute bar' to the plaintiff's claim, 'entirely' and 'automatically' precluded recovery, and made relief 'impossible.'" Wilcox v. City of Asheville, 222 N.C. App. 285, 299–300, 730 S.E.2d 226, 237 (2012); see also Glenn-Robinson v. Acker, 140 N.C. App. 606, 631–32, 538 S.E.2d 601, 619 (2000) (holding that claims under the North Carolina Constitution are cognizable only if there is no common law cause of action).

36

Consequently, a plaintiff has been found to be left with no remedy for his alleged constitutional injuries where an excess liability policy operates to "entirely preclude[]" any recovery so as to "make relief impossible." Craig, 363 N.C. at 340, 678 S.E.2d at 355-56.[17] So, too, will the availability of administrative review constitute an adequate State law remedy that prohibits a plaintiff from advancing his State constitutional law claim. Hawkins v. State, 117 N.C. App. 615, 629, 453 S.E.2d 233, 241 (1995). Even the presence of a statute of limitations that bars a claim will not render a claim inadequate. Craig, 363 N.C. at 340, 678 S.E.2d at 355-56.[18]

Thus, because Plaintiffs have a remedy for their free speech injuries under their State law claim for wrongful discharge to the extent of the Fund's $1 million "Each Claim limit," their recovery is not completely barred and is deemed "adequate" for purposes of

---

[17] By contrast, in an unpublished decision, the North Carolina Court of Appeals held that a plaintiff had an adequate remedy under State law partially because the defendant had waived sovereign immunity to the extent of the value of a surety bond, even though the plaintiff's State constitutional claims failed on the merits. Johnson v. Causey, 207 N.C. App. 748, 701 S.E.2d 404 (2010). While unpublished opinions of the North Carolina Court of Appeals are not precedential, the court finds this reasoning to be further indication that North Carolina courts consider a remedy adequate where immunity is waived by the purchase of insurance. State v. Pritchard, 186 N.C. App. 128, 129, 649 S.E.2d 917, 918 (2007) (recognizing instructive value of unpublished opinion of North Carolina Court of Appeals).

[18] Given the court's ruling, it need not address Bralley and Cook's argument that Plaintiffs had an adequate remedy at State law because Plaintiffs had other viable State law claims they could have brought against these Defendants. (Doc. 186 at 4.)

the North Carolina constitutional claim.  <u>Phillips v. Gray</u>, 163

N.C. App. 52, 58, 592 S.E.2d 229, 233 (2004) (finding presence of

wrongful discharge claim for violation of free speech rights

adequate so as to render direct constitutional claim unwarranted).

Plaintiffs' second claim for relief under the North Carolina

Constitution will therefore be dismissed.

### 3. Bralley and Cook's Argument as to Plaintiffs' Remedies

Bralley and Cook argue that Plaintiffs are entitled to only

one satisfaction of their compensatory damages judgment against

them and the Town and that "this Court must give the same

preclusive effect to any satisfaction of the Plaintiffs' claims

against the Town." (Doc. 187 at 7.)  Plaintiffs do not directly

respond to this argument.  However, the issue raised relates to

post-judgment remedies, which are premature at this time.

Therefore, the court declines to issue what would be an advisory

ruling.

### III. CONCLUSION

For the foregoing reasons,

IT IS ORDERED that Plaintiffs' motion to supplement the record

(Doc. 206) is GRANTED IN PART as to Exhibit A (Doc. 206-1) as noted

herein, that Plaintiffs' motion to reconsider equitable remedies

(Doc. 191) is GRANTED IN PART AND DENIED IN PART, and the Town is

DIRECTED to reinstate Donathan to his former position as MPD

lieutenant as soon as a position becomes available. Once the Town reinstates Donathan, its obligation to pay any prorated unpaid front pay awarded herein shall terminate.

IT IS FURTHER ORDERED that the Fund's motion to intervene (Doc. 195) is GRANTED, and the court concludes that insurance coverage under the Fund's policy for judgment as to Plaintiffs' wrongful discharge claim against the Town under State law (second claim for relief) is limited to a total of $1 million for the combined Plaintiffs' claims.

A Judgment reflecting these rulings will be entered.


                                    /s/   Thomas D. Schroeder
                                    United States District Judge

February 21, 2017